Timothy M. Ryan, Bar No. 178059
Andrew J. Mase, Bar No. 300680
Michael W. Stoltzman, Jr., Bar No. 263423
THE RYAN FIRM
A Professional Corporation
2603 Main St, Suite 1225
Irvine, CA 92614
Telephone (949) 263-1800; Fax (949) 872-2211

Attorneys for Plaintiffs WE Alliance Secured Income Fund, LLC; WE Alliance Structured Strategies Stock Allocations Fund, LLC; and, WE Alliance Structured Active Allocation Growth Fund, LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WE ALLIANCE SECURED INCOME FUND, LLC; WE ALLIANCE STRUCTURED STRATEGIES STOCK ALLOCATIONS FUND, LLC; AND WE ALLIANCE STRUCTURED ACTIVE ALLOCATION GROWTH FUND, LLC;<br><br>Plaintiffs,<br><br>vs.<br><br>PACIFIC FREEDOM FUND, LLC; PACIFIC PRIVATE MONEY, INC.; HANF CAPITAL, LLC; PACIFIC PRIVATE MONEY FUND, LLC; PACIFIC REALTY DEVELOPMENT I, LLC; PACIFIC MORTGAGE CAPITAL, LLC; PRIVATE MONEY MANAGEMENT GROUP, LLC; PACIFIC PRIVATE MONEY GROUP, LLC; PACIFIC CAPITAL FUNDING GROUP, INC.; MARK HANF; NAM PHAN; and DOES 1-50, inclusive,<br><br>Defendants. | CASE NO.:<br>Unlimited Jurisdiction<br>Date Action Filed:<br><br>Assigned for All Purposes to<br>Hon.<br>Crtrm.<br><br>**COMPLAINT FOR:**<br>1) **VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO")**<br>2) **NEGLIGENCE**<br>3) **INTENTIONAL MISREPRESENTATION**<br>4) **CONCEALMENT**<br>5) **FALSE PROMISE**<br>6) **CONVERSION**<br>7) **BREACH OF FIDUCIARY DUTY: FAILURE TO USE REASONABLE CARE**<br>8) **BREACH OF FIDUCIARY DUTY: DUTY OF UNDIVIDED LOYALTY**<br>9) **MONEY HAD AND RECEIVED**<br>10) **OPEN BOOK ACCOUNT**<br><br>Trial Date: |

1

Complaint

THE RYAN FIRM
A Professional Corporation

Plaintiffs WE Alliance Secured Income Fund, LLC ("WE Income"), WE Alliance Structured Strategies Stock Allocations Fund, LLC ("WE Passive"), and WE Alliance Structured Active Allocation Growth Fund, LLC ("WE Active") (collectively referred to herein as "Plaintiffs") allege as follows:

**PARTIES**

1.      Plaintiff WE Income is, and at all times herein mentioned was, a limited liability company doing business in the State of California.

2.      Plaintiff WE Passive is, and at all times herein mentioned was, a limited liability company doing business in the State of California.

3.      Plaintiff WE Active is, and at all times herein mentioned was, a limited liability company doing business in the State of California.

4.      Plaintiff is informed and believes, and based thereon alleges, that defendant Pacific Freedom Fund, LLC ("PFF") is, and at all times herein mentioned was, a limited liability company doing business in the State of California.

5.      Plaintiff is informed and believes, and based thereon alleges, that defendant Pacific Private Money, Inc. ("PPM") is, and at all times herein mentioned was, a corporation doing business in the State of California.  Plaintiff is informed and believes, and based thereon alleges, that PPM is a member and/or manager of PFF.

6.      Plaintiff is informed and believes, and based thereon alleges, that defendant Hanf Capital, LLC ("Hanf Capital") is, and at all times herein mentioned was, a limited liability company doing business in the State of California.

7.      Plaintiff is informed and believes, and based thereon alleges, that defendant Pacific Private Money Fund, LLC ("PPMF") is, and at all times herein mentioned was, a limited liability company doing business in the State of California.

8.      Plaintiff is informed and believes, and based thereon alleges, that defendant Pacific Realty Development I, LLC ("PRD") is, and at all times herein mentioned was, a limited liability company doing business in the State of California.

/ / /

2

Complaint

9. Plaintiff is informed and believes, and based thereon alleges, that defendant Pacific Mortgage Capital, LLC ("PMC") is, and at all times herein mentioned was, a limited liability company doing business in the State of California.

10. Plaintiff is informed and believes, and based thereon alleges, that defendant Private Money Management Group, LLC ("PMMG") is, and at all times herein mentioned was, a limited liability company doing business in the State of California. Plaintiff is informed and believes, and based thereon alleges, that PMMG is a member and/or manager of PPMF.

11. Plaintiff is informed and believes, and based thereon alleges, that defendant Pacific Private Money Group, LLC ("PPMG") is, and at all times herein mentioned was, a limited liability company doing business in the State of California. Plaintiff is informed and believes, and based thereon alleges, that PPMG is a member and/or manager of PMMG, PMC, and PPM.

12. Plaintiff is informed and believes, and based thereon alleges, that defendant Pacific Capital Funding Group, Inc. ("PCFG") is, and at all times herein mentioned was, a corporation doing business in the State of California. Plaintiff is informed and believes, and based thereon alleges, that PCFG is a member and/or manager of PPMG.

13. Plaintiff is informed and believes, and based thereon alleges, that defendant Mark Hanf ("Hanf") is, and at all times herein mentioned was, an individual doing business in the State of California. Plaintiff is informed and believes, and based thereon alleges, that Hanf is a director, member, manager, officer, and/or shareholder of PFF, PPM, Hanf Capital, PPMF, PRD, PMC, PMMG, PPMG, and/or PCFG.

14. Plaintiff is informed and believes, and based thereon alleges, that defendant Nam Phan ("Phan") is, and at all times herein mentioned was, an individual doing business in the State of California. Plaintiff is informed and believes, and based thereon alleges, that Phan is a director, member, manager, officer, and/or shareholder of PFF, PPM, Hanf Capital, PPMF, PRD, PMC, PMMG, PPMG, and/or PCFG.

/ / /

Complaint

**THE RYAN FIRM**
A Professional Corporation

15. Plaintiff is unaware of the true names and capacities of those sued in this action by the fictitious names of DOES 1 through 50, inclusive. Plaintiff will amend this complaint when those names and/or capacities become known to Plaintiff. Plaintiff is informed and believes that each of the fictitiously named defendants are in some manner responsible for the events and allegations set forth in this complaint.

16. The above-named defendants, and all DOE defendants will be individually referred to herein as a "Defendant" or, collectively, as "Defendants."

17. Plaintiff is informed and believes, and based thereon alleges, that, at all times herein mentioned, Defendants were agents of each other and, in doing the things alleged in this complaint, were acting in the scope of such agency and with the permission and consent of each and every other one of Defendants.

18. Plaintiff is informed and believes, and based thereon alleges, that, at all times herein mentioned, Defendants were alter egos of each other. In doing the things alleged in this complaint, each Defendant was acting with a unity of interest as to each other Defendant. Recognition of the separateness of any of the Defendants would effectuate an injustice.

## VENUE

19. Plaintiff is informed and believes, and based thereon alleges, that venue is proper within this judicial district because: (1) one or more of the contracts that are the subject of this action were to be performed in this judicial district; and (2) one or more of the contracts that are the subject of this action were breached in this judicial district.

## FACTUAL ALLEGATIONS

20. On or about April 1, 2020, Defendants electronically sent an= "Private Placement Memorandum" to Plaintiffs in order to solicit investments from Plaintiffs into an investment fund created by Defendants. Therein, Defendants represented as follows:

a. They were offering interests in their investment fund—specifically, PFF—which is referred to herein as the "Fund."

/ / /

4

Complaint

b.    The Fund would utilize funds invested in order to "originate, purchase, fund, acquire and sell loans secured by interests in real or personal property across the United States, with a primary focus in California.  It is presently anticipated that the Fund will originate, purchase, or otherwise invest in loans with the intent to sell such loans within Thirty (30) days from the date of such investment."

c.    The Fund would be managed by PPM and Hanf.

d.    Likewise, interests in loans and/or properties owned by the Fund would also be serviced by PPM and Hanf.

e.    Investors in the Fund would be "entitled to receive a non-cumulative annualized fixed return [] on their capital account balance, payable monthly [].  This Fixed Return will be payable prior to any profit participation by the Manager."

f.    The Fixed Return would be "equal to a non-cumulative annualized rate of Six Percent (6%), calculated and payable on a monthly basis."

g.    The loans that the Fund would invest in would primarily consist of "senior deeds of trust or mortgages that are first lien positions," would have minimum loan-to-value ("LTV") ratios, and would consider "the income level and general creditworthiness of a borrower to determine his, her or its ability to repay the loan according to its terms in addition to considering the loan-to-value ratios [] and secondary sources of security for repayment."

21.    A true and correct copy of the "Private Placement Memorandum" referenced above is attached hereto as Exhibit 1 and incorporated herein by reference.

22.    Stated simply, Defendants represented that, if Plaintiffs invested money in the Fund, the money would be used to acquire interests in senior position secured loans and/or the properties secured by such loans, and those assets would later be sold for a profit, which would then be distributed to Plaintiffs (and other members of the Fund).

23.    Based and in reliance on the representations made by Defendants, Plaintiffs invested into the Fund offered by Defendants.

/ / /

5

Complaint

THE RYAN FIRM
A Professional Corporation

24.    However, years later, Defendants' effectively "ran out of money" and stopped making any distributions to their investors, including Plaintiffs.

25.    Thus, on January 9, 2026, Plaintiffs were informed that third party Bill Brinkman ("Brinkman") was hired as a "Chief Restructuring Officer" in connection with "financial challenges" that Defendants were experiencing related, in part, to the Fund.

26.    On January 23, 2026, Brinkman sent an email to all investors in the Fund, including Plaintiffs and others, wherein he laid out various findings that he had independently made in relation to the Fund's cash liquidity, assets and liabilities, and paths forwards.    Specifically, Brinkman's email detailed the following findings (which are adopted and alleged as fact herein):

a.    The Fund "continues to operate with critically minimal cash balances, and the ability to continue to operate is at risk."

b.    The Fund would be discontinuing operations and begin an orderly "wind-down process."

c.    Once trouble at the Fund arose, Phan resigned.

d.    "[N]et recoveries under an orderly liquidation process will be a fraction of total capital provided by investors."

27.    A true and correct copy of the January 23, 2026 email referenced above is attached hereto as Exhibit 2 and incorporated herein by reference.

28.    Then, on or about February 17, 2026, Brinkman provided further findings regarding Defendants' mismanagement of the Fund and related self-dealing (which are adopted and alleged as fact herein), including, but not limited to:

a.    The Fund had outstanding investments from 138 investors, including Plaintiffs, totaling at least $74,221,216.00.

b.    Despite having at least $74,221,216.00 in outstanding investments funds from Plaintiffs and other investors, Defendants only had investments in 6 loans, which had a cumulative unpaid principal balance of $5,317,852.00—leaving at least $68,903,364.00 that was not invested in loans, as Defendants represented it would be.

6

Complaint

c.    Despite not investing the aforementioned $68,903,364.00 in loans, the Fund only had $66,482.00 in cash on hand.

d.    Defendants used the remaining funds for "transactions that did not involve[] funding traditional hard money loans or consumer bridge loans," as Defendants had represented such funds would be used.

e.    Rather, Defendants used these funds to make transfers to and among each other, rather than investing them, as represented.  Specifically, the Fund transferred: (1) $13,747,638.00 to PPMF; (2) $727,577.00 to PMC; (3) $38,861,179.00 to PPM; (4) $4,107,125.00 to PRD; and (5) $18,420.724.00 to Hanf Capital.

f.    In sum, the Fund transferred the total sum of $75,864,244.00 to Defendants, rather than investing them, as Defendants represented they would.

g.    And, of the 6 loans that the Fund had actually invested, only 1 of them was deemed collectible.  That loan had a principal balance of just $189,677.00.

h.    The other 5 loans—totaling approximately $5,128,175.00 in unpaid principal balances—were unsecured (i.e., there was no ability to foreclose in the event of a default, thus leaving these loans without any practical value), or were in a junior lien position (such that any foreclosure by a senior lender would "wipe out" the Fund's lien, again leaving these loans without any practical value).

i.    As a result of the above, Hanf was terminated as an employee of the Fund.  Prior to that time, he was collecting a $250,000.00 annual salary.

29.    A true and correct copy of the February 17, 2026 memorandum referenced above is attached hereto as Exhibit 3 and incorporated herein by reference.

30.    Stated simply, Defendants only had funds invested in 1 legitimate asset in the amount of $189,677.00, and only had $66,482.00 in cash on hand.

31.    The remaining amounts—totaling approximately $75,864,244.00—were either pilfered by Defendants (through transfers from PFF to other Defendants) or invested in completely uncollectible and virtually worthless assets.

/ / /

7

Complaint

THE RYAN FIRM
A Professional Corporation

THE RYAN FIRM
A Professional Corporation

32.    Plaintiffs have made multiple requests to Defendants that their funds be returned to them.  But, Defendants have denied all such requests.

33.    As of the present, Plaintiffs have approximately $4.6M in funds that were invested with Defendants—including PFF—which have not been returned and which have not been invested as Defendants represented they would be.  Rather, as stated above, Defendants used those funds for their own purposes, rather than investment.

34.    Specifically, WE Income contributed at least $3,705,219.30 to Defendants' Fund based on Defendants' representations, which remains due and owing.

35.    Further, WE Passive contributed at least $585,113.44 to Defendants' Fund based on Defendants' representations, which remains due and owing.

36.    And, WE Active contributed at least $201,490.80 to Defendants' Fund based on Defendants' representations, which remains due and owing.

**First Cause of Action for Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO")**

**(Against All Defendants and DOES 1-50)**

37.    Plaintiffs allege and incorporate herein by reference, each and every allegation contained in the above paragraphs as if set forth fully herein.

38.    Defendants engaged in an "enterprise" whose common purpose was to solicit investments from investors to invest in the Fund, collect as much money as possible for the Fund, make a minimal amount of legitimate outside investments using the funds collected, and then funnel all of the other monies invested to Defendants for their own personal use and gain, effectively depriving Plaintiffs and investors of their investments (i.e., stealing investors' money based on the misrepresentation that all of the monies invested would be used to acquire loans secured by real property).

39.    Defendants constructed this enterprise in such a way that Defendants owned and/or managed each other, such that Defendants—particularly Hanf and Phan—could use and control each other to ensure that invested monies with one of Defendants (e.g., PFF) could freely be transferred among each other without any outside interference.

8

Complaint

40.    This enterprise has been carried out for, at least, approximately 6 years.

41.    Defendants' acts and/or omissions constitute a pattern of racketeering activity, including, but not limited to, wire fraud.

42.    Indeed, as alleged above, Defendants emailed potential investors the "Private Placement Memorandum," wherein Defendants represented that, if investors invested money into the Fund, the money would be used to invest in senior position loans secured by real property, which would generate profits, and lead to monthly and regular distributions to the investors.

43.    In reliance on Defendants' representations, at least 138 investors, including Plaintiffs, invested funds with Defendants, totaling at least $74,221,216.00 "on the books."

44.    But, Defendants did not use these funds in the manner they represented they would (i.e., to invest in senior position loans secured by real property, which would generate profits, and lead to monthly and regular distributions to the investors).

45.    Rather, as stated above, despite having investments of at least $74,221,216.00: (1) Defendants only had investments in 6 loans, which had a cumulative unpaid principal balance of $5,317,852.00 (and 5 of 6 of those investments were made in loans of a quality that was contrary to what was represented by Defendants); and (2) Defendants had transferred the total sum of $75,864,244.00 to each other (over multiple transactions), rather than investing them as Defendants represented they would.

46.    As a result of the above, Plaintiffs have been damaged in a sum no less than $4,600,000.00, and is entitled to a damages award for, at least, that sum.

**Second Cause of Action for Negligence**

**(Against All Defendants and DOES 1-50)**

47.    Plaintiffs allege and incorporate herein by reference, each and every allegation contained in the above paragraphs as if set forth fully herein.

48.    Plaintiffs, and others, invested money with Defendants based on Defendants' representation that such funds would be prudently invested in senior position loans secured

THE RYAN FIRM
A Professional Corporation

9

Complaint

by real property, which would generate profits, and lead to monthly and regular distributions to the investors.

49. Defendants owed Plaintiffs a duty of care to manage their money as represented and in a non-negligent manner.

50. Defendants breached that duty of care by not investing the monies invested in the manner that Defendants represented they would (i.e., to invest in senior position loans secured by real property, which would generate profits, and lead to monthly and regular distributions to the investors).

51. Rather, as stated above, despite having investments of at least $74,221,216.00: (1) Defendants only had investments in 6 loans, which had a cumulative unpaid principal balance of $5,317,852.00 (and 5 of 6 of those investments were made in loans of a quality that was contrary to what was represented by Defendants); and (2) Defendants had transferred the total sum of $75,864,244.00 to each other (over multiple transactions), rather than investing them as Defendants represented they would.

52. As a result of the above, Plaintiffs have been damaged in a sum no less than $4,600,000.00, and is entitled to a damages award for, at least, that sum.

53. Defendants' actions were a substantial factor, if not the only factor, in causing Plaintiffs' claimed damages.

### Third Cause of Action for Intentional Misrepresentation

### (Against All Defendants and DOES 1-50)

54. Plaintiffs allege and incorporate herein by reference, each and every allegation contained in the above paragraphs as if set forth fully herein.

55. As alleged above, Defendants misrepresented to Plaintiffs and others that they intended to, and would, use any monies invested with them in the Fund to invest in senior position loans secured by real property, which would generate profits, and lead to monthly and regular distributions to the investors.

56. This representation was false. Indeed, Defendants' true intention was to solicit investments from investors to invest in the Fund, collect as much money as possible

10

Complaint

for the Fund, make a minimal amount of legitimate outside investments using the funds collected, and then funnel all of the other monies invested to the Defendants for their own personal use and gain, effectively depriving Plaintiffs and investors of their investments (i.e., stealing investors' money based on the misrepresentation that all of the monies invested would be used to acquire loans secured by real property).

57.    And, Defendants' followed through on this undisclosed intention by not investing the monies invested in the manner that Defendants represented they would (i.e., to invest in senior position loans secured by real property, which would generate profits, and lead to monthly and regular distributions to the investors).

58.    Rather, as stated above, despite having investments of at least $74,221,216.00: (1) Defendants only had investments in 6 loans, which had a cumulative unpaid principal balance of $5,317,852.00 (and 5 of 6 of those investments were made in loans of a quality that was contrary to what was represented by Defendants); and (2) Defendants had transferred the total sum of $75,864,244.00 to each other (over multiple transactions), rather than investing them as Defendants represented they would.

59.    Defendants knew that their above-described representation(s) were false at the time they were made.

60.    Defendants intended that Plaintiffs rely of their above-described representation(s) and invest money with Defendants.

61.    Plaintiffs reasonably relied on Defendants' representations by investing a substantial sum of money with Defendants.

62.    As a result of the above, Plaintiffs have been damaged in a sum no less than $4,600,000.00, and is entitled to a damages award for, at least, that sum

63.    Plaintiffs' reliance on Defendants' representations was a substantial factor, if not the only factor, in causing Plaintiffs' claimed damages.  Indeed, if Plaintiffs knew that the monies they invested would not be used as represented and/or would instead be used for Defendants' own benefit, they would have never invested with Defendants.

/ / /

11

Complaint

**THE RYAN FIRM**
A Professional Corporation

THE RYAN FIRM
A Professional Corporation

**Fourth Cause of Action for Concealment**

**(Against All Defendants and DOES 1-50)**

64.    Plaintiffs allege and incorporate herein by reference, each and every allegation contained in the above paragraphs as if set forth fully herein.

65.    Plaintiffs and Defendants were in a fiduciary relationship by virtue of the fact that Plaintiffs had invested their money with Defendants, who voluntarily undertook responsibility for prudently investing those monies on behalf of Plaintiffs, and in accordance with their prior representations.

66.    Defendants intentionally failed to disclose the fact that they were not investing the monies that Plaintiffs invested with Defendants, as they represented they would (i.e., to invest in senior position loans secured by real property, which would generate profits, and lead to monthly and regular distributions to the investors).

67.    Rather, as stated above, despite having investments of at least $74,221,216.00: (1) Defendants only had investments in 6 loans, which had a cumulative unpaid principal balance of $5,317,852.00 (and 5 of 6 of those investments were made in loans of a quality that was contrary to what was represented by Defendants); and (2) Defendants had transferred the total sum of $75,864,244.00 to each other (over multiple transactions), rather than investing them as Defendants represented they would.

68.    These facts were only know to Defendants and could not have been reasonably discovered by Plaintiffs.

69.    Indeed, Plaintiffs were unaware of the concealed facts at all relevant times.

70.    Defendants intended to deceive Plaintiffs by concealing the undisclosed facts (i.e., the manner in which they were misusing investor funds).  Indeed, Defendants were aware that if these transactions had been disclosed to Plaintiffs and other investors, nobody would be willing to invest with Defendants.

71.    If Plaintiffs knew that the monies they invested would not be (or were not being) used as represented and/or would instead be used for Defendants' own benefit, they would have never invested with Defendants and/or would have filed suit sooner.

12

Complaint

72.    As a result of the above, Plaintiffs have been damaged in a sum no less than $4,600,000.00, and is entitled to a damages award for, at least, that sum

73.    Defendants' concealment was a substantial factor, if not the only factor, in causing Plaintiffs' claimed damages.  Indeed, if Plaintiffs knew that the monies they invested would not be used as represented and/or would instead be used for Defendants' own benefit, they would have never invested with Defendants.

**Fifth Cause of Action for False Promise**

**(Against All Defendants and DOES 1-50)**

74.    Plaintiffs allege and incorporate herein by reference, each and every allegation contained in the above paragraphs as if set forth fully herein.

75.    Defendants made promises to Plaintiffs regarding how, if Plaintiffs invested with Defendants, their money would be used.  Specifically, Defendants promised that they would invest in senior position loans secured by real property, which would generate profits, and lead to monthly and regular distributions to the investors.

76.    Defendants did not intend to perform this promise at the time they made it. Rather, Defendants intended to solicit investments from investors to invest in the Fund, collect as much money as possible for the Fund, make a minimal amount of legitimate outside investments using the funds collected, and then funnel all of the other monies invested to the Defendants for their own personal use and gain, effectively depriving Plaintiffs and investors of their investments.

77.    Defendants intended that Plaintiffs, and other investors, rely on their promises and invest monies with Defendants.

78.    Plaintiffs reasonably relied on Defendants' promises by investing a substantial sum of money with Defendants.

79.    As a result of the above, Plaintiffs have been damaged in a sum no less than $4,600,000.00, and is entitled to a damages award for, at least, that sum.

80.    Plaintiffs' reliance on Defendants' promises was a substantial factor, if not the only factor, in causing Plaintiffs' claimed damages.  Indeed, if Plaintiffs knew that the

13

Complaint

THE RYAN FIRM
A Professional Corporation

monies they invested would not be used as promised and/or would instead be used for Defendants' own benefit, they would have never invested with Defendants.

### Sixth Cause of Action for Conversion

### (Against All Defendants and DOES 1-50)

81. Plaintiffs allege and incorporate herein by reference, each and every allegation contained in the above paragraphs as if set forth fully herein.

82. Plaintiffs owned and had a right to possess the funds it invested with Defendants, which is a sum no less than $4,600,000.00.

83. Defendants have substantially interfered with Plaintiffs' right to possess their own money by knowingly and/or intentionally taking possession of such monies, preventing Plaintiffs from having access to the monies (as Plaintiffs have demanded that these sums be returned, and which request was rejected), and misappropriating such funds for their own use instead of investing them.

84. Plaintiffs do not consent to Defendants' continued retention and use of the funds Plaintiffs invested with Defendants under false pretenses.

85. As a result of the above, Plaintiffs have been damaged in a sum no less than $4,600,000.00, and is entitled to a damages award for, at least, that sum.

86. Defendants' actions were a substantial factor, if not the only factor, in causing Plaintiffs' claimed damages.

### Seventh Cause of Action for Breach of Fiduciary Duty: Failure to Use Reasonable Care

### (Against All Defendants and DOES 1-50)

87. Plaintiffs allege and incorporate herein by reference, each and every allegation contained in the above paragraphs as if set forth fully herein.

88. Plaintiffs, and others, invested money with Defendants based on Defendants' representation that such funds would be prudently invested in senior position loans secured by real property, which would generate profits, and lead to monthly and regular distributions to the investors.

**THE RYAN FIRM**
A Professional Corporation

14

Complaint

THE RYAN FIRM
A Professional Corporation

89.    Thus, Defendants owed Plaintiffs a fiduciary duty to care to manage their money as represented and in a non-negligent manner.

90.    To that end, Defendants were tasked with acting on Plaintiffs' behalf for the purposes of investing Plaintiffs' monies, as Defendants had represented they would.

91.    Defendants failed to act as a reasonably careful money manager would have acted under the same or similar circumstances by not investing the monies invested in the manner that Defendants represented they would (i.e., to invest in senior position loans secured by real property, which would generate profits, and lead to monthly and regular distributions to the investors).

92.    Rather, as stated above, despite having investments of at least $74,221,216.00: (1) Defendants only had investments in 6 loans, which had a cumulative unpaid principal balance of $5,317,852.00 (and 5 of 6 of those investments were made in loans of a quality that was contrary to what was represented by Defendants); and (2) Defendants had transferred the total sum of $75,864,244.00 to each other (over multiple transactions), rather than investing them as Defendants represented they would.

93.    As a result of the above, Plaintiffs have been damaged in a sum no less than $4,600,000.00, and is entitled to a damages award for, at least, that sum.

94.    Defendants' actions were a substantial factor, if not the only factor, in causing Plaintiffs' claimed damages.

**Eighth Cause of Action for Breach of Fiduciary Duty: Duty of Undivided Loyalty**

**(Against All Defendants and DOES 1-50)**

95.    Plaintiffs allege and incorporate herein by reference, each and every allegation contained in the above paragraphs as if set forth fully herein.

96.    Plaintiffs, and others, invested money with Defendants based on Defendants' representation that such funds would be prudently invested in senior position loans secured by real property, which would generate profits, and lead to monthly and regular distributions to the investors.

/ / /

15

Complaint

THE RYAN FIRM
A Professional Corporation

97.    Thus, Defendants owed Plaintiffs a fiduciary duty to care to manage their money as represented and in a non-negligent manner.

98.    To that end, Defendants were tasked with acting on Plaintiffs' behalf for the purposes of investing Plaintiffs' monies, as Defendants had represented they would.

99.    However, Defendants knowingly acted against Plaintiffs' interests and acted on behalf of themselves instead by not investing the monies invested in the manner that Defendants represented they would (i.e., to invest in senior position loans secured by real property, which would generate profits, and lead to monthly and regular distributions to the investors).

100.    Rather, as stated above, despite having investments of at least $74,221,216.00: (1) Defendants only had investments in 6 loans, which had a cumulative unpaid principal balance of $5,317,852.00 (and 5 of 6 of those investments were made in loans of a quality that was contrary to what was represented by Defendants); and (2) Defendants had transferred the total sum of $75,864,244.00 to each other (over multiple transactions), rather than investing them as Defendants represented they would.

101.    Plaintiffs did not consent to their monies being used in the above manner.

102.    As a result of the above, Plaintiffs have been damaged in a sum no less than $4,600,000.00, and is entitled to a damages award for, at least, that sum.

103.    Defendants' actions were a substantial factor, if not the only factor, in causing Plaintiffs' claimed damages.

**Ninth Cause of Action for Common Count: Money Had and Received**

**(Against All Defendants and DOES 1-50)**

104.    Plaintiffs allege and incorporate herein by reference, each and every allegation contained in the above paragraphs as if set forth fully herein.

105.    Defendants received monies that were intended to be used for the benefit of Plaintiffs.

106.    That money was not used for the benefit of Plaintiffs.  Rather, as stated above, despite having investments of at least $74,221,216.00: (1) Defendants only had

16

Complaint

investments in 6 loans, which had a cumulative unpaid principal balance of $5,317,852.00 (and 5 of 6 of those investments were made in loans of a quality that was contrary to what was represented by Defendants); and (2) Defendants had transferred the total sum of $75,864,244.00 to each other (over multiple transactions), rather than investing them as Defendants represented they would.

107.   Defendants have not given the money at issue—a sum no less than $4,600,000.00—to Plaintiffs.

### Tenth Cause of Action for Common Count: Open Book Account

### (Against All Defendants and DOES 1-50)

108.   Plaintiffs allege and incorporate herein by reference, each and every allegation contained in the above paragraphs as if set forth fully herein.

109.   Plaintiffs and Defendants had financial transactions with each other.

110.   Plaintiffs, in the regular course of business, kept an account of the debits and credits involved in the transactions.

111.   Defendants owe Plaintiffs money on the account.

112.   The amount of money owed is no less than $4,600,000.00.

### PRAYER

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

1.   For damages in a sum no less than $4,600,000.00;

2.   For special damages according to proof;

3.   For punitive damages;

4.   For prejudgment and post-judgment interest;

5.   For costs of suit;

6.   For attorneys' fees, as applicable; and

7.   For such other relief as the Court deems just and proper.

/ / /

/ / /

/ / /

17

Complaint

DATED: April 6, 2026

THE RYAN FIRM
A Professional Corporation


By:_____
TIMOTHY M. RYAN
ANDREW J. MASE
MICHAEL W. STOLTZMAN, JR.
Attorneys for Plaintiffs WE Alliance Secured Income Fund, LLC; WE Alliance Structured Strategies Stock Allocations Fund, LLC; and, WE Alliance Structured Active Allocation Growth Fund, LLC

18

# EXHIBIT 1

# EXHIBIT 1

Memorandum No. _____

# Pacific Freedom Fund, LLC

*a California limited liability company*

## PRIVATE PLACEMENT MEMORANDUM

1555 Grant Avenue
Novato, California 94945

$25,000,000
Minimum Investment Amount: $500,000

---

April 1, 2020

PACIFIC FREEDOM FUND, LLC ("Fund") is a California limited liability company. The Fund is offering ("Offering") by means of this Private Placement Memorandum ("Memorandum") limited liability company membership interests ("Membership Interests") on a "best efforts" basis to qualified investors who meet the Investor Suitability standards as set forth herein. (See "Investor Suitability" below). The Fund will be managed by Pacific Private Money Inc., a California corporation ("Manager").

As further described in the Memorandum, the Fund has been primarily organized to originate, purchase, fund, acquire, and sell loans secured by interests in real or personal property across the United States with a primary focus in California. It is presently anticipated that the Fund will originate, purchase, or otherwise invest in loans with the intent to sell such loans within Thirty (30) days from the date of such investment. This type of vehicle is also generally referred to as a gestational fund ("Gestational Fund"). The primary purpose and strategy of the Gestational Fund is to provide the stakeholders with the flexibility and liquidity to invest in various loans, within a short span of time as well as maintain a cash balance for deployment or redemption. (See "Fund Objectives" below). The Fund may also manage, remodel, repair, lease and/or sell real properties acquired through the Fund's lending activities, including but not limited to, properties acquired through foreclosure and real estate owned assets ("REO").

Prospective investors ("Investors") who execute a subscription agreement ("Subscription Agreement") to invest in the Fund will become a member of the Fund ("Member") once the Manager deposits the Investor's investment into the Fund's main operating bank account and subject to terms and conditions in the Memorandum and Subscription Agreement. An investment in the Fund is subject to restrictions on withdrawal (See "Withdrawal" below). Subject to the terms and conditions provided herein, Members will have the option to either receive income distributions from the Fund or reinvest their distributable share of Fund earnings back into the Fund. The Manager will receive compensation and income from the Fund and is subject to certain conflicts of interest. (See "Risk Factors," "Income to the Fund" and "Conflicts of Interest" below). There are material income tax risks associated with investing in the Fund that prospective Investors should consider. (See "Income Tax Considerations" below).

The Offering will continue until it (1) is terminated by the Fund or, (2) the Fund has raised the Maximum Offering Amount.  At such time, the Offering will be deemed closed. The Fund may, at its sole and absolute discretion, at any time during the period of the Offering, increase or decrease the Minimum Investment Amount or the Maximum Offering Amount.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR PASSED UPON THE ADEQUACY OR ACCURACY OF THIS PRIVATE PLACEMENT MEMORANDUM.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  THIS OFFERING IS MADE IN RELIANCE ON AN EXEMPTION FROM REGISTRATION WITH THE SECURITIES AND EXCHANGE COMMISSION PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT OF 1933, AS AMENDED ("ACT"), AND RULE 506(C) OF REGULATION D PROMULGATED THEREUNDER.

THIS INVESTMENT INVOLVES A DEGREE OF RISK THAT MAY NOT BE SUITABLE FOR ALL PERSONS.  ONLY THOSE INVESTORS WHO HAVE NO NEED FOR LIQUIDITY AND CAN BEAR THE LOSS OF A SIGNIFICANT PORTION (OR ALL) OF THEIR INVESTMENT SHOULD PARTICIPATE IN THE INVESTMENT.  (SEE "RISK FACTORS" BELOW).

### CERTAIN TERMS OF THE OFFERING

|  | Price to Investors [1] | Estimated Selling Commissions [2] | Estimated Fund Proceeds [3] |
|---|---|---|---|
| Amount to be Raised Per Membership Interest | $1,000 | $0 | $1,000 |
| Minimum Investment Amount [4] | $500,000 | $0 | $500,000 |
| Maximum Offering Amount [5] | $25,000,000 | $0 | $25,000,000 |

1. The offering price to Investors was arbitrarily determined by the Manager.

2. Membership Interests will be offered and sold directly by the Fund, the Manager and the Fund's and Manager's respective officers and employees.  No commissions for selling Membership Interests will be paid to the Fund, Manager or the Fund's or Manager's respective officers or employees.  While most Membership Interests are expected to be offered and sold directly by the Fund, the Manager and their respective officers and employees, the Fund or Manager may also, in limited instances, offer and sell Membership Interests through the services of independent broker/dealers who are member firms of the Financial Industry Regulatory Authority ("FINRA") and who will be entitled to receive customary and standard commissions based on the proceeds received for the sale of Membership Interests. These commissions will be paid by the Investor admitted to the Fund through such broker/dealer (and such payment may reduce the Capital Account of the Investor).  The amount and nature of commissions payable to broker/dealers is expected to vary on a case-by-case basis as is agreed between the Investor and the broker/dealer. Notwithstanding the foregoing, the Manager may pay finders' fees to finders who introduce and/or refer investors to the Fund, provided that, such compensation complies with applicable federal and/or state requirements and/or laws.

3. Net proceeds to the Fund are calculated before deducting organization and offering expenses. The expenses relating to this Offering include without limitation, legal, organizational, printing, binding and miscellaneous expenses).  The remaining Offering proceeds will be available for investment in assets pursuant to the business plan of the Fund.  The Manager will receive its compensation from a variety of sources, including, without limitation, a portion of the Net Profits of the Fund.  (See "Income to the Fund" below).  The Manager may, in its sole and absolute discretion, elect to be responsible for some or all of the foregoing expenses related to the Offering, whether through direct payment of such expenses or reimbursement to the Fund of such expenses incurred.

4. Assumes the sale of the Minimum Investment Amount.  Notwithstanding the foregoing, the Fund and Manager reserve the right, in its sole and absolute discretion, to at any time, and for any reason or no reason, accept subscriptions in a lesser amount or to require a higher amount or to reject any subscription(s).  The Fund may, at its sole and absolute discretion, at any time during the period of the Offering, increase or decrease the Minimum Investment Amount.

5. Assumes sale or ownership of the Maximum Offering Amount. It is possible that the Fund will sell less than the Maximum Offering Amount. The Fund may, at its sole and absolute discretion, at any time during the period of the Offering, increase or decrease the Maximum Offering Amount.

THIS PRIVATE PLACEMENT MEMORANDUM HAS BEEN PREPARED SOLELY FOR THE BENEFIT OF AUTHORIZED PERSONS INTERESTED IN THE OFFERING.  IT CONTAINS

CONFIDENTIAL INFORMATION AND MAY NOT BE DISCLOSED TO ANYONE OTHER THAN AUTHORIZED PERSONS SUCH AS ACCOUNTANTS, FINANCIAL PLANNERS OR ATTORNEYS RETAINED FOR THE PURPOSE OF RENDERING PROFESSIONAL ADVICE RELATED TO THE PURCHASE OF SECURITIES OFFERED HEREIN.  IT MAY NOT BE REPRODUCED, DIVULGED OR USED FOR ANY OTHER PURPOSE UNLESS WRITTEN PERMISSION IS OBTAINED FROM THE FUND.  THIS PRIVATE PLACEMENT MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION TO ANY PERSON EXCEPT THOSE PARTICULAR PERSONS WHO SATISFY THE SUITABILITY STANDARDS DESCRIBED HEREIN.

THE SALE OF MEMBERSHIP INTERESTS COVERED BY THIS PRIVATE PLACEMENT MEMORANDUM HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, IN RELIANCE UPON THE EXEMPTIONS FROM SUCH REGISTRATION REQUIREMENTS SET FORTH IN SECTION 4(2) OF THE ACT AND RULE 506(C) OF REGULATION D THEREUNDER.  THESE SECURITIES HAVE NOT BEEN QUALIFIED OR REGISTERED IN ANY STATE IN RELIANCE UPON THE EXEMPTIONS FROM SUCH QUALIFICATION OR REGISTRATION UNDER STATE LAW.  THESE SECURITIES ARE "RESTRICTED SECURITIES" AND MAY NOT BE RESOLD OR OTHERWISE DISPOSED OF UNLESS A REGISTRATION STATEMENT COVERING DISPOSITION OF SUCH MEMBERSHIP INTERESTS IS THEN IN EFFECT OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE.

THERE IS NO PUBLIC MARKET FOR THE MEMBERSHIP INTERESTS AND NONE IS EXPECTED TO DEVELOP IN THE FUTURE.  ANY SUMS INVESTED IN THE FUND ARE ALSO SUBJECT TO SUBSTANTIAL RESTRICTIONS UPON WITHDRAWAL AND TRANSFER.  THE MEMBERSHIP INTERESTS OFFERED HEREBY SHOULD BE PURCHASED ONLY BY INVESTORS WHO HAVE NO NEED FOR LIQUIDITY IN THEIR INVESTMENT.

NO PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THIS OFFERING TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THAT INFORMATION AND THOSE REPRESENTATIONS SPECIFICALLY CONTAINED IN THIS PRIVATE PLACEMENT MEMORANDUM; ANY OTHER INFORMATION OR REPRESENTATIONS SHOULD NOT BE RELIED UPON.  ANY PROSPECTIVE PURCHASER OF THE MEMBERSHIP INTERESTS WHO RECEIVES ANY OTHER INFORMATION OR REPRESENTATIONS SHOULD CONTACT THE FUND IMMEDIATELY TO DETERMINE THE ACCURACY OF SUCH INFORMATION AND REPRESENTATIONS. NEITHER THE DELIVERY OF THIS PRIVATE PLACEMENT MEMORANDUM NOR ANY SALES HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE FUND OR IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE OF THIS PRIVATE PLACEMENT MEMORANDUM SET FORTH ABOVE.

PROSPECTIVE INVESTORS SHOULD NOT REGARD THE CONTENTS OF THIS PRIVATE PLACEMENT MEMORANDUM OR ANY OTHER COMMUNICATION FROM THE FUND AS A SUBSTITUTE FOR CAREFUL AND INDEPENDENT TAX AND FINANCIAL PLANNING.  EACH POTENTIAL INVESTOR IS ENCOURAGED TO CONSULT WITH HIS, HER OR ITS OWN INDEPENDENT LEGAL COUNSEL, ACCOUNTANT AND OTHER PROFESSIONALS WITH RESPECT TO THE LEGAL AND TAX ASPECTS OF THIS INVESTMENT AND WITH SPECIFIC REFERENCE TO HIS, HER OR ITS OWN TAX SITUATION, PRIOR TO SUBSCRIBING FOR THE MEMBERSHIP INTERESTS.

THE PURCHASE OF MEMBERSHIP INTERESTS BY AN INDIVIDUAL RETIREMENT ACCOUNT (IRA), KEOGH PLAN OR OTHER QUALIFIED RETIREMENT PLAN INVOLVES SPECIAL TAX

RISKS AND OTHER CONSIDERATIONS THAT SHOULD BE CAREFULLY CONSIDERED. INCOME EARNED BY QUALIFIED PLANS AS A RESULT OF AN INVESTMENT IN THE FUND MAY BE SUBJECT TO FEDERAL INCOME TAXES, EVEN THOUGH SUCH PLANS ARE OTHERWISE TAX EXEMPT.   (SEE "INCOME TAX CONSIDERATIONS" AND "ERISA CONSIDERATIONS BELOW").

THE MEMBERSHIP INTERESTS ARE OFFERED SUBJECT TO WITHDRAWAL OR CANCELLATION OF THE OFFERING AT ANY TIME FOR ANY REASON (OR NO REASON) AND WITHOUT ANY NOTICE THEREOF TO PROSPECTIVE INVESTORS. THE FUND RESERVES THE RIGHT, AT ITS SOLE AND ABSOLUTE DISCRETION, TO REJECT ANY SUBSCRIPTIONS IN WHOLE OR IN PART FOR ANY REASON (OR NO REASON) AT ANY TIME.

THE FUND WILL MAKE AVAILABLE TO ANY PROSPECTIVE INVESTOR AND HIS, HER OR ITS ADVISORS THE OPPORTUNITY TO ASK QUESTIONS AND RECEIVE ANSWERS CONCERNING THE TERMS AND CONDITIONS OF THE OFFERING, THE FUND, THE MANAGER OR ANY OTHER RELEVANT MATTERS, AND TO OBTAIN ANY ADDITIONAL INFORMATION TO THE EXTENT THAT THE FUND POSSESSES SUCH INFORMATION.

THIS OFFERING INVOLVES SIGNIFICANT RISKS WHICH ARE DESCRIBED IN DETAIL HEREIN. FEES WILL BE PAID TO THE MANAGER AND ITS AFFILIATES, WHO ARE SUBJECT TO CERTAIN CONFLICTS OF INTEREST. PROSPECTIVE PURCHASERS OF MEMBERSHIP INTERESTS SHOULD READ THIS PRIVATE PLACEMENT MEMORANDUM CAREFULLY AND IN ITS ENTIRETY.

THE INFORMATION CONTAINED IN THIS PRIVATE PLACEMENT MEMORANDUM HAS BEEN SUPPLIED BY THE MANAGER AND THE FUND. THIS PRIVATE PLACEMENT MEMORANDUM CONTAINS SUMMARIES OF CERTAIN DOCUMENTS NOT CONTAINED IN THIS PRIVATE PLACEMENT MEMORANDUM, WHICH ARE BELIEVED BY THE MANAGER AND FUND TO BE ACCURATE. HOWEVER, ALL SUCH SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCES TO THE ACTUAL DOCUMENTS. COPIES OF DOCUMENTS REFERRED TO IN THIS PRIVATE PLACEMENT MEMORANDUM, BUT NOT INCLUDED HEREIN AS AN EXHIBIT, WILL BE MADE AVAILABLE TO QUALIFIED PROSPECTIVE INVESTORS UPON REQUEST.

**FOR RESIDENTS OF ALL STATES**. THE PRESENCE OF A LEGEND FOR ANY GIVEN STATE REFLECTS ONLY THAT A LEGEND MAY BE REQUIRED BY THAT STATE AND SHOULD NOT BE CONSTRUED TO MEAN AN OFFER OR SALE MAY BE MADE IN ANY PARTICULAR STATE. THIS MEMORANDUM MAY BE SUPPLEMENTED BY ADDITIONAL STATE LEGENDS. IF YOU ARE UNCERTAIN AS TO WHETHER OR NOT OFFERS OR SALES MAY BE LAWFULLY MADE IN ANY GIVEN STATE, YOU ARE ADVISED TO CONTACT THE FUND FOR A CURRENT LIST OF STATES IN WHICH OFFERS OR SALES MAY BE LAWFULLY MADE. AN INVESTMENT IN THIS OFFERING IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF FINANCIAL RISK. ACCORDINGLY, PROSPECTIVE INVESTORS SHOULD CONSIDER ALL OF THE RISK FACTORS DESCRIBED BELOW.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS

ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

**UNITED STATES TERRITORIES AND POSSESSIONS**. THESE SECURITIES ARE NOT AUTHORIZED FOR OFFERING OR SALE IN ANY TERRITORY OR POSSESSION OF THE UNITED STATES IN LIEU OF APPLICABLE SECURITIES LAWS TO THE CONTRARY. SECURITIES AND/OR CAPITAL GUARDIANSHIPS ARE NOT AUTHORIZED FOR SALE IN SUCH TERRITORIES OR POSSESSIONS.

**IRS CIRCULAR 230 NOTICE.**

PURSUANT TO U.S. INTERNAL REVENUE SERVICE CIRCULAR 230, THE STATEMENTS SET FORTH HEREIN WITH RESPECT TO FEDERAL TAX ISSUES, AS DEFINED BELOW, WERE NOT INTENDED NOR WRITTEN TO BE USED, AND SUCH STATEMENTS CANNOT BE USED BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER UNDER THE U.S. INTERNAL REVENUE CODE. SUCH STATEMENTS WERE WRITTEN TO SUPPORT THE MARKETING OF THE MEMBERSHIP INTERESTS OR MATTERS ADDRESSED HEREIN.  IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT WOULD AFFECT THE FEDERAL TAX TREATMENT OF AN INVESTMENT IN THE FUND AND THE STATEMENTS CONTAINED HEREIN DO NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO SUCH ADDITIONAL ISSUES. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR. A "FEDERAL TAX ISSUE" IS A QUESTION CONCERNING THE FEDERAL TAX TREATMENT OF ANY ITEM OF INCOME, GAIN, LOSS, DEDUCTION OR CREDIT, THE EXISTENCE OR ABSENCE OF A TAXABLE TRANSFER OF PROPERTY, OR THE VALUE OF PROPERTY FOR PURPOSES OF ANY TAX IMPOSED BY OR PURSUANT TO THE U.S. INTERNAL REVENUE CODE. (SEE "INCOME TAX CONSIDERATIONS" BELOW).

**TABLE OF CONTENTS**

FUND OBJECTIVES ..................................................................................................................... 7

SUMMARY OF THE OFFERING ................................................................................................ 7

SUBSCRIPTION PROCESS AND RESTRICTIONS OF TRANSFER .................................... 12

INVESTOR SUITABILITY ......................................................................................................... 14

USE OF PROCEEDS ................................................................................................................... 15

LENDING STANDARDS AND POLICIES ............................................................................... 16

THE MANAGER .......................................................................................................................... 19

FIDUCIARY RESPONSIBILITY OF THE MANAGER .......................................................... 20

RISK FACTORS ........................................................................................................................... 21

CONFLICTS OF INTEREST....................................................................................................... 34

CERTAIN LEGAL ASPECTS OF FUND LOANS ................................................................... 37

LEGAL PROCEEDINGS ............................................................................................................ 40

INCOME TAX CONSIDERATIONS.......................................................................................... 40

ERISA CONSIDERATIONS ....................................................................................................... 44

LEGAL MATTERS...................................................................................................................... 46

ADDITIONAL INFORMATION AND UNDERTAKINGS....................................................... 46

**EXHIBITS**

**EXHIBIT A-1**        **ARTICLES OF ORGANIZATION**

**EXHIBIT A-2**        **LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

**EXHIBIT B**            **SUBSCRIPTION AGREEMENT**

## FORWARD LOOKING STATEMENTS

Investors should not rely on forward-looking statements because they are inherently uncertain. Investors should not rely on forward-looking statements in this Memorandum. This Memorandum contains forward-looking statements that involve risks and uncertainties. We use words such as "anticipated," "projected," "forecasted," "estimated," "prospective," "believes," "expects," "plans," "future," "intends," "should," "can," "could," "might," "potential," "continue," "may," "will," and similar expressions to identify these forward-looking statements. Investors should not place undue reliance on these forward-looking statements, which may apply only as of the date of this Memorandum.

## FUND OBJECTIVES

The primary strategy and purpose of the Gestational Fund is to provide the stakeholders with the flexibility and liquidity to invest in various loans, within a short span of time as well as maintain a cash balance for deployment or redemption. Accordingly, the Fund will originate, purchase, fund, or acquire loans with the intent to sell such loans held within a period of Thirty (30) days from the date of such investment. The Fund loans held within the portfolio will be secured by interests in real or personal property across the United States with a primary focus in California. The Fund may also manage, remodel, repair, lease and/or sell real properties acquired through the Fund's lending activities, including but not limited to, properties acquired through foreclosure and real estate owned assets ("REO").

A Gestational Fund provides unique benefits to Members. Due to the short-term retention period of the loans and high volume, the Fund will retain various fee income and interest payment derived from the Fund loans. In addition, due to the sale strategy, the Fund will allow for greater liquidity than a traditional mortgage fund, which will enable the Fund to regularly return capital to the Members and continue to consistently invest in various loans. Furthermore, the Fund will mitigate the risks from holding the loans for a longer period of time, which include, default risk, illiquidity, and devaluation of underlying collateral. Lastly, the short term nature of the loans allows for the Fund to expend less resources to regularly maintain Fund loans.

Despite these benefits, various risks remain for the Fund. For example, the real estate market may be illiquid causing it to be difficult for the Fund to find purchasers for Fund loans within Thirty (30) days from the date of investment. This difficulty could cause the Fund to sell the loans at a lesser value or retain the loans for a longer period of time than intended. Moreover, the purchasers of these loans may require the Fund to agree to a "buy back clause" which could force the Fund to re-purchase the loans. In addition to risks relating to the sale of loans, it may be difficult for the Fund to enter into agreements with quality borrowers if the borrowers prefer to work with one particular lender throughout the term of their loan. This could cost the Fund additional resources to locate and come to a beneficial agreement with borrowers who are comfortable with a lender who intends to sell the loan to a third party shortly after the date of investment. For additional risks related to the Fund, please see "Risk Factors" below.

## SUMMARY OF THE OFFERING

The following information is only a brief summary of, and is qualified in its entirety by, the detailed information appearing elsewhere in this Private Placement Memorandum. This Private Placement Memorandum, together with the exhibits attached including, but not limited to, the limited liability company Operating Agreement of the Fund ("Operating Agreement"), a copy of which is attached hereto as Exhibit A-2, should be carefully read in its entirety before any investment decision is made. If there is a conflict, misunderstanding, or ambivalence between the terms contained in this Memorandum and the Operating Agreement, the Operating Agreement shall prevail and control.

| | |
|---|---|
| **THE FUND AND ITS OBJECTIVES** | Pacific Freedom Fund, LLC is a California limited liability company located at 1555 Grant Avenue, Novato, California 94945. The Fund will raise money through this Offering of Membership Interests to conduct the following business: to make, purchase, originate, fund, acquire and/or otherwise sell loans secured by interests in real or personal property across the United States with a primary focus in California. It is presently anticipated that the Fund will originate, purchase, or otherwise invest in loans with the intent to sell loans within Thirty (30) days from the date of such investment. The Fund may also manage, remodel, repair, lease and/or sell real properties acquired through the Fund's lending activities, including but not limited, properties acquired through foreclosure and REOs. |
| **THE MANAGER** | The Fund will be managed by Pacific Private Money Inc., a California corporation. The Manager is located at 1555 Grant Avenue, Novato, California 94945. |
| **THE OFFERING** | The Fund is hereby offering to Investors an opportunity to purchase Membership Interests in the Fund in the maximum aggregate amount of Twenty-Five Million Dollars ($25,000,000). The minimum investment amount per Investor is Five Hundred Thousand Dollars ($500,000) ("Minimum Investment Amount"); provided, however, that the Manager reserves the right to accept subscriptions in a lesser amount or require a higher amount. |
| **PRIOR EXPERIENCE** | The principal of the Manager has prior experience in real estate finance and lending industries. (See "The Manager" below). |
| **SUITABILITY STANDARDS** | Membership Interests are offered exclusively to certain individuals, Keogh plans, individual retirement accounts ("IRAs") and other qualified Investors who meet certain minimum standards of income and/or net worth. Each Investor must execute a Subscription Agreement and an Investor Questionnaire making certain representations and warranties to the Fund, including, but not limited to, such purchaser's qualifications as an "Accredited Investor" as defined by the Securities and Exchange Commission in Rule 501(a) of Regulation D. (See "Investor Suitability" below). |
| **CAPITALIZATION** | The Fund will be funded with equity of a maximum of Twenty-Five Million Dollars ($25,000,000) ("Maximum Offering Amount"). The Fund may, at its sole and absolute discretion, at any time during the period of the Offering, increase or decrease the Minimum Investment Amount and/or the Maximum Offering Amount. |
| **INVESTMENT AMOUNT** | This Offering is made to qualified Investors to purchase Membership Interests in the Fund. The Minimum Investment Amount is Five Hundred Thousand Dollars ($500,000). (See "Investor Suitability" below). While the Offering is still open, Members that have subscribed for at least the Minimum Investment Amount may purchase additional Membership Interests in increments of One Thousand Dollars ($1,000). The Manager |

| | |
|---|---|
| | reserves the sole right, but has no obligation, to adjust the purchase price per Membership Interest at any time and for any reason (or no reason) and thereby require either a higher or lesser amount. |
| **COMMISSIONS FOR SELLING MEMBERSHIP INTERESTS** | Membership Interests will be offered and sold directly by the Fund, the Manager and the Fund's and Manager's respective officers and employees. No commissions for selling Membership Interests will be paid to the Fund, Manager or the Fund's or Manager's respective officers or employees. While most Membership Interests are expected to be offered and sold directly by the Fund, the Manager and their respective officers and employees, the Fund or Manager may also, in limited instances, offer and sell Membership Interests through the services of independent broker/dealers who are member firms of FINRA and who will be entitled to receive customary and standard commissions based on the proceeds received for the sale of Membership Interests. These commissions will be paid by the Investor admitted to the Fund through such broker/dealer (and such payment may reduce the Capital Account of the Investor). The amount and nature of commissions payable to broker/dealers is expected to vary on a case-by-case basis as is agreed between the Investor and the broker/dealer. Notwithstanding the foregoing, the Manager may pay finders' fees to finders who introduce and/or refer investors to the Fund, provided that, such compensation complies with applicable federal and/or state requirements and/or laws. |
| **NO LIQUIDITY** | There is no public market for the Membership Interests, and none is expected to develop. Additionally, there are substantial restrictions on transferability of Membership Interests. (See "Risk Factors" below). |
| **LOAN ORIGINATOR AND SERVICER** | The Manager, the Fund, and/or third-party may originate the loans as a mortgage broker. In addition, it is presently anticipated that the Fund loans will be serviced by the Manager. The servicer, whether a third party or the Manager or its Affiliate, shall be herein referred to as the "Servicer." The Servicer will be compensated by the Fund and/or borrowers for such loan servicing activities, as is agreed upon by the Manager and Servicer (See "Income to the Fund" below). To the extent applicable, the Manager will oversee the activities and performance of the Servicer. At any time, at the sole and absolute discretion of the Manager, the Manager may decide to service the Fund loans itself, appoint an Affiliate, or elect to retain a third-party servicer at any time for any reason (or no reason). |
| **RECOVERY OF DEFERRED COMPENSATION** | If the Manager or Servicer defers or assigns to the Fund any of their respective compensation, the Manager and/or Servicer may elect, in the sole and absolute discretion of the Manager, to recover the same at a later time within the same calendar year (or, if expressly approved by the Manager, in any subsequent calendar year). Notwithstanding the foregoing, the Manager and/or Servicer have no obligation to waive, defer, or assign to the Fund any portion of such compensation at any time. |

| | |
|---|---|
| **NO LEVERAGE** | Except for limited instances, such as trade payables or other similar instances encountered during the ordinary course of business, the Fund does not anticipate borrowing funds for purpose described in this Memorandum. |
| **FIXED RETURN** | Members will generally be entitled to receive a non-cumulative annualized fixed return ("Fixed Return") on their capital account balance, payable monthly, (and prorated as applicable for the amount of time that a Member was a member of the Fund).  This Fixed Return will be payable prior to any profit participation by the Manager (however, all expenses and fees other than profit participation will be paid to the Manager prior to the Fixed Return).<br><br>As of April 1, 2021, the Fixed Return for any Member shall be equal to a non-cumulative annualized rate of **Six Percent (6%)**, calculated and payable on a monthly basis.  (See "Summary of the Offering – Distribution of Profits" below).<br><br>Prospective Investors should understand that earnings, cash flow and distributions of the Fund may necessarily fluctuate in accordance with the business and operations of the Fund. At the end of the fiscal year, the Fund may review all distributions paid or payable to Members in order to ensure that Members receive accurate Fixed Return distributions for the annual year in accordance with the intent and provisions of the Operating Agreement in the Memorandum.<br><br>DISTRIBUTIONS OF THE FIXED RETURN ARE NOT A GUARANTEED DISTRIBUTION AND ARE SUBJECT TO THE CASH AVAILABILITY OF THE FUND. THE MANAGER AND THE FUND MAKE NO GUARANTEES, ASSURANCES OR COMMITMENTS TO THE DISTRIBUTION OF ANY RETURNS. THE MANAGER WILL ONLY MAKE DISTRIBUTIONS TO THE EXTENT CASH IS AVAILABLE AND, IN THE SOLE AND ABSOLUTE DISCRETION OF THE MANAGER, AND TO THE EXTENT THAT ANY DISTRIBUTIONS WILL NOT IMPACT THE CONTINUING OPERATIONS OF THE FUND. |
| **DISTRIBUTION OF PROFITS** | Net Profits in excess of the Fixed Return shall be distributed as follows: One Hundred Percent (100%) of the Net Profits shall be distributed to the Manager.<br><br>"Net Profits" means the Fund's monthly gross revenue less (1) the Fund's monthly operating expenses (including payment outstanding debt (if any), administrative costs, legal expenses, and accounting fees), (2) an allocation of income for a loan loss reserve and any applicable compensation to the Manager, and (3) payment of the Fixed Return to the Members. All distributions of Net Profits will be made on a monthly basis, in arrears. |

| | |
|---|---|
| **REINVESTMENT** | Each Member must elect to (a) receive cash distributions for his, her or its share distributions of the Fund that is payable to the Member, or (b) having such amount(s) credited to his, her or its capital accounts and reinvested in the Fund to purchase additional Membership Interests. Notwithstanding the foregoing, the Manager reserves the right to commence making cash distributions at any time to any Member(s) in order for the Fund to remain exempt from the ERISA plan asset regulations. Members must elect to receive cash or reinvest all of their monthly income distributions.  No partial reinvestment is permitted (See "ERISA Considerations"). <br><br> An election to reinvest the monthly Fixed Return is revocable at any time upon a written request to revoke such election.  If no election is made, then the monthly Fixed Return will be a cash disbursement.  Members may change their election at any time upon Thirty (30) days written notice to the Fund.  Upon receipt and after the Thirty (30) day notice has occurred, the Member's election shall be changed and reflected on the following first day of the monthly in which the Member is entitled to receive a distribution.  Notwithstanding the preceding sentences, the Manager may at any time immediately commence with income distributions in cash only (hence, suspending the reinvestment option for such Member(s)) to any Member(s) in order for the Fund to remain exempt from the ERISA plan asset regulations. No partial reinvestment is permitted. (See "ERISA Considerations" below). |
| **RETURN OF CAPITAL** | The Manager reserves the right to return part or all of the Member's capital investment to the Member at any time during the investment and to expel any Member for cause. (See "Exhibit A-2 – Operating Agreement"). |
| **LOSS RESERVE** | A loan loss reserve may be maintained by the Fund.  The loan loss reserve will be evaluated and established on a case-by-case basis at the sole and absolute discretion of the Manager. This loss reserve is intended to temporarily protect Members from potential unrecoverable losses from the Fund's business and operating activities. Although the loss reserve will help reduce the impact of defaults temporarily, ultimate repayment/resale of the loans will be jeopardized to the extent that any loans are in default and are not eventually repaid or resold, whether by the applicable borrower or by the Fund, to protect available collateral. Depending on reserve overages and the weighted risk levels of the portfolio, reserve amounts may be reduced, eliminated or increased accordingly in the sole and absolute discretion of the Manager.  The loss reserve may initially be funded from the proceeds of the Offering, and thereafter may be funded from Offering proceeds or cash flow and/or profits of the Fund (as is determined by the Manager in its sole discretion). |

| | |
|---|---|
| **WITHDRAWAL** | Members who invest in the Fund may not withdraw their capital until they have been members of the Fund for at least Twelve (12) months. Members who have been members of the Fund for a period longer than Twelve (12) months may request withdrawal from the Fund in writing and give the Fund at least Thirty (30) days' notice prior to expecting to be withdrawn from the Fund.  The withdrawal date shall be effective upon the date of receipt of the Member's withdrawal request. The Fund will use its best efforts to return capital subject to, among other things, the Fund's then cash flow, financial condition, and prospective transactions in assets. The Manager may, in its sole and absolute discretion, waive, adjust, or modify the requirements for withdrawal.<br><br>The Manager may at any time suspend the withdrawal of funds from the Fund, upon the occurrence of any of the following circumstances: (i) whenever, as a result of events, conditions or circumstances beyond the control or responsibility of the Manager or the Fund, disposal of the assets of the Fund is not reasonably practicable without being detrimental to the interests of the Fund or its Members, determined in the sole and absolute discretion of the Manager; (ii) it is not reasonably practicable to determine the net asset value of the Fund on an accurate and timely basis; or (iii) if the Manager has determined to dissolve the Fund.  Notice of any suspension will be given within Ten (10) business days from the time the decision was made to suspend distributions to any Member who has submitted a withdrawal request and to whom full payment of the redemption proceeds has not yet been remitted.  If a redemption request is not rescinded by a Member following notification of a suspension, the redemption will be effected as of the last day of the calendar month in which the suspension is lifted, on the basis of the net asset value of the Fund at that time and in the order determined by the Manager in its sole and absolute discretion.<br><br>All prospective Investors should understand that the average term of loans is expected to range from Six (6) months to Thirty-Six (36) months, and accordingly, the cash flow and access to cash availability of the Fund is likely to be limited on an ongoing basis (i.e. most of the Fund's available resources will be committed as invested in loans for significant periods of time).  Further, prospective Investors should understand the loans are illiquid and the ability to sell loans or its assets (even if the Fund was inclined to do so) may be limited, and accordingly, any investment made in or through this Offering should be considered highly illiquid. |

## SUBSCRIPTION PROCESS AND RESTRICTIONS OF TRANSFER

**Subscription Agreements; Admission to the Fund**

To subscribe with the Fund and purchase any Membership Interests, an Investor must meet certain eligibility and suitability standards, some of which are set forth below (see "Investor Suitability" below). Additionally, an Investor who wishes to become a Member of the Fund must sign and execute a Subscription Agreement in the form attached hereto as Exhibit B (together with payment in the amount of the capital contribution payable to the Fund), which shall be accepted or rejected by the Manager in its sole

and absolute discretion. By executing the Subscription Agreement, an Investor makes certain representations and warranties upon which the Manager will rely on in accepting the Investor's subscription funds. INVESTORS SHOULD CAREFULLY READ AND COMPLETE THE SUBSCRIPTION AGREEMENT (WITH POWER OF ATTORNEY) AND INVESTOR QUESTIONNAIRE.

The Manager may reject an Investor's Subscription Agreement for any reason or no reason at all.  If accepted by the Manager, the Investor's capital contribution will be temporarily deposited into a call account ("Subscription Account"). While an Investor's contribution is held in the Subscription Account, the Investor will not be considered a Member of the Fund, and the Investor's contribution will not accrue any interest from the Fund.  An Investor shall become a Member of the Fund when the Investor's contribution is deposited into the Fund's operating account ("Operating Account") from the Subscription Account. In the event interest accrues on an Investor's capital contribution while being held in the Subscription Account, such interest shall be payable to the Investor. The Manager will transfer the Investor's contribution from the Subscription Account into the Fund's main Operating Account on a first in, first out basis when capital is needed by the Fund (in the Manager's sole and absolute discretion) to make or purchase loans.

Notwithstanding the previous paragraph, should the process from depositing an Investor's funds into the Subscription Account and admission as a Member take longer than Ninety (90) days, the Investor may request in writing to recover his, her or its investment funds.  If, upon receipt of such request in writing, the Manager has not yet admitted the Investor as a Member, then Manager may, in its sole and absolute discretion, return the Investor's funds to the Investor and revoke the Subscription Agreement within Ten (10) business days of receipt of such request from the Investor.

Subscription Agreements are non-cancelable and irrevocable by the Investor and subscription funds are non-refundable for any reason, except with the express written consent of the Manager or as expressly set forth herein or in the Subscription Agreement.

Notwithstanding the foregoing, the Fund reserves the right, in its sole and absolute discretion to, at any time, and for any reason or no reason, accept subscriptions in a lesser amount or to require a higher amount or to reject any subscription(s) in whole or in part.

AN INVESTOR SHALL OWN MEMBERSHIP INTERESTS IN THE FUND IF AND ONLY IF THE INVESTOR'S SUBSCRIPTION FUNDS ARE TRANSFERRED INTO THE FUND'S MAIN OPERATING ACCOUNT.

**Restrictions on Transfer**

As a condition to this Offering, restrictions have been placed upon the ability of Members to resell or otherwise transfer any Membership Interests purchased hereunder.  Specifically, no Member may resell or otherwise transfer any Membership Interests without the satisfaction of certain conditions designed to ensure compliance with applicable tax and securities laws including, without limitation, the requirement that certain legal opinions be provided to the Fund with respect to such matters and the requirement that any transfer of Membership Interests to a transferee does not violate any state or federal securities laws. Notwithstanding the foregoing, no Member may resell or otherwise transfer any Membership Interests without the prior written consent of the Manager, whose consent may be withheld in its sole and absolute discretion.  (See "Exhibit A-2 – Operating Agreement").

To the extent required by applicable law or in the sole and absolute discretion of the Manager, legends shall be placed on all instruments or certificates evidencing ownership of Membership Interests in the Fund stating that the Membership Interests have not been registered under the federal securities laws and setting

13

forth limitations on resale, and notations regarding these limitations shall be made in the appropriate records of the Fund with respect to all Membership Interests offered through this Offering.

Any Member who transfers, upon the Manager's consent, any Membership Interests to another person shall pay the Manager, subject to the sole and absolute discretion of the Manager, a transfer fee of at least Five Hundred Dollars ($500) to cover administrative costs related thereto.

## INVESTOR SUITABILITY

This investment is appropriate only for Investors who have no need for immediate liquidity in their investments and who have adequate means of providing for their current financial needs, obligations and contingencies, even if such investment results in a total loss.  Investment in the Membership Interests involves a high degree of risk and is suitable only for an Investor whose business and investment experience, either alone or together with a purchaser representative, renders the Investor capable of evaluating each and every risk of the proposed investment.  CAREFULLY READ THE ENTIRE "RISK FACTORS" SECTION OF THIS PRIVATE PLACEMENT MEMORANDUM.

Each Investor seeking to acquire Membership Interests will be required to represent that he, she or it is purchasing for his, her or its own account for investment purposes and not with a view to resale or distribution.  The Fund will sell the Membership Interests to an unlimited number of "Accredited Investors" only.

To qualify as an "Accredited Investor" an Investor must meet ONE of the following conditions:

1.        Any natural person who had an individual income in excess of Two Hundred Thousand Dollars ($200,000) in each of the two most recent years or joint income with that person's spouse in excess of Three Hundred Thousand Dollars ($300,000) in each of those years and who has a reasonable expectation of reaching the same income level in the current year;

2.        Any natural person whose individual net worth or joint net worth, with that person's spouse, at the time of their purchase exceeds One Million Dollars ($1,000,000) (excluding the value of such person's primary residence);

3.        Any bank as defined in Section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities and Exchange Act of 1934 ("Exchange Act"); any insurance company as defined in Section 2(13) of the Exchange Act; any investment company registered under the Investment Fund Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; any Small Business Investment Fund ("SBIC") licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a  State, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of Five Million Dollars ($5,000,000); any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment advisor, or if the employee benefit plan has total assets in excess of  Five Million Dollars ($5,000,000) or, if a self-directed plan, with investment decisions made solely by persons who are Accredited Investors;

4.        Any private business development company as defined in Section 202(a)(22) of the Investment Advisors Act of 1940;

5.       Any organization described in Section 501(c)(3)(d) of the Internal Revenue Code of 1986, as amended ("Code"), corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of Five Million Dollars ($5,000,000);

6.       Any director or executive officer, or Fund of the issuer of the securities being sold, or any director, executive officer, or Fund of a Fund of that issuer;

7.       Any trust, with total assets in excess of Five Million Dollars ($5,000,000), not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Section 506(B)(b)(2)(ii) of the Code; or

8.       Any entity in which all the equity owners are accredited investors as defined above.

**Verification**

The Fund will require that the Investor verify the Investor's status as an Accredited Investor through any reasonable means and steps deemed necessary or suitable by the Fund.  A non-exhaustive list of verification steps that the Fund may use for, or require from, an Investor is noted in the Subscription Agreement.  Every Investor is required to cooperate in the Fund's verification steps and methods before being permitted to invest in the Offering.  The Fund may use differing or varied verification steps or methods for each Investor as the facts and circumstances surrounding any particular Investor's financial situation would likely be different from any other Investor.

**USE OF PROCEEDS**

|  | Maximum Offering Amount | Percentage of Gross Offering Proceeds |
|---|---|---|
| Gross Offering Proceeds | $25,000,000 | 100% |
| Commissions Payable by the Fund [(1)] | $0 | 0% |
| **Deployable Proceeds** [(2)] | $25,000,000 | 100% |

[(1)]Membership Interests will be offered and sold directly by the Fund, the Manager and the Fund's and Manager's respective officers and employees.  No commissions for selling Membership Interests will be paid to the Fund, Manager or the Fund's or Manager's respective officers or employees.  While most Membership Interests are expected to be offered and sold directly by the Fund, the Manager and their respective officers and employees, the Fund or Manager may also, in limited instances, offer and sell Membership Interests through the services of independent broker/dealers who are member firms of the Financial Industry Regulatory Authority ("FINRA") and who will be entitled to receive customary and standard commissions based on the proceeds received for the sale of Membership Interests. These commissions will be paid by the Investor admitted to the Fund through such broker/dealer (and such payment may reduce the Capital Account of the Investor).  The amount and nature of commissions payable to broker/dealers is expected to vary on a case-by-case basis as is agreed between the Investor and the broker/dealer.  Notwithstanding the foregoing, the Manager may pay finders' fees to finders who introduce and/or refer investors to the Fund, provided that, such compensation complies with applicable federal and/or state requirements and/or laws.

[(2)] Gross Offering proceeds to the Fund are calculated before deducting organization and offering expenses. The expenses relating to this Offering include, without limitation, legal, organizational, printing, binding and miscellaneous expenses.  The remaining Offering proceeds will be available for investment in assets pursuant to the business plan of the Fund.  The Manager will receive its compensation from a variety of sources, including, without limitation, a portion of the Net Profits.  (See "Income to the Fund"

below).  The Manager may, in its sole and absolute discretion, elect to be responsible for some or all of the foregoing expenses related to the Offering, whether through direct payment of such expenses or reimbursement to the Fund of such expenses incurred.

## LENDING STANDARDS AND POLICIES

### General Standards for Loans

The Fund has been primarily organized to originate, acquire, and sell loans secured by interests in real or personal property across the United States with a primary focus in California.  It is presently anticipated that the Fund will originate, purchase, or otherwise invest in loans with the intent to sell such loans within Thirty (30) days from the date of such investment. This type of vehicle is also generally referred to as a gestational fund ("Gestational Fund"). The purpose of the Gestational Fund strategy is to provide the Fund with the flexibility and liquidity to invest in various loans within a short span of time as well as maintain a cash balance for deployment or redemption. (See "Fund Objectives" below). The Fund may also manage, remodel, repair, lease and/or sell real properties acquired through the Fund's lending activities, including but not limited, properties acquired through foreclosure and real estate owned assets ("REO"). The Fund's loans will not be guaranteed by any governmental agency or private entity, but may be guaranteed by members, shareholders, affiliates, and/or associates of the underlying borrowers.  The Fund will select loans according to the standards provided below.

**1.     Lien Priority.**  Loans will primarily be secured by senior deeds of trust or mortgages that are first lien positions.  The Fund may also fund loans secured by second, junior, deeds of trust or mortgages provided that, the aggregate loan-to-value ratios in Section 3 below are met.

**2.     Location of Real Property Securing Loans.**  Most deeds of trusts and mortgages will be secured by real property in California.  Notwithstanding the foregoing, the Fund reserves the right to make loans in other jurisdictions.

**3.     Loan-to-Value Ratio.**  A loan from the Fund will generally not exceed the loan-to-value ("Loan-to-Value" or "LTV") percentage ratios set forth below.  The Loan-to-Value ratio is calculated by taking the amount of the Fund's loan combined with the amount of outstanding debt secured by other liens on the property ("Loan"), dividing that by the value of the real property securing the deed of trust or mortgage and multiplying that figure by One Hundred (100) to come to a percentage.  "Value" shall be determined by an independent certified appraiser or non-certified appraiser doing an appraisal on the real property or the Manager or commercial or residential real estate broker giving his, her, or its opinion of value of the real property.  Notwithstanding the foregoing, the Fund may exceed the below stated Loan-to-Value ratios if the Manager determines in its sole business judgment that a higher loan amount is warranted by the circumstances of that particular loan, such as being able to secure multiple properties, called "cross-collateralization," personal guaranties, prior loan history with the borrower, market conditions, if mortgage insurance is obtained, or other compensating factors that would support the Manager in making its decision in the best interest of the Fund.

| Type of Real Property Securing Loan[1] | Target and Maximum LTV Ratios |
|---|---|
| Non-Owner-Occupied Single Family Residential | Target:  65% to 70%; Maximum: 80% |
| Multi-Family Properties[1] | Target:  65% to 70%; Maximum: 80% |
| Commercial[2] | Target:  65% to 70%; Maximum: 80% |

1. In "as completed" value.
2. Multi-family includes apartments, manufactured housing, student housing, short term multifamily housing and senior apartments.

3. Commercial includes retail, office, industrial, self-storage, and specialized commercial properties (e.g. churches, synagogues, etc., if alternative use is viable).

Upon analysis in approximately Twenty-Four (24) months, the Manager may re-evaluate the portfolio and Loan-to-Value ratio maximums set by the Fund and may revise the Loan-to-Value ratio maximums at that time if it considers it to be in the best interests of the Fund.  The Manager will inform Members of the new Loan-to-Value ratios when and if the Manager re-evaluates them.

In general, the Fund will seek to maintain a weighted Loan-to-Value ratio for the Fund of approximately Sixty-Five Percent (65%); provided that the maximum Loan-to-Value ratio for the Fund shall not exceed Seventy-Five Percent (75%), unless the Manager determines in its sole discretion that it is in the best interests of the Fund to exceed such ratio in any single or multiple instances.

The foregoing Loan-to-Value ratios do not apply to purchase-money financing offered by the Fund. Examples of these types of loans may be, but are not limited to, real estate owned by the Fund whereby the Fund decides to sell the property and carry back a loan on the property to make it cash flow positive.

**4.      Terms of Fund Loans.**  The terms of the Fund loans will vary.  Loans generally have terms of as short as Six (6) months to as long as Thirty-Six (36) months. A loan may, however, be shorter in term or exceed the foregoing terms if the Manager's believes, it its sole and absolute discretion, that the loan is in the best interests of the Fund. Many loans that the Fund will originate or acquire may provide for interest-only payments followed by a balloon payment at the end of the term.  For risk hedging purpose, borrowers may be required to make principal and interest payments.  At the end of the term, the Fund will require the borrower to pay the loan in full, to refinance the loan, or to sell the real property to pay back the loan.  The Fund may allow Six to Twelve (6-12) month extensions for a fee paid by Fund borrowers. Finally, the Fund may also charge exit fees on Loans based on the existing Loan balance at maturity.  These exit fees may range from Zero Percent (0%) to Ten Percent (10%) of the remaining loan balance at maturity.

**5.      Title Insurance.**  Satisfactory title insurance coverage will be obtained for all loans and will usually be paid by the borrower.  The title insurance policy will name the Fund as the insured and provide title insurance in an amount not less than the principal amount of the loan unless there is multiple forms of security for the loan, in which case the Manager shall use its sole business judgment in determining whether and to what extent title insurance shall be required.  Title insurance insures only the validity and priority of the Fund's deed of trust or mortgage, and does not insure the Fund against loss from other causes, such as diminution in the value of the secured property, loan defaults, and other such losses.

**6.      Fire and Casualty Insurance.**  Satisfactory fire and casualty insurance will be obtained for all improved real property loans which insurance will name the Fund as its loss payee in the amount equal to the improvements on the real property.  (See "Business Risks – Uninsured Losses" below).

**7.      Mortgage Insurance.**  The Manager does not intend to, but may if the property otherwise qualifies, arrange for mortgage insurance, which would afford some protection against loss if the Fund foreclosed on a loan and there existed insufficient equity in the security property to repay all sums owed.

**8.      Acquiring Loans from Other Lenders.**  In the event the Fund acquires loans from other lenders, the Fund will receive assignments of all beneficial interest in any loans purchased.

**9.      Purchase of Loans from Affiliates.**  The Fund may purchase loans from the Manager or Affiliates so long as it meets the lending requirements set forth above.

**10.** **Fractionalized Interests.** The Fund may also invest in fractionalized interests in promissory notes secured by real property with other lenders (including other entities organized by the Manager), by providing funds for or by purchasing a fractional undivided interest in a first position loan that meets the requirements set forth above.

**11.** **Sale of Loans**. The Fund may invest in loans for the purpose of reselling such loans in the course of business. The Fund may sell loans, or fractional interests in such loans, when the Manager determines (in its sole and absolute discretion) that it appears to be advantageous for the Fund to do so, based upon then current interest rates, the length of time that the loan has been held by the Fund and the overall investment objectives of the Fund. (See "Risk Factors – Investment Risks" below).

**12.** **Diversification of the Fund's Capital in Loans.** After the Fund has Ten Million Dollars ($10,000,000) in capital, no loan originated or acquired by the Fund shall exceed Twenty Five Percent (25%) of the total Fund capital at the time of the loan. A loan may exceed the foregoing percentage if, the Manager believes, it its sole and absolute discretion, that the loan is in the best interests of the Fund.

**13.** **Property Acquisition**. Properties acquired by the Fund will be acquired through the Fund's lending activities, including but not limited to, properties acquired as a result of a borrower defaulting on a loan. The Fund may appoint an Affiliate or establish limited liability companies that are wholly owned subsidiaries of the Fund to own and hold title of a property which the Fund has acquired and intends to improve, rent, and/or sell. As applicable to the subsidiaries, they will be single purpose entities ("SPE") created solely for the purpose of owning, improving, renting and/or selling the properties the Fund acquires. The Manager (or an Affiliate) shall serve as the sole manager of these SPEs.

**Credit Evaluations**

The Manager will consider the income level and general creditworthiness of a borrower to determine his, her or its ability to repay the loan according to its terms in addition to considering the loan-to-value ratios described above and secondary sources of security for repayment. The Fund may acquire loans made to borrowers who are in default under other obligations (e.g., to consolidate their debts) or who do not have sources of income that would be sufficient to qualify for loans from other lenders such as banks or savings and loan associations.

**Loan Servicing**

It is presently anticipated that all Fund loans will be serviced (i.e., loan payments collected and other services relating to the loan) by the Manager. Notwithstanding the foregoing, at its sole election, the Manager may appoint an Affiliate or retain the services third-party loan servicer, at any time for any reason (or no reason). The servicer, whether a third party or the Manager or its affiliate, shall be herein referred to as the "Servicer." The Servicer will be compensated by the borrowers and/or Fund for such loan servicing activities, as is agreed upon by the Manager and Servicer. To the extent applicable, the Manager will oversee the activities and performance of the Servicer. (See "The Manager" below).

Borrowers will make loan payments in arrears (i.e. with respect to the preceding month) and will be instructed to send their loan payments either to the Manager or to the Servicer (as applicable) for deposit in the respective party's trust account.

## THE MANAGER

The Manager of the Fund is Pacific Private Money Inc., a California corporation. The Manager was formed under the laws of California on December 28, 2010. The Manager will manage and direct the affairs of the Fund.  The principals, officers, and directors of the Manager, and their biographies, are as follows:

Mark Hanf, President of Pacific Private Money Inc., Manager of the Fund

Mark Hanf has spent his entire career in the real estate industry. From 1982 to 2006, Mark worked for a family-held real estate and development firm founded by his father. In 2007 Mark worked in private lending and in 2008 founded Pacific Private Money Loans. Pacific Private Money was incorporated in 2010 and it's first fund, the Pacific Private Money Fund, was launched in 2013 and has grown to $50 million in assets under management as of July 2019.

## INCOME TO THE FUND

The following discussion summarizes some important areas of compensation to be received by the Manager and its Affiliates, and in certain instances, the Servicer.  If the Manager or Servicer defers or assigns to the Fund any of their respective compensation, the Manager and/or Servicer will be entitled to recover same at a later time within the same calendar year or at any time thereafter.  Notwithstanding the foregoing, the Manager and/or Servicer have no obligation to waive, defer, or assign to the Fund any portion of such compensation at any time.

| Form of Income | Estimated Amount or Method of Compensation |
|---|---|
| **PROFIT PARTICIPATION** | The Manager shall participate in the distribution of Net Profits as follows: the Manager shall receive One Hundred Percent (100%) of the Net Profits. Net Profits shall be distributed on a monthly basis. |
| **INCOME TO THE FUND** | The Fund's income will generally include the following: <br><br> 1. Interest income from the Fund loans; <br><br> 2. Loan origination fees and lender discount points; <br> 3. Loan extension and modification fees; <br><br> 4. Loan processing, documentation and other similar fees; <br><br> 5. Forbearance fees, late fees, late charges, collection fees, prepayment penalties, default interest, and all other similarly related fees incurred by borrowers; and <br><br> 6. When the Fund purchases an existing loan (or pool of loans) from a third party, the Fund will be paid a fee comparable to a loan origination fee. |

| | |
|---|---|
| **LOAN SERVICING FEE** | Any loan servicing fees payable to the Servicer shall be calculated as an expense to the Fund. This fee shall be collected monthly from the payments received by the Fund from the borrowers.  Notwithstanding the foregoing, the loan servicing fee may vary from loan to loan. |
| **INCOME FROM REOs** | Any REOs acquired through the Fund's lending activities will be managed, remodeled, repaired, leased, and/or sold by the Fund, the Manager, and/or its Affiliates, as determined by the Manager in its sole and absolute discretion. Any cash flow derived from REOs, or profits gained from sale of such properties shall be retained by the Fund, including any real estate commissions, property management fees, and/or fees accrued in connection with the REOs. |
| **OPERATING EXPENSES** | The Manager shall be entitled to reimbursement by the Fund (but only to the extent that Fund assets are sufficient therefor) for reasonable and necessary out-of-pocket expenses incurred by the Manager on behalf of the Fund. Further, the Fund shall reimburse the Manager and its Affiliates for any reasonable formation, accounting, analyst, banking, transactional fees and legal costs incurred in connection with the formation of the Fund and the capital raising activities undertaken by the Fund. |

## FIDUCIARY RESPONSIBILITY OF THE MANAGER

Under applicable law, the Manager is generally accountable to the Fund as a fiduciary, which means that the Manager is required to exercise good faith and integrity with respect to Fund affairs and sound business judgment.  This is a rapidly developing and changing area of the law, and Members should consult with their own legal counsel in this regard.  The fiduciary duty of the Manager is in addition to the other duties and obligations of, and limitations on, the Manager set forth in the Operating Agreement of the Fund. Investors should consult with their own independent counsel in this regard.

The Fund has not been separately represented by independent legal counsel in its formation or in the dealings with the Manager, and Members must rely on the good faith and integrity of the Manager to act in accordance with the terms and conditions of this Offering.

The Operating Agreement provides that the Manager will not have any liability to the Fund for losses resulting from errors in judgment or other acts or omissions unless the Manager is guilty of fraud, bad faith or willful misconduct.  The Operating Agreement also provides that the Fund will indemnify the Manager against liability and related expenses (including, without limitation, legal fees and costs) incurred in dealing with the Fund, Members, or third parties as long as no fraud, bad faith, or willful misconduct on the part of the Manager is involved.  Therefore, Members may have a more limited right of action than they would have absent these provisions in the Operating Agreement.  A successful indemnification of the Manager or any litigation that may arise in connection with the Manager's indemnification could deplete the assets of the Fund.  Members who believe that a breach of the Manager's fiduciary duty has occurred should consult with their own legal counsel in the event of fraud, willful misconduct or bad faith.

It is the position of the U.S. Securities and Exchange Commission that indemnification for liabilities arising from, or out of, a violation of federal securities law is void as contrary to public policy.  However, indemnification will be available for settlements and related expenses of lawsuits alleging securities law violations if a court approves the settlement and indemnification, and also for expenses incurred in successfully defending such lawsuits if a court approves such indemnification.

## RISK FACTORS

Although the Fund will attempt to comply with requests for the early withdrawal of the Membership Interests if the financial position of the Fund can accommodate it (See "Exhibit A-2 – Operating Agreement"), any investment in the Membership Interests involves a significant degree of risk and is suitable only for Investors who have NO NEED FOR LIQUIDITY in their investments.  When analyzing this Offering, prospective Investors should carefully consider each of the following risks and should also carefully consider the matters discussed herein under the captions "Income to the Fund," "Conflicts of Interest," "Income Tax Considerations" and "ERISA Considerations."

## INVESTMENT RISKS

### No Registration: Limited Governmental Review

This Offering has not been registered with, or reviewed by, the U.S. Securities and Exchange Commission or any state agency or regulatory body, nor is registration contemplated.

### Dilution

The Membership Interests offered in the Offering consist of units of limited liability company interests of the Fund. Members may experience dilution of their respective Membership Interests in the Fund as more Investors are admitted as Members of the Fund. Further, under the Operating Agreement, the Manager has the right to cause the Fund to sell additional Membership Interests. Any such sale of additional Membership Interests would further dilute the percentage interests of the existing Members.

### Limited Transferability of Membership Interests

Although the Fund will attempt to redeem Membership Interests when possible (See "Exhibit A-2 – Operating Agreement"), there is no public market for the Membership Interests and none is expected to develop in the future.  Even if a potential buyer could be found, the transferability of these Membership Interests is also restricted by the provisions of the Securities Act of 1933 and Rule 144 promulgated thereunder, and by the provisions of the Operating Agreement.  Unless an exemption is available, these Membership Interests may not be sold or transferred without registration under the Securities Act of 1933 and the prior written consent of applicable state securities regulators and agencies.  Any sale or transfer of these Membership Interests also requires the prior written consent of the Fund. (See "Exhibit A-2 – Operating Agreement"). Members possess very limited rights to withdraw from the Fund or to otherwise recover any of their invested capital. (See "Exhibit A-2 – Operating Agreement"). Investors must be capable of bearing the economic risks of this investment with the understanding that these Membership Interests may not be liquidated by resale or redemption and should expect to hold their Membership Interests as a long-term investment.

**Size of the Offering**

There is no assurance that the Fund will obtain capital investments equal to the amount required to close the Offering.  In addition, receipt of capital investments of less than the Maximum Offering Amount will reduce the ability of the Fund to spread investment risks through diversification of its investment portfolio.

**Speculative Nature of Investment**

Investment in these Membership Interests is speculative and, by investing, each Investor assumes the risk of losing the entire investment.  The Fund has limited operations as of the date of this Private Placement Memorandum and will be solely dependent upon the Fund and the Fund's loan portfolio, both of which are subject to the risks described herein.  Accordingly, only Investors who are able to bear the loss of their entire investment and who otherwise meet the Investor suitability standards should consider purchasing these Membership Interests.  (See "Investor Suitability" above).

**Conflicts of Interest**

There are several areas in which the interests of the Manager may conflict with those of the Fund.  (See "Conflicts of Interest" below).

**Investors and Fund Not Independently Represented**

The Fund has not been represented by independent legal counsel for its organization and dealings with the Manager.  In addition, the attorneys who have performed services for the Fund have also represented the Manager but have not represented the interests of the Investors or Members of the Fund.  (See "Conflicts of Interest" below).

**Investment Delays**

There may be a delay between the time the Investor submits the Subscription Agreement to the Manager and admitted as a Member, and the time the proceeds of this Offering are invested in loans and investments by the Fund.  During these periods, the Fund may invest these proceeds in short-term certificates of deposit, money-market funds or other liquid assets with FDIC-insured and/or NCUA-insured banking institutions which will not yield a return as high as the anticipated return to be earned on Fund loans and property investments.

**Adverse Impact due to Economic Conditions**

Generally, economic recessions or downturns may result in a prolonged period of market illiquidity, which could have an adverse effect on the Fund business, financial condition and results of operations. Periods of economic slowdown or recession, significantly rising interest rates, declining employment levels, decreasing demand for real estate, or the public perception that any of these events may occur, have resulted in and could continue to result in a general decline in acquisition, disposition and leasing activity, as well as a general decline in the value of real estate and in rents. These events could adversely affect our demand among investors, which will impact our results of operations.

During an economic downturn, it may also take longer for us to dispose of real estate investments, or the disposition prices may be lower than originally anticipated. As a result, the carrying value of such real estate investments may become impaired and we could record losses as a result of such impairment or could experience reduced profitability related to declines in real estate values. These events could adversely affect our performance and, in turn, our business, and negatively impact our results of operations.

Negative general economic conditions could continue to reduce the overall amount of sale and leasing activity in the commercial real estate industry, and hence the demand for our securities, which may in turn adversely affect our revenues. We are unable to predict the likely duration and severity of the current disruption in financial markets and adverse economic conditions in the United States and other countries.

**Lack of Regulation**

The Manager and the Fund are not supervised or regulated by any federal or state authority, except to the extent that the Manager's lending and brokerage activities are regulated and supervised by applicable authorities in at least the State of California.

**Reliance on Manager**

The Manager (and/or its Affiliates) will participate in all decisions with respect to the management of the Fund, including (without limitation) determining which loans to purchase and originate, and the Fund is dependent to a significant degree on its continued services. In the event of the dissolution, death, retirement or other incapacity of the Manager or its principals, the business and operations of the Fund may be adversely affected. The Members will then elect a new Manager or the Manager shall appoint a new Manager pursuant to the Operating Agreement.

**Requirement of Additional Capital.**

Future capital requirements depend on many factors, including the Fund's ability to successfully locate investments, and whether further investment in these opportunities becomes necessary to protect the Fund's existing positions in the investments. If further capitalization becomes necessary to further stabilize, develop, or protect any of the Fund's assets, or if capitalization is needed for any other reason, any equity financing, if available at all, may not be on terms favorable to the Fund, and dilution to the Members could result, and in any case such securities may have rights, preferences and privileges that are senior to those of the Membership Interests offered herein. If adequate capital cannot be obtained, the Fund's business, operating results and financial condition could be adversely affected.

**Tax and ERISA Risks**

Investment in the Fund involves certain tax risks of general application to all Members in the Fund, and certain other risks specifically applicable to Keogh accounts, Individual Retirement Accounts and other tax-exempt investors. (See "Income Taxation Considerations" and "ERISA Considerations" below)

**Unidentified Assets**

None of the specific assets in which the Fund will invest in are identified at this time. Therefore, any potential Investor is unable to evaluate the Fund's loans portfolio to determine whether to invest in the Fund. However, the general business goals of the Fund are to make and acquire loans as further described herein. Upon commencing operations, the Fund may later have specific, identifiable portfolio data which Members may review upon their request to the Manager.

**Price of Membership Interests Arbitrarily Determined**

The purchase price of the Membership Interests offered through this Memorandum has been arbitrarily determined and may not reflect their actual value. The purchase price of the Membership Interests has been arbitrarily determined and is not the result of arm's-length negotiations. It bears no relationship to any established criteria of value such as book value or earnings per share, or any combination thereof. Further,

the price is not based on past earnings of the Fund, nor does the price necessarily reflect the current market value of the Fund.  No valuation or appraisal of the Fund or the Fund's potential business has been prepared.

## Anti-Money Laundering

The Uniting and Strengthening America By Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("PATRIOT Act") requires that financial institutions establish and maintain compliance programs to guard against money laundering activities, and requires the Secretary of the U.S. Treasury ("Treasury") to prescribe regulations in connection with antimony laundering policies of financial institutions. The Financial Crimes Enforcement Network ("FinCEN"), an agency of the Treasury, has announced that it is likely that such regulations would subject certain pooled investment vehicles to enact anti-money laundering policies. It is possible that there could be promulgated legislation or regulations that would require the Fund or its service providers to share information with governmental authorities with respect to prospective investors in connection with the establishment of anti-money laundering procedures. Such legislation and/or regulations could require the Fund to implement additional restrictions on the transfer of the Membership Interests. The Fund reserves the right to request such information as is necessary to verify the identity of prospective Investors and the source of the payment of subscription monies, or as is necessary to comply with any customer identification programs required by FinCEN and/or the U.S. Securities and Exchange Commission. In the event of delay or failure by a prospective investor to produce any information required for verification purposes, an application for or transfer of the Interests may be refused.

## Investment Company Act Risks

The Fund intends to avoid becoming subject to the Investment Company Act of 1940, as amended ("1940 Act"); however, the Fund cannot assure prospective Investors that under certain conditions, changing circumstances or changes in the law, the Fund may not become subject to the 1940 Act in the future as a result of the determination that the Fund is an "investment company" within the meaning of the 1940 Act that does not qualify for an exemption as set forth below. Becoming subject to the 1940 Act could have a material adverse effect on the Fund. Additionally, the Fund could be terminated and liquidated due to the cost of registration under the 1940 Act. In general, the 1940 Act provides that if there are 100 or more investors in a securities offering, then the 1940 Act could apply unless there is an exemption; however, the 1940 Act generally is intended to regulate entities that raise monies where the entity itself "holds itself out as being engaged primarily, or purposes to engage primarily, in the business of investing, reinvesting or trading in securities" (Section 3(a)(1)(A) of the 1940 Act).

The second key definition of an "investment company" under the 1940 Act considers the nature of an entity's assets. Section 3(a)(1)(C) of the 1940 Act defines "investment company" as any issuer that: "...is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40% of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis." Section 3(b)(1) of the 1940 Act provides that a company is not an "investment company" within the meaning of the 1940 Act if it is: "[An] issuer primarily engaged, directly or through a wholly-owned subsidiary or subsidiaries, in a business or businesses other than that of investing, reinvesting, owning, holding, or trading in securities..."

Section 3(c) of the 1940 Act provides for the following relevant exemptions: "Notwithstanding subsection (a), none of the following persons is an investment company within the meaning of this title: (1) Any issuer whose outstanding securities (other than short- term paper) are beneficially owned *by not more than one hundred persons* [emphasis added] and which is not making and does not presently propose to make a public offering of its securities. Such issuer shall be deemed to be an investment company for purposes of

24

the limitations set forth in subparagraphs (A)(i) and (B)(i) of section 12(d)(1) governing the purchase or other acquisition by such issuer of any security issued by any registered investment company and the sale of any security issued by any registered open-end investment company to any such issuer. For purposes of this paragraph: (A) Beneficial ownership by a company shall be deemed to be beneficial ownership by one person, except that, if the company owns 10 per centum or more of the outstanding voting securities of the issuer, and is or, but for the exception provided for in this paragraph or paragraph (7), would be an investment company, the beneficial ownership shall be deemed to be that of the holders of such company's outstanding securities (other than short-term paper). (B) Beneficial ownership by any person who acquires securities or interests in securities of an issuer described in the first sentence of this paragraph shall be deemed to be beneficial ownership by the person from whom such transfer was made, pursuant to such rules and regulations as the Commission shall prescribe as necessary or appropriate in the public interest and consistent with the protection of investors and the purposes fairly intended by the policy and provisions of this title, where the transfer was caused by legal separation, divorce, death, or other involuntary event….or (5) Any person who is not engaged in the business of issuing redeemable securities, face-amount certificates of the installment type or periodic payment plan certificates, and who is primarily engaged in one or more of the following businesses: (A) Purchasing or otherwise acquiring notes, drafts, acceptances, open accounts receivable, and other obligations representing part or all of the sales price of merchandise, insurance, and services; (B) making loans to manufacturers, wholesalers, and retailers of, and to prospective purchasers of, specified merchandise, insurance, and services; and (C) ***purchasing or otherwise acquiring mortgages and other liens on and interests in real estate*** [emphasis added]."

Based upon the above, the Fund has been advised that the Offering is exempt under the 1940 Act and that the 3(c)(1) and/or 3(c)(5) exemptions will apply. However, there are no assurances that this will ultimately be the case.

## BUSINESS RISKS

### Limited Operating History of Operations

The Fund has a relatively limited history of operations. The Fund's projections are based upon the limited operating history, and limited publicly available information and industry knowledge. The Fund's projections may not be indicative of future prospects or performance, and ultimate operations expenses and potential losses cannot be projected with certainty. There can be no assurance that expenses and losses exceeding the Fund's total resources will not occur.

### Risks Associated with Expansion

The Fund plans on expanding its business through aggressively marketing and networking with realtors, wholesalers, title companies, banks, real estate investment clubs, and real estate investors. Any expansion of operations the Fund may undertake will entail risks. Such actions may involve specific operational activities, which may negatively impact the profitability of the Fund. Consequently, investors must assume the risk that (i) such expansion may ultimately involve expenditures of funds beyond the resources available to the Fund at that time, and (ii) management of such expanded operations may divert the Manager's attention and resources away from its existing operations, all of which factors may have a material adverse effect on the Fund's present and prospective business activities.

### Competition

The Fund will be competing for loans, investment opportunities and property acquisitions with other mortgage funds, private investors, institutional lenders and investors and others engaged in the mortgage lending and property acquisition businesses.  These other lenders and investors may have greater financial

resources and experience than the Fund and the Manager. Other lenders and investors may also generally be able to accept more risk than the Fund can manage.  Competition may reduce the number of suitable prospective loans offered to the Fund.

**Trend in Consumer Preferences and Spending**

The Fund's operating results may fluctuate significantly from period to period as a result of a variety of factors, including competitive investment structures, foreclosures, regional unemployment, increases in interest rates, decreases in conventional lending, and general economic conditions. There is no assurance that the Fund will be successful in marketing any of its services, or that the revenues will be significant. Consequently, the Fund's revenues may vary by quarter, and the Fund's operating results may experience fluctuations.

**Performance Projections**

The Manager and its principals have experience in real estate investments, loans and related loan syndications, and the Manager, through its management of other funds and investment vehicles, has made other real estate investments and loans under other formats, but the performance of previous investments may not be indicative of the future performance of the investments relating to the Fund, and the Fund does not yet know what its long-term loan loss experience will be.

**Fluctuations in Interest Rates**

Mortgage interest rates are subject to abrupt and substantial fluctuations and the purchase of Membership Interests are a relatively illiquid investment.  If prevailing interest rates rise above the average interest rate being earned by the Fund's portfolio, Members may wish to liquidate their investment to take advantage of higher available returns but may be unable to do so due to restrictions on transfer and withdrawal.

**Litigation Risks**

The Manager will act in good faith and use reasonable judgment in selecting borrowers and making, purchasing, and managing the mortgage loans and investing in, purchasing and managing properties. However, as a lender, the Manager and the Fund are exposed to the risk of litigation by a borrower for any warranted or unwarranted allegations by a borrower regarding the terms of the loans or the actions or representations of the Manager in making, managing or foreclosing on subject properties.  It is impossible to foresee the allegations borrowers will bring against the Manager or the Fund, but the Manager will use its best efforts to avoid litigation if, in the Manager's sole discretion, it is in the best interests of the Fund. If the Fund is required to incur legal fees and costs to respond to the lawsuit, the costs and fees could have an adverse impact on the Fund's profitability and distributions to Members.

**Loan Defaults and Foreclosures**

The Fund will participate in loans and take the risk that borrowers will default on those loans and other risks that lenders typically face, many of which are detailed in this Offering.  Fund loans may be made to borrowers who do not qualify for loans from more traditional sources of financing, such as banks and savings and loans associations.  Fund loans may generally provide for a monthly payment from the borrower followed by a "balloon" payment at the loan's maturity.  Many borrowers may be unable to pay such a balloon payment and are compelled to refinance the balloon amount into a new loan.  Fluctuations in the interest rates, unavailability of mortgage funds, and a decrease in the value of the real property securing the loan could adversely affect the borrower's ability to refinance their loans at maturity.

The Fund will generally look to the underlying property securing the loan to determine whether to make the loan to the borrower and, to a lesser extent, the credit rating a borrower has. Nonetheless, borrowers will need to demonstrate adequate ability to meet its financial obligations under the terms of any loan which the Fund originates or purchases.

To determine the fair market value of the property securing the loan, the Fund will primarily rely on an appraisal, Manager's opinion of value of the property, or other similar opinion.  Appraisals are a judgment of an individual appraiser's interpretation of a property's value. Due to the differences in individual opinions, values may vary from one appraiser to another.   Furthermore, the appraisal is merely the value of the real property at the time the loan is originated.   Market fluctuations and other conditions could cause the value of real property to decline over time.

If the borrower defaults on the loan, the Fund may be forced to purchase the property at a foreclosure sale. If the Fund cannot quickly sell the real property and the property does not produce significant income, the Fund's profitability will be adversely affected.

Due to certain provisions of state law that may be applicable to all real estate loans, if real property security proves insufficient to repay amounts owing to the Fund, it is unlikely that the Fund will be able to recover any deficiency from the borrower.

Finally, the recovery of sums advanced by the Fund in making or investing in mortgage loans and protecting its security may also be delayed or impaired by the operation of the federal bankruptcy laws or by irregularities in the manner in which the loan was made.  Any borrower has the ability to delay a foreclosure sale for a period ranging from several months to several years by filing a petition in bankruptcy which automatically stays any actions to enforce the terms of the loan.  It can be assumed that such delays and the costs associated therewith will reduce the Fund's profitability.

**Speculative Value of Property and Notes**

Some properties and/or notes may not sell for the anticipated value. This result may cause a loss or principal, and/or a reduction in or loss of profits and/or returns on investment for the Fund and its Members.

**Risks Related to Rehabilitation Loans**

Rehabilitation loans involve a number of particular risks, involving, among other things, the timeliness of the project's completion, the integrity of appraisal values, whether or not the completed property can be sold for the amount anticipated, and the length of ultimate sale process.

If rehabilitation work is not completed (due to contractor abandonment, unsatisfactory work performance, or various other factors) and all the Loan funds have already been expended, then in the event of a default the Fund may have to invest significant additional funds to complete rehabilitation work. Any such investment would be recuperated by the Fund prior to the Member being paid back. If the value an uncompleted property is materially less than the amount of the loan, even if the work were completed, then upon a default the Fund might need to invest additional funds in order to recoup all or a portion of the investment. Default risks also exist where it takes a borrower longer than anticipated either to construct or then resell the property, or if the borrower does not receive sufficient proceeds from the sale to repay the corresponding loan in full.

**Participation in Other Loans**

The Fund may be participating in loans with other lenders. When participating in loans with other lenders, the Fund or its Manager may not have control over the determination of when and how to enforce a default, depending on the terms of any participation agreement with the other lenders, other lenders may have varied amounts of input into such decision-making process, including the ultimate decision-making power on if and when to enforce a default.  If the Fund participates with a lender affiliated with the Manager or its principals, it is possible that the Fund would not be the lead lender, although the principal of the Manager who is affiliated with the other lender may be the decision-making party.  There is no certainty who will be a lead lender in a situation where the Fund participates in ownership of a Loan with another entity.

**Increase in Loss Rates.**

Loss rates on loans may be significantly affected by economic downturns or general economic conditions beyond the Fund's control and beyond the control of individual borrowers. In particular, loss rates on corresponding loans may increase due to factors such as (among other things) local real estate market conditions, prevailing interest rates, the rate of unemployment, the level of consumer confidence, the value of the U.S. dollar, energy prices, changes in consumer spending, the number of personal bankruptcies, disruptions in the credit markets and other factors.

**Risks of Government Action**

While the Manager will use its best efforts to comply with all laws, including federal, state and local laws and regulations, there is a possibility of governmental action to enforce any alleged violations of mortgage lending laws which may result in legal fees and damage awards that would adversely affect the Fund.

**Risks Associated with Fund Performance**

If the Fund's investments in assets do not perform and generate income, the Fund may not be able to make expected distributions to its Members. Several factors may adversely affect the economic performance and value of the Fund's investments. These factors include but are not limited to, decrease in value of the loans, borrower non-performance, decrease in real estate or other asset values, increase in investor competition, lengthy legal proceedings, adverse legal judgments, changes in the national, regional and local economic climate, local conditions that may cause borrowers to not be able to make their interest payments, and which may devalue the Fund's collateral and other assets to the extent that exit strategies and liquidation of assets become unavailable. The Fund's performance would also depend on the Fund's ability to collect rent from tenants and to pay for adequate maintenance, insurance and other operating costs (including real estate taxes), which could increase over time. In addition, the expenses of owning and operating real property and other assets are not necessarily reduced when circumstances such as market factors and competition cause a reduction in income from the property. In addition, interest rate levels, the availability of financing, changes in laws and governmental regulations (including those governing usage, zoning and taxes) and the possibility of bankruptcies of tenants or borrowers may adversely affect the Fund's financial condition and results of operations.

**Diversification Risks**

The Fund may participate in a limited number of loans and the Fund lending activities may not be widely diversified. As a consequence, the Fund's aggregate return may be substantially adversely affected by the unfavorable performance of even a single investment. The ability of the Fund to diversify the risks of making investments will depend upon a variety of factors, including the size, characteristics, type and class of the investments being made, and with regard to short-term loans, the number and quality of borrowers

28

in need of financing. The Fund may not be able to make investments that would provide a desired level of diversification.

## General Risks of Commercial Real Estate Market

The Fund may participate in investment of commercial real estate market. Concentration in commercial real property entails risks that are specific to the industry. For example, the Fund may experience fluctuations in occupancy rates, rent schedules and operating expenses, among other factors, which can adversely affect operating results of the commercial real property and the borrower's ability to make payments on the loans. Operating performance will also depend on adverse changes in local population trends, market conditions, neighborhood values, national, regional or local economic and social conditions, federal, state or local regulations, controls or fiscal policies, including those affecting rents, prices of goods, fuel and energy consumption, environmental restrictions, real estate taxes, zoning and other factors affecting real property. Additionally, there may be a need for capital improvements and repairs, accounting for inflation, financial condition and profitability of tenants, uninsured losses, acts of nature such as floods and earthquakes, and other risks. Some or all of these factors may also affect the financial condition of borrower's on loans secured by commercial real property and thus their ability to make payments on these loans.

In addition, in the event a borrower defaults on a loan and lacks sufficient assets to satisfy our loan, we may suffer a loss of principal or interest. In the event a borrower declares bankruptcy, the Fund may not have full recourse to the assets of the borrower, or the assets of the borrower may not be sufficient to satisfy the loan. If a borrower defaults on our loan or on debt senior to our loan, or in the event of a borrower bankruptcy, our loan will be satisfied only after the senior debt is paid in full. Where debt senior to our loan exists, the presence of intercreditor arrangements may limit our ability to amend our loan documents, assign our loans, accept prepayments, exercise our remedies (through "standstill periods"), and control decisions made in bankruptcy proceedings relating to borrowers.

## Risks Related to Sale of Loans

The Fund may participate in sale of loans with Affiliates or third-parties, including institutions. In certain sales contracts exists a buy-back clause which may be enforced by the purchaser of the loans, including, in the event if the Fund has breached a representation or warranty contained in such sale agreement. In that instance, the Fund may be forced to repurchase one or more loans sold to the purchaser. The breach of a representation or warranty by the Manager may impact the Fund's ability to originate new loans and collect fee and strip interest income which the Fund and Manager use to fund its operations and distribute return to the Members.

## U.S. State Licensing Requirements

The Manager believes that the Fund or its affiliated have either obtained the licenses necessary for (or are exempt from) participating lawfully in the business of business purpose lending in each state in which it plans to make loans prior to commencing operations, based on current assessment of the regulatory requirements of each such state. This means that while the Fund and Manager may believe that that the Fund's practices in a particular state are compliant with that state's current regime, it is possible that that regime might come under question from state or other regulatory authorities, and/or be changed in such a way as to adversely affect the Fund's ability to continue lending or conducting business in that state or may prohibit continuation of Fund's loans in that state. The Fund intends to monitor such regulatory activity closely, but may fail to correctly or adequately anticipate regulatory action in this developing arena.

PRIVATE PLACEMENT MEMORANDUM         PACIFIC FREEDOM FUND, LLC                    $25,000,000

**Uninsured Losses**

The Manager will arrange for title, fire, and casualty insurance on the real properties securing the Fund's investments. However, there are certain types of losses, including catastrophic, war, floods, mudslides and other acts of God, which are either uninsurable or economically uninsurable. Should any such disaster occur, or if the insurance policies lapse through oversight, the Fund could suffer a loss of principal and interest on the loan secured by the uninsured property.

**Possible Repeal of Usury Exemption**

Depending on the state, loans arranged by or through a mortgage lending licensee are generally exempt from the otherwise applicable state's usury limitation. Should this exemption be repealed, the Fund may no longer be able to originate loans in excess of the usury limit, potentially reducing its return on investment or forcing it to limit its lending or investing activities. In addition, some states have maximum interest rates that may be charged on a loan by a lender. If the Fund were to exceed the maximum interest rate allowed by law in any of those states, it could become subject to penalties and fess, thus potentially reducing the Fund's return on its investment on a loan or forcing the Fund to limit its lending or investing activities.

**Risks of Real Estate Ownership**

There is no assurance that the Fund's owned properties will be profitable or that cash from operations will be available for distribution to Members. Because real estate, like many other types of long-term investments, historically has experienced significant fluctuations and cycles in value, specific market conditions may result in occasional or permanent reductions in the value of property interests. The marketability and value of the Fund's properties will depend upon many factors beyond the control of the Manager and the Fund, including, without limitation:

- changes in general or local economic conditions;

- changes in supply or demand for competing properties in an area (e.g., as a result of over-building);

- changes in interest rates;

- the promulgation and enforcement of governmental regulations relating to land use and zoning restrictions, environmental protection, and occupational safety;

- condemnation and other taking of property by the government;

- unavailability of mortgage funds that may increase borrowing costs and/or render the sale of a property difficult;

- unexpected environmental conditions;

- the financial condition of tenants, ground lessees, ground lessors, buyers and sellers of properties;

- changes in real estate taxes and any other operating expenses;

- energy and supply shortages and resulting increases in operating costs or the costs of materials and construction;

- various uninsured, underinsured or uninsurable risks (such as losses from terrorist acts), including risks for which insurance is unavailable at reasonable rates or with reasonable deductibles; and

- imposition of rent controls.

## Risks of Development, Renovation and Undeveloped Property

The Manager anticipates that the Fund may invest existing properties that require varying degrees of development.  In addition, some properties may be under construction or under contract to be developed or redeveloped.  Properties that involve development or redevelopment will be subject to the general real estate risks described above and will also be subject to additional risks, such as unanticipated delays or excess costs due to factors beyond the control of the Manager and the Fund. These factors may include (without limitation):

- strikes;

- adverse weather;

- earthquakes and other "force majeure" events;

- changes in building plans and specifications;

- zoning, entitlement and regulatory concerns, including changes in laws, regulations, elected officials and government staff;
- material and labor shortages;

- increases in the costs of labor and materials;

- changes in construction plans and specifications;

- rising energy costs; and

- delays caused by the foregoing (which could result in unanticipated inflation, the expiration of permits, unforeseen changes in laws, regulations, elected officials and government staff, and losses due to market timing of any sale that is delayed).

- Delays in completing any development or renovation project will cause corresponding delays in the receipt of operating income and, consequently, the distribution of any cash flow by the Fund with respect to such property.

## Risks Associated with Buying Contaminated Properties

The Fund presently does not intend to originate and/otherwise invest in loans secured by properties with known environmental conditions. Notwithstanding the foregoing, in the event a property is found to have environmental conditions and/or is contaminated after the Fund has acquired such loan, the Fund may be required to take steps to complete the remediation of such property (or properties), in order to be able to sell the property to a third-party. The Manager would plan to use contractors, service providers and/or Affiliates to help the Manager in evaluating, servicing and managing issues associated with contaminated properties, who will be covered under their own insurance policies. However, costs related to remediating such properties will likely negative impact the Fund's business operations, as unanticipated costs may rise.

31

In addition, if toxic environmental contamination is discovered to exist on a property underlying a corresponding loan, it might affect the borrower's ability to repay the corresponding loan and the Fund could suffer from a devaluation of the loan security. To the extent that the Fund is forced to foreclose and/or operate such a property, potential additional liabilities include reporting requirements, remediation costs, fines, penalties and damages, all of which would adversely affect the likelihood that Members would receive a return of capital on their Membership Interests.

Of particular concern may be those properties that are, or have been, the site of manufacturing, industrial or disposal activity. These environmental risks may give rise to a diminution in value of the security property or liability for clean-up costs or other remedial actions. This liability could exceed the value of the real property or the principal balance of the related mortgage loan. For this reason, the Fund may choose not to foreclose on contaminated property rather than risk incurring liability for remedial actions.

Under the laws of certain states, an owner's failure to perform remedial actions required under environmental laws may give rise to a lien on mortgaged property to ensure the reimbursement of remedial costs. In some states this lien has priority over the lien of an existing mortgage against the real property. Because the costs of remedial action could be substantial, the value of a mortgaged property as collateral for a mortgage loan could be adversely affected by the existence of an environmental condition giving rise to a lien.

The state of law is currently unclear as to whether and under what circumstances clean-up costs, or the obligation to take remedial actions, can be imposed on a secured lender. If a lender does become liable for cleanup costs, it may bring an action for contribution against the current owners or operators, the owners or operators at the time of on-site disposal activity or any other party who contributed to the environmental hazard, but these persons or entities may be bankrupt or otherwise judgment-proof. Furthermore, an action against the borrower may be adversely affected by the limitations on recourse in the loan documents.

**Rise in Insurance Costs**

Real estate properties are typically insured against risk of fire damage and other typically insured property casualties, but are sometimes not covered by severe weather or natural disaster events such as landslides, earthquakes, or floods. Changes in the conditions affecting the economic environment in which insurance companies do business could affect the borrower's ability to continue insuring the property at a reasonable cost or could result in insurance being unavailable altogether. Moreover, any hazard losses not then covered by the borrower's insurance policy would result in the corresponding Loan becoming significantly undersecured or the property being at risk, and a Member could sustain a significant reduction, or complete elimination of, the return on investment.

**Compliance with the Americans with Disabilities Act and Other Changes in Governmental Rules and Regulations**

Under the Americans with Disabilities Act of 1990 ("ADA"), all public properties are required to meet certain federal requirements related to access and use by disabled persons. Properties acquired by the Fund or in which the Fund makes a property investment may not be in compliance with the ADA. If a property is not in compliance with the ADA, then the Fund may be required to make modifications to such property to bring it into compliance, or face the possibility of imposition, or an award, of damages to private litigants. In addition, changes in governmental rules and regulations or enforcement policies affecting the use or operation of the properties, including changes to building, fire and life-safety codes, may occur which could have adverse consequences to the Fund.

**Dodd-Frank Wall Street Reform and Consumer Protection Act (amending the Federal Truth in Lending, Real Estate Settlement Procedures and Equal Credit Opportunity Acts)**

Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") created the Consumer Financial Protection Bureau ("CFPB") and transferred regulatory and rulemaking authority for the federal laws regulating consumer mortgage lending to the CFPB. Title XIV of Dodd-Frank, the Mortgage Reform and Anti-Predatory Lending Act, provides for substantial amendments to the statutes and regulations which govern consumer purpose loans secured by one to four residential properties.

Many of the final rules implementing the Dodd-Frank amendments took effect in January 2014. In part, the new rules require creditors to document and verify a consumer's ability to repay the mortgage loan; require appraisals for all higher-cost and high-cost loan transactions; restrict prepayment penalties on higher-cost loans and prohibit them on high cost loans; require creditors to establish escrow accounts for all higher-cost and high-cost loan transactions; and, require creditors to obtain written certification that a consumer has received homeownership counseling prior to closing a high cost mortgage loan. Failure to comply with the new rules implemented in Regulation Z may subject the Fund to, among other things, rescission of the loan and a loss of all finance charges and fees paid by the consumer.

**Risks Related to Tenancy and Leaseholds**

The Fund does not intend to engage in any direct commercial real property acquisition. However, there may be instances in which the Fund may own and hold commercial real properties as a result of the Fund's lending activities, including REOs. Although the Fund intends to divest these properties as soon as practicable, that may not always be the case and the Manager (or an Affiliate or third party) may have to manage the property and lease to tenants until sold. In such instances, there are risks associated with certain aspects of leases, including, without limitation:

- Tenancy bankruptcy;

- Cost of unlawful detainer and lessor remedies, including, breach of lease agreement covenants;

- Risks of noncompliant eviction;

- Contest of leases related to businesses and/or franchisees;

- Unintended consequences of remedies provided under the lease agreements, including, in the event the borrower defaults; and

- Occupancy risks such that the real property may fail to stabilize and/or generate income.

All of the above risks will diminish the overall return to the Members.

**Economic Conditions**

Changes in national or local economic conditions (including economic recessions, as noted above) could result in unanticipated declines in real estate values. Any decline in real estate values could have an adverse effect upon the Fund and could result in losses to Members. No assurance exists that the Fund would be able to avoid losses if real estate assets decline materially.

## Borrower Fraud

Borrowers and developers supply a variety of information regarding the current rental income, property valuations, market data, and other information. The Fund makes an attempt to verify much of the information provided, but as a practical matter, cannot verify all of it, which may result as incomplete, inaccurate or intentionally false. Borrowers and developers may also misrepresent their intentions for the use of investment proceeds. The Fund may not verify any statements by applicants as to how proceeds are to be used. If a borrower or developer supplies false, misleading or inaccurate information, Members may lose all or a portion of the investment in the loans.

When the Fund finances a loan, its primary assurances that the financing proceeds will be properly spent by the borrower or developer are the contractual covenants agreed to by the borrower or developer, along with their business history and reputation. Should the proceeds of a financing be diverted improperly, the borrower or developer might become insolvent, which could cause the Members to lose their entire investment.

## Unforeseen Changes

While the Fund has enumerated certain material risk factors herein, it is impossible to know all risks which may arise in the future.  In particular, Members may be negatively affected by changes in any of the following: (i) laws, rules and regulations; (ii) regional, national and/or global economic factors and/or real estate trends; (iii) the capacity, circumstances and relationships of partners of Affiliates, the Fund or the Manager; (iv) general changes in financial or capital markets, including (without limitations) changes in interest rates, investment demand, valuations or prevailing equity or bond market conditions; or (v) the presence, availability or discontinuation of real estate and/or housing incentives.

The Fund continuously encounters changes in its operating environment, and the Fund may have fewer resources than many of its competitors to continue to adjust to those changes.  The operating environment of the Fund is undergoing rapid changes, with frequent introductions of laws, regulations, competitors, market approaches, and economic impacts.  Future success will depend, in part, upon the ability of the Fund to address the needs of its borrowers, sponsors and clients by adapting to those changes and providing products and services that will satisfy the demands of their respective businesses and projects.  Many of the competitors have substantially greater resources to adapt to those changes.  The Fund may not be able to effectively react to all of the changes in its operating environment or be successful in adapting its products, services and approach.

## CONFLICTS OF INTEREST

The following is a list of some of the important areas in which the interests of the Manager and its Affiliates may conflict with those of the Fund.  The Members must rely on the general fiduciary standards and other duties which may apply to a manager of a limited liability company to prevent unfairness by any of the aforementioned in a transaction with the Fund.  (See "Fiduciary Responsibility of the Manager" above).

## Loan Origination and Renewal Commissions and Forbearance Fees

The Manager and/or its Affiliates will have the sole and absolute discretion to determine whether or not to make, acquire or sell a particular loan or property. None of the Income to the Fund set forth under "Income to the Fund" was determined through arms-length negotiations. Any increase in such charges may have a direct, adverse effect upon the interest rates that borrowers will be willing to pay the Fund, thus may reduce the overall rate of return to Members.  Conversely, if the Fund reduces the loan fees charged, a higher rate of return might be obtained for the Fund and the Members.  This conflict of interest will exist in connection with every transaction the Fund participates in.

**Fund Management Not Required to Devote Full-Time**

The Manager is not required to devote its capacities full-time to the Fund's affairs, but only such time as the affairs of the Fund may reasonably require.

**Competition with Affiliates of the Fund**

Though they currently have no intention to do so, there is no restriction preventing the Fund or any of its affiliates, principals or management from competing with the Fund by investing in collateral liens or sponsoring the formation of other investment groups like the Fund to invest in similar areas. If the Fund or any of its principals were to do so, then when considering each new investment opportunity, the Fund or such affiliate, principal or manager would need to decide whether to originate or hold the resulting transaction in the Fund, as an individual or in a competing entity. This situation would compel the Manager to make decisions that may at times favor persons other than the Fund. The Operating Agreement exonerates the Fund and its Affiliates, principals and management from any liability for investment opportunities given to other persons.

**Loan Transactions by Managers**

The Manager and/or its principals and affiliates may contribute loans to the Fund that otherwise meet the lending and underwriting criteria discussed herein. Such transactions would generally increase the Membership Interests or percentage ownership or interest of the Manager as a Member of the Fund, and correspondingly would dilute the ownership and percentage interests of other Members.

**Loan Servicing by the Fund or Manager**

The Manager has reserved the right to retain other firms in addition to, or in lieu of, the Manager acting as the loan servicer to perform the various brokerage services, loan servicing and other activities in connection with the Fund's investment portfolio that are described in this Memorandum. Such other firms may or may not be affiliated with the Fund or Manager. Loan servicing firms not affiliated with the Fund or Manager may provide comparable services on terms more favorable to the Fund. The Manager has very wide discretion in determining which entity (including, but not limited to, the Manager itself, an Affiliate of the Manager, or an unaffiliated third party) will service the loans.

**Other Companies & Partnerships or Businesses**

The Manager and its managers, principals, directors, officers or affiliates may engage, for their own account or for the account of others, in other business ventures similar to that of the Fund or otherwise, and neither the Fund nor any Member shall be entitled to any interest therein. As such, there exists a conflict of interest on the part of the Manager because there may be a financial incentive for the Manager to arrange or originate transactions for private investors and other mortgage funds. Further, the Manager may be involved in creating other mortgage or real estate funds that may compete with the Fund.

The Fund will not have independent management and it will rely on the Manager and its managers, principals, directors, officers and/or affiliates for the operation of the Fund. The Manager and these individuals/entities will devote only so much time to the business of the Fund as is reasonably required. The Manager may have conflicts of interest in allocating management time, services and functions between various existing companies, the Manager and any future companies which it may organize as well as other business ventures in which it or its managers, principals, directors, officers and/or affiliates may be or become involved. The Manager believes it has sufficient staff to be fully capable of discharging its responsibilities.

**Purchase, Sale and/or Hypothecation of Loans**

The Fund and its managers, principals, directors, officers and/or affiliates may sell, buy or hypothecate loans (use loans as collateral for another loan) to the Fund, provided that such loans meet the then-existing underwriting criteria of the Fund.  The Fund may pay a price greater or less than the remaining balance on such loans.  The price at which existing loans are bought and sold is normally a function of prevailing interest rates and the term of the loan.  Therefore, the Fund or its managers, principals, directors, officers and/or affiliates, may make a profit on the sale of an existing loan from the Fund to the Fund.  There will be no independent review of the value of such loans or of compliance with the conditions set forth above.

**Lack of Independent Legal Representation**

Investors and the Fund have not been represented by independent legal counsel to date.  The use of the Manager's counsel in the preparation of this Memorandum and the organization of the Fund may result in a lack of independent review.  Investors are encouraged to consult with their own attorney for legal advice in connection with this Offering.  Also, since legal counsel for the Manager prepared this Offering, legal counsel will not represent the interests of the Members at any time.

**Conflict with Related Programs**

The Manager and its managers, principals, directors, officers and/or Affiliates may cause the Fund to join with other entities organized by the Manager for similar purposes as partners, joint venturers or co-owners under some form of ownership in certain loans or in the ownership of repossessed real property. The interests of the Fund and those of such other entities may conflict, and the Fund controlling or influencing all such entities may not be able to resolve such conflicts in a manner that serves the best interests of the Fund.

**Other Services Provided by the Manager or its Affiliates**

The Manager or its Affiliates may provide other services to persons dealing with the Fund or the loans. The Manager or its Affiliates are not prohibited from providing services to, and otherwise doing business with, the persons that deal with the Fund, the Membership Interests, or the Members.

**Sale of Real Estate to Affiliates**

In the event the Fund becomes the owner of any real property by reason of foreclosure on a Fund loan or otherwise, the Manager's first priority will be to arrange for the sale of the property for a price that will permit the Fund to recover the full amount of its invested capital plus accrued but unpaid interest and other charges, or so much thereof as can reasonably be obtained in light of current market conditions.  In order to facilitate such a sale, the Manager may, but is not required to, arrange a sale to persons or entities controlled by it, (e.g. to another limited liability company formed by the Manager for the express purpose of acquiring foreclosure properties from lenders such as the Fund).  The Manager will be subject to conflicts of interest in arranging such sales since it will represent both parties to the transaction.  For example, the Fund and the potential buyer will have conflicting interests in determining the purchase price and other terms and conditions of sale.  The Manager's decision will not be subject to review by any outside parties. The Fund may sell a foreclosed property to the Manager or an Affiliate at a price that is fair and reasonable for all parties, but no assurance can be given that the Fund could not obtain a better price from an independent third party.

## CERTAIN LEGAL ASPECTS OF FUND LOANS

Each of the Fund's loans will be secured by, among other things, a deed of trust, mortgage, leasehold deed of trust or leasehold mortgage, or security agreement. The deed of trust and the mortgage are the most commonly used real property security devices. A deed of trust has three parties: a debtor, referred to as the "trustor"; a third party, referred to as the "trustee"; and the lender, referred to as the "beneficiary." The trustor irrevocably grants the property until the debt is paid, "in trust, with power of sale" to the trustee to secure payment of the obligation. The trustee's authority is governed by law, the express provisions of the deed of trust and the directions of the beneficiary. The Fund will be the beneficiary under all deeds of trust securing the Fund's loans. In a mortgage loan, there are only two parties: the mortgagor (borrower) and the mortgagee (lender).

In the United States, each individual state law determines how a mortgage is foreclosed. The route usually requires a judicial process, but varies from state to state. For properties located in the United States, some states have a statute known as the "one form of action" rule, which requires the beneficiary of a collateral lien to exhaust the security under the security lien (i.e., foreclose on the property) before any personal action may be brought against the borrower. Foreclosure statutes vary from state to state. Loans by the Fund secured by mortgages will be foreclosed in compliance with the laws of the state where the real property collateral is located.

### Foreclosure Example

In California, for example and illustration only, a statute known as the "one action" rule requires the beneficiary of a deed of trust to exhaust the security under the deed of trust (i.e., foreclose on the property) before any personal action may be brought against the borrower. There are two methods of foreclosing a deed of trust.

(a)     Foreclosure of a deed of trust is accomplished in most cases by a non-judicial trustee's sale under the power of sale provision in the deed of trust. Prior to such sale, the trustee must record a notice of default and send a copy to the trustor and to any person who has recorded a request for a copy of a notice of default, and to the successor in interest to the trustor and to the beneficiary of any junior deed of trust. The trustor or any person having a junior lien or encumbrance of record may, during a Three (3) month reinstatement period, cure the default by paying the entire amount of the debt then due, exclusive of principal due only because of acceleration upon default, plus costs and expenses actually incurred in enforcing the obligation and statutorily limited attorneys' and trustee's fees. Thereafter, and at least Twenty-One (21) days before the trustee's sale, a notice of sale must be posted in a public place and published once a week over such period. A copy of the notice of sale must be posted on the property, and sent to the trustee, to each person who has requested a copy, to any successor in interest to the trustor and to the beneficiary of any junior deed of trust, at least Twenty-One (21) days before the sale. Following the sale, neither the debtor/trustor nor a junior lien has any right of redemption, and the beneficiary may not obtain a deficiency judgment against the trustor.

(b)     A judicial foreclosure (in which the beneficiary's purpose is usually to obtain a deficiency judgment where otherwise unavailable) is subject to most of the delays and expenses of other lawsuits, sometimes requiring up to several years to complete. Following a judicial foreclosure sale, the trustor or his, her, or its successors in interest may redeem for a period of One (1) year (or a period of only Three (3) months if the entire amount of the debt is bid at the foreclosure sale), and until the trustor redeems, foreclosed junior lien holder may redeem during successive redemption periods of Sixty (60) days following the previous redemption, but in no event later than One (1) year after the judicial foreclosure sale. The Fund generally will not pursue a judicial foreclosure to obtain a deficiency judgment, except where, in the sole discretion of the Manager, such a remedy is warranted in light of the time and expense involved.

37

California has four principal statutory prohibitions which limit the remedies of a beneficiary under a deed of trust.  Two statutes limit the beneficiary's right to obtain a deficiency judgment against the trustor following foreclosure of a deed of trust - one based on the method of foreclosure and the other on the type of debt secured.

Under one statute, a deficiency judgment is barred where the foreclosure was accomplished by means of a non-judicial trustee's sale.  If foreclosure becomes necessary, it is anticipated that all of the Fund's loans will be enforced by means of a non-judicial trustee's sale.  Under the other statute, a deficiency judgment is barred in any event where the foreclosed deed of trust secured by a "purchase money obligation," i.e., a promissory note evidencing a loan used to pay all or part of the purchase price of a residential property occupied, at least in part, by the purchaser.  This restriction may apply to a number of Fund loans.

The third statute is known as the "one action" rule, which requires the beneficiary to exhaust the security under the deed of trust by foreclosure before bringing a personal action against the trustor on the promissory note.  The fourth statute which limits any deficiency judgment obtained by the beneficiary following a judicial sale to the excess of the outstanding debt over the fair market value of the property at the time of sale, thereby preventing a beneficiary from obtaining a large deficiency judgment against the debtor as a result of low bids at the judicial sale.

Other matters, such as litigation instituted by a defaulting borrower or the operation of the federal bankruptcy laws, may have the effect of delaying enforcement of the lien of a defaulted loan and may in certain circumstances reduce the amount realizable from sale of a foreclosed property.  States other than California also have laws intended to limit deficiency judgments and requiring the exhaustion of the security.

Foreclosure statutes vary from State to State.  Any loans by the Fund secured by mortgages will be foreclosed in compliance with the laws of the state where the real property collateral is located.  The above example based on California law is for illustration purposes only and is not an exhaustive summary of California law applicable to foreclosure or default or a reflection or summary of the laws of any other state or foreign jurisdiction.

**Special Considerations in Connection with Junior Encumbrances**

In addition to the general considerations concerning trust deeds discussed above, there are certain additional considerations applicable to second and more junior deeds of trust ("junior encumbrances").  By its very nature, a junior encumbrance is less secure than a more senior lien.  If a senior lien holder forecloses on its loan, unless the amount of the bid exceeds the senior encumbrances, the junior lien holder will receive nothing.  Because of the limited notice and attention given to foreclosure sales, it is possible for a junior lien holder to be sold out, receiving nothing from the foreclosure sale, although all legal methods of recouping the Fund's investment will be exhausted.  By virtue of anti-deficiency legislation, discussed above, a junior lien holder may be totally precluded from any further remedies.

Accordingly, a junior lien holder (such as the Fund in certain cases) may find that the only method of protecting its security interest in the property is to take over all obligations of the trustor with respect to senior encumbrances while the junior lien holder commences its own foreclosure, making adequate arrangements either to (1) find a purchaser for the property at a price which will recoup the junior lien holder's interest, or (2) to pay off the senior encumbrances so that the junior lien holder's encumbrance achieves first priority.  Either alternative may require the Fund to make substantial cash expenditures to protect its interest.  (See "Business Risks" above).

The Fund may also make wrap-around mortgage loans (sometimes called "all-inclusive loans"), which are junior encumbrances to which all the considerations discussed above will apply.  A wrap-around loan is made when the borrower desires to refinance his, her, or its property but does not wish to retire the existing indebtedness for any reason, e.g., a favorable interest rate or a large prepayment penalty.  A wrap-around loan will have a principal amount equal to the outstanding principal balance of the existing secured loans plus the amount actually to be advanced by the Fund.  The borrower will then make all payments directly to the Fund, and the Fund in turn will pay the holder of the senior encumbrance.  The actual ultimate yield to the Fund under a wrap-around mortgage loan will likely exceed the stated interest rate on the underlying senior loan, since the full principal amount of the wrap-around loan will not actually be advanced by the Fund.  State laws generally require that the Fund be notified when any senior lien holder initiates foreclosure.

If the borrower defaults solely upon his, her or its debt to the Fund while continuing to perform with regard to the senior lien, the Fund (as junior lien holder) will foreclose upon its security interest in the manner discussed above in connection with deeds of trust generally.  Upon foreclosure by a junior lien, the property remains subject to all liens senior to the foreclosed lien.  Thus, if the Fund were to purchase the security property at its own foreclosure sale, it would acquire the property subject to all senior encumbrances.

The standard form of deed of trust used by most institutional lenders, like the one that will be used by the Fund or its affiliates, confers on the beneficiary the right both to receive all proceeds collected under any hazard insurance policy and all awards made in connection with any condemnation proceedings, and to apply such proceeds and awards to any indebtedness secured by the deed of trust in such order as the beneficiary may determine.  Thus, in the event improvements on the property are damaged or destroyed by fire or other casualty, or in the event the property is taken by condemnation, the beneficiary under the underlying first deed of trust will have the prior right to collect any insurance proceeds payable under a hazards insurance policy and any award of damages in connection with the condemnation, and to apply the same to the indebtedness secured by the first deed of trust before any such proceeds are applied to repay the loan in respect of the Fund.  The amount of such proceeds may be insufficient to pay the balance due to the Fund, while the debtor may fail or refuse to make further payments on the damaged or condemned property, leaving the Fund with no feasible means to obtain payment of the balance due under its junior deed of trust.  In addition, the borrower may have a right to require the lender to allow the borrower to use the proceeds of such insurance for restoration of the insured property.

**Bankruptcy Laws**

If a borrower or property owner on which a lien is imposed files for protection under the federal bankruptcy statutes, the Fund will be initially barred from taking any foreclosure action on its real property security by an "automatic stay order" that goes into effect upon the borrower's filing of a bankruptcy petition.  Thereafter, the Fund would be required to incur the time, delay and expense of filing a motion with the bankruptcy court for permission to foreclose on the real property security ("relief from the automatic stay order").  Such permission is granted only in limited circumstances.  If permission is denied, the Fund will likely be unable to foreclose on its security for the duration of the bankruptcy, which could be a period of years.  During such delay, a borrower may or may not be required to pay current interest on the Fund loan.  Also, a property owner may or may not be able to pay down the lien.  The Fund would therefore lack the cash flow it anticipated from the loan, and the total indebtedness secured by the security property would increase by the amount of the defaulted payments, perhaps reaching a total that would exceed the market value of the property.

In addition, bankruptcy courts have broad powers to permit a sale of the real property free of the Fund's lien, to compel the Fund to accept an amount less than the balance due under the loan and to permit the borrower to repay the loan over a term which may be substantially longer than the original term of the loan.

**"Due-on-Sale" Clauses**

The Fund's forms of promissory notes and deeds of trust, like those of many lenders, contain "due-on-sale" clauses, which permits the Fund to accelerate the maturity of a loan if the borrower sells, conveys or transfers all or any portion of the property, but may or may not contain "due-on-encumbrance" clauses which would permit the same action if the borrower further encumbers the property (i.e., executes further deeds of trust). The enforceability of these types of clauses has been the subject of several major court decisions and legislation in recent years.

(1)      Due-on-Sale.  Federal law now provides that, notwithstanding any contrary pre-existing state law, due-on-sale clauses contained in mortgage loan documents are enforceable in accordance with their terms by any lender after October 15, 1985.  On the other hand, acquisition of a property by the Fund by foreclosure on one of its loans may also constitute a "sale" of the property, and would entitle a senior lien holder to accelerate its loan against the Fund.  This would be likely to occur if then prevailing interest rates were substantially higher than the rate provided for under the accelerated loan.  In that event, the Fund may be compelled to sell or refinance the property within a short period of time, notwithstanding that it may not be an opportune time to do so.

(2)      Due-on-Encumbrance.  With respect to mortgage loans on residential property containing four or less units, federal law prohibits acceleration of the loan merely by reason of the further encumbering of the property (e.g., execution of a junior deed of trust).  This prohibition does not apply to mortgage loans on other types of property. Although many of the Fund's junior lien mortgages will be on properties that qualify for the protection afforded by federal law, some loans will be secured by properties that do not qualify for the protection, including (without limitation) small apartment buildings or commercial properties.  Junior lien mortgage loans made by the Fund may trigger acceleration of senior loans on properties if the senior loans contain valid due-on-encumbrance clauses, although both the number of such instances and the actual likelihood of acceleration are anticipated to be minor.  Failure of a borrower to pay off the senior loan would be an event of default and subject the Fund (as junior lien holder) to the risks attendant thereto.  It will not be customary practice of the Fund to make loans on non-residential property where the senior encumbrance contains a due-on-encumbrance clause.  (See "Special Considerations in Connection with Junior Encumbrances.")

**Prepayment Charges**

Loans may provide for certain prepayment charges to be imposed on the borrowers in the event of certain early payments on the loan.  The Manager reserves the right, but has no obligation, at its business judgment to waive collection of prepayment penalties.  Applicable federal and state laws may limit the prepayment charge on residential loans.  For commercial or multi-family loans there is no federal law that limits the prepayment amount charge, but applicable state laws may vary.

## LEGAL PROCEEDINGS

Neither the Fund, Manager nor any of its managers, principals, directors or officers of the Fund are now, or within the past Five (5) years have been, involved in any material litigation or arbitration.

## INCOME TAX CONSIDERATIONS

**Federal Income Tax Aspects**

The following discussion generally summarizes the material federal income tax consequences of an investment in the Fund based upon the existing provisions of the Internal Revenue Code of 1986, as

amended ("Code"), and applicable Treasury regulations thereunder, current administrative rulings and procedures and applicable judicial decisions.  However, it is not intended to be a complete description of all tax consequences to prospective Investors with respect to their investment in the Fund.  No assurance can be given that the Internal Revenue Service ("IRS") will agree with the interpretation of the current federal income tax laws and regulations summarized below.  In addition, the Fund or the Investors may be subject to state and local taxes in jurisdictions in which the Fund may be deemed to be doing business.

ACCORDINGLY, ALL PROSPECTIVE INVESTORS SHOULD INDEPENDENTLY SATISFY THEMSELVES REGARDING THE POTENTIAL FEDERAL AND STATE TAX CONSEQUENCES OF PARTICIPATION IN THE FUND AND ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS, ATTORNEYS OR ACCOUNTANTS IN CONNECTION WITH ANY INTEREST IN THE FUND.  EACH PROSPECTIVE INVESTOR SHOULD SEEK, AND RELY UPON, THE ADVICE OF THEIR OWN TAX ADVISORS IN EVALUATING THE SUITABILITY OF AN INVESTMENT IN THE FUND IN LIGHT OF THEIR PARTICULAR INVESTMENT AND TAX SITUATION.

**Tax Law Subject to Change**

Frequent and substantial changes have been made, and will likely continue to be made, to the federal and state income tax laws.  The changes made to the tax laws by legislation are pervasive, and in many cases, have yet to be interpreted by the IRS or the courts.

**State and Local Taxes**

A description or analysis of the state and local tax consequences of an investment in the Fund is beyond the scope of this discussion.  Prospective Members are advised to consult their own tax counsel and advisors regarding these consequences and the preparation of any state or local tax returns that an Investor may be required to file.

In addition to the United States Federal Income tax considerations described herein, Members should consider the potential state and local tax consequences of a purchase of Membership Interests.  In addition to being taxed and subject to tax filling obligations in its own state or locality of residence or domicile, a Member may be subject to the tax filing obligations and income, franchise and other taxes in jurisdictions in which the Fund conducts its activities.  Although no assurances can be provided, the Fund intends to conduct its activities in such a manner that will not cause Members who are not otherwise subject to taxation in states other than their state of residence, to be taxed and subject to tax filing obligations in other states solely as a result of owning Membership Interests.  The Fund itself may also become subject to tax in certain jurisdictions.  This discussion does not purport to discuss the state and local tax consequences of an investment in the Membership Interests.

**Federal Partnership Treatment**

The Fund is likely to be treated as a partnership under the Internal Revenue Code of 1986 ("Code").  Assuming that the Fund has been properly formed under California law, is operated in accordance with applicable California corporate and business law and the terms of the Operating Agreement, it is the Fund's opinion (subject to the discussion regarding "Taxable Mortgage Pools" below) that, if the matter were litigated, it is more likely than not that the Fund would prevail as to its classification and would be taxed as a partnership for federal income tax purposes. If the Internal Revenue Service ("IRS") determined that the Fund was an association taxable as a corporation for federal income tax purposes, there would be significant adverse tax consequences to the Fund and possibly to its investors, including (without limitation) the Fund would have to pay tax on its net income and then the investor would have to pay tax on any distributions as dividends as opposed to interest income.

**IRS Audits**

Informational returns filed by the Fund are subject to audit by the IRS.  The IRS devotes considerable attention to the proper application of the tax laws to partnerships.  An audit of the Fund's return may lead to adjustments which adversely affect the federal income tax treatment of Membership Interests and cause Members to be liable for tax deficiencies, interest thereon and penalties for underpayment. An audit of the Fund's tax return could also lead to an audit of their individual tax return that may not otherwise have occurred, and to the adjustment of items unrelated to the Fund.  Prospective Investors should make their determination to invest based on the economic considerations of the Fund rather than any anticipated tax benefits. Furthermore, the IRS has taken the position in Temp. Reg. 1.163-9T that any interest on income taxes owed by an individual is personal interest, subject to limitations on deduction, regardless of the nature of the activity that produced the income that was the source of the tax.

If the IRS makes audit adjustments to the Fund's income tax returns, it may assess and collect any taxes (including any applicable penalties and interest) resulting from such audit adjustment directly from the Fund. Generally, the Fund may elect to have the Members take such audit adjustment into account in accordance with their interest in the Fund during the tax year under audit, but there can be no assurance that such election will be effective in all circumstances and the manner in which the election is made and implemented has yet to be determined.  If the Fund is unable to have the Members take such audit adjustment into account in accordance with their interests in the Fund during the tax year under audit, current Members may bear some or all of the tax liability resulting from such audit adjustment, even if such Members did not own Membership Interests in the Fund during the tax year under audit.  If, as a result of any such audit adjustment, the Fund is required to make payments of taxes, penalties and interest, cash available for distribution to Members might be substantially reduced.  The Fund may, at any time, during the existence of the Fund or any predecessor of the Fund, directly seek reimbursement of underpaid taxes, penalties, and interest from the Members who held Membership Interests during the year which is under IRS, state, or local audit examination, even if such Member has since redeemed its Membership Interest and is no longer a Member of the Fund.  The Fund will designate the Manager to act as the partnership representative who shall have the sole authority to act on behalf of the Fund with respect to dealings with the IRS under these audit procedures.  The acts of the Manager in its capacity as partnership representative, including the extension of statutes of limitation, will bind the Fund and all Members.  The Members will not have a right to participate in the audit proceedings.

**Profit Objective of the Fund**

Deductions will be disallowed if they result from activities not entered into for profit to the extent that such deductions exceed an amount equal to the greater of: (a) the gross income derived from the activity; or (b) deductions (such as interest and taxes) that are allowable in any event. The applicable Treasury Department regulations indicate a transaction will be considered as entered into for profit where there is an expectation of profit in the future, either of a recurring type or from the disposition of property.  In addition, the Code provides, among other things, an activity is presumed to be engaged for profit if the gross income from such activity for Three (3) of the Five (5) taxable years ending with the taxable year in question exceeds the deductions attributable to such activity.  It is anticipated that the Fund will satisfy this test.

**Property Held Primarily for Sale: Potential Dealer Status**

The Fund has been organized to invest in loans and notes primarily secured by deeds of trust or mortgages on real property and to acquire real estate properties.  However, if the Fund were at any time deemed for federal tax purposes to be holding one or more Fund loans, notes or properties primarily for sale to customers in the ordinary course of business (a "dealer"), any gain or loss realized upon the disposition of such loans, notes or properties would be taxable as ordinary gain or loss rather than as capital gain or loss.

42

The federal income tax rates for ordinary income are currently higher than those for capital gains.  In addition, income from sales of loans, notes and properties to customers in the ordinary course of business would also constitute unrelated business taxable income to any Members which are tax-exempt entities.  Under existing law, whether or not real property is held primarily for sale to customers in the ordinary course of business must be determined from all the relevant facts and circumstances.  The Fund intends to make and hold the Fund loans, notes and properties for investment purposes only, and to dispose of Fund loans, notes and properties, by sale or otherwise, at the discretion of the Manager and as consistent with the Fund's investment objectives.  It is possible that, in so doing, the Fund will be treated as a "dealer" in mortgage loans, notes and properties, and that profits realized from such sales will be considered unrelated business taxable income to otherwise tax-exempt Investors in the Fund.

**Taxable Mortgage Pool Rules**

Notwithstanding the check-the-box provisions, the IRS may still reclassify certain partnerships as corporations for federal income tax purposes, if they meet the definition of a "taxable mortgage pool" under Internal Revenue Code Section 7701(i)(2)(A)(ii).  A taxable mortgage pool is any entity whose assets consist substantially of debt instruments, who is the obligor under debt obligations with Two (2) or more maturities, and where there is a relationship between the debt instruments and the debt obligations of the entity.  The issue of what constitutes debt obligations with Two (2) or more maturities is unclear. The regulations state that "[T]he purpose of section 7701(i) is to prevent income generated by a pool of real estate mortgages from escaping Federal income taxation when the pool is used to issue multiple class mortgage-backed securities."  The Fund has only one class of Membership Interests. A literal reading of this provision could lead to the conclusion that the Fund would not be reclassified as a taxable mortgage pool and taxed as a corporation.  However, due to the lack of clarity with respect to this provision, there is no assurance (and no opinion of any kind can be given) that the IRS would not attempt to tax the Fund as a corporation and not a partnership. Any such taxation would have an adverse effect on the Fund and the return an Investor would receive on their investment in the Fund.

**Portfolio Income**

A primary source of Fund income will be interest, which is ordinarily considered "portfolio income" under the Code.  Similarly, Temporary Regulations issued by the Internal Revenue Service in 1988 (Temp. Reg. Section 1.469 2T(f)(4)(ii)) confirmed that net interest income from an equity-financed lending activity such as the Fund will be treated as portfolio income, not as passive income, to Members.  Therefore, Members will not be entitled to treat their proportionate share of Fund income as passive income, against which passive losses (such as deductions from unrelated real estate investments) may be offset. Another source of Fund income will be capital gains from selling real property. Capital gains are also treated as portfolio income and not as passive income to the Members. Thus, Members will not be entitled to treat their proportionate share of Fund income as passive income, against which passive losses may be offset.

**Understatement Penalties**

The Fund will be subject to substantial understatement penalty in the event that it understates its income tax.  The IRS imposes a penalty of Twenty Percent (20%) on any substantial understatement of income tax.  Furthermore, the IRS can charge interest on underpayments of income tax exceeding One Hundred Thousand Dollars ($100,000) for any tax year owing by certain corporations at a rate that is higher than the normal interest rate.  The Manager strongly advises prospective investors to consult with their own tax advisor to be sure that they fully evaluate the proposed tax treatment of LLC as described herein.

**Unrelated Business Taxable Income**

The Fund may generate unrelated business taxable income for Members that are qualified plans such as self-directed IRA's, or tax exempt organizations such as pension/benefit plan investors, colleges, universities, private foundations and charitable remainder trusts. Investors should be aware also that the issue of how the unrelated business taxable income of a qualified plan or exempt organization should be taxed is regularly under discussion by one or more committees of Congress. The Fund advises that all Members, particularly Members with qualified plans or exempt organizations, consult with their own tax advisor to be sure they fully evaluate the impact of unrelated business taxable income for Members.

## ERISA CONSIDERATIONS

The following is a discussion of how certain requirements of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and the Code relating to Employee Benefit Plans and certain Other Benefit Arrangements (each as defined below) may affect an investment in the Membership Interests.  It is not, however, a complete or comprehensive discussion of all employee benefits aspects of such an investment.  If the Investors are trustees or other fiduciaries of an Employee Benefit Plan or Other Benefit Arrangement, before purchasing Membership Interests, they should consult with their own independent legal counsel to assure that the investment does not violate any of the applicable requirements of ERISA or the Code, including, without limitation, the ERISA fiduciary rules and the prohibited transaction requirements of ERISA and the Code.

**ERISA Fiduciary Duties**

Under ERISA, persons who serve as trustees or other fiduciaries of an Employee Benefit Plan have certain duties, obligations and responsibilities with respect to the participants and beneficiaries of such plans. Among the ERISA fiduciary duties are the duty to invest the assets of the plan prudently, and the duty to diversify the investment of plan assets so as to minimize the risk of large losses.  An "Employee Benefit Plan" is a plan subject to ERISA that is an employee pension benefit plan (such as a defined benefit pension plan or a section 401(k) or 403(b) plan) or any employee welfare benefit plan (such as an employee group health plan).

**Prohibited Transaction Requirements**

Section 406 of ERISA and Section 4975 of the Code proscribe certain dealings between Employee Benefit Plans or Other Benefit Arrangements, on the one hand, and "parties-in interest" or "disqualified persons" with respect to those plans or arrangements on the other.  An "Other Benefit Arrangement" is a benefit arrangement described in Section 4975(e)(1) of the Code (such as a self-directed individual retirement account ("IRA"), other than an Employee Benefit Plan.

Prohibited transactions include, directly or indirectly, any of the following transactions between an Employee Benefit Plan or Other Benefit Arrangement and a party in interest or disqualified person:

> (a)      sales or exchanges of property;
>
> (b)      lending of money or other extension of credit;
>
> (c)      furnishing of goods, services or facilities; and
>
> (d)      transfers to, or use by or for the benefit of, a party in interest or disqualified person of any assets of the Employee Benefit Plan or Other Benefit Arrangement.

In addition, prohibited transactions include any transaction where a trustee or other fiduciary of an Employee Benefit Plan or Other Benefit Arrangement:

(a)     deals with plan assets for his own account,

(b)     acts on the behalf of parties whose interests are adverse to the interest of the plan, or

(c)     receives consideration for his own personal account from any party dealing with the plan with respect to plan assets.

The terms "party in interest" under ERISA and "disqualified person" under the Code have similar definitions. The terms include persons who have particular relationships with respect to an Employee Benefit Plan or Other Benefit Arrangement, such as:

(a)     fiduciaries;

(b)     persons rendering services of any nature to the plan;

(c)     employers any of whose employees are participants in the plan, as well as owners of 50% or more of the equity interests of such employers;

(d)     spouses, lineal ascendants, lineal descendants, and spouses of such ascendants or descendants of any of the above persons;

(e)     employees, officers, directors and Ten Percent (10%) or more owners of such fiduciaries, service providers, employers or owners;

(f)     entities in which any of the above-described parties hold interests of 50% or more; and

(g)     Ten Percent (10%) or more joint venturers or partners of certain of the parties described above.

Certain transactions between Employee Benefit Plans or Other Benefit Arrangements and parties in interest or disqualified persons that would otherwise be prohibited transactions are exempt from the prohibited transaction rules due to the application of certain statutory or regulatory exemptions. In addition, the United States Department of Labor ("DOL") has issued class exemptions and individual exemptions for certain types of transactions. Violations of the prohibited transaction rules may require the prohibited transactions to be rescinded and will cause the parties in interest or disqualified persons to be subject to excise taxes under Section 4975 of the Code.

**Investments in the Fund**

If any Investor is a fiduciary of an Employee Benefit Plan, the investor must act prudently and ensure that the plan's assets are adequately diversified to satisfy the ERISA fiduciary duty requirements. Whether an investment in the Fund is prudent and whether an Employee Benefit Plan's investments are adequately diversified must be determined by the plan's fiduciaries in light of all of the relevant facts and circumstances. A fiduciary should consider, among other factors, the limited marketability of the Membership Interests.

Investors also should be aware that under certain circumstances the DOL may view the underlying assets of the Fund as "plan assets" for purposes of the ERISA fiduciary rules and the ERISA and Internal Revenue

45

Code prohibited transaction rules.  DOL regulations indicate that Fund assets will <u>not</u> be considered plan assets if less than Twenty Five Percent (25%) of the value of the Membership Interests is held by Employee Benefit Plans and Other Benefit Arrangements.

The Fund anticipates that if any Investor is an Employee Benefit Plan subject to ERISA, the Fund will limit the investments by all Employee Benefit Plans and Other Benefit Arrangements to ensure that the Twenty Five Percent (25%) limit is not exceeded.  Because the Twenty Five Percent (25%) limit is determined after every subscription or redemption, the Fund has the authority to require the redemption of all or some of the Membership Interests held by any Member that is an Employee Benefit Plan or Other Benefit Arrangement if the continued holding of such Membership Interests, in the sole opinion of the Fund, could result in the Fund being subject to the ERISA fiduciary rules.

If there are no Employee Benefit Plan investors in the Fund, the Fund anticipates that investments by Other Benefit Arrangements (such as self-directed IRAs) may exceed the Twenty Five Percent (25%) limit.  This situation may cause the underlying assets of the Fund to be considered plan assets for purposes of the Code prohibited transaction rules.  In such a case, the Other Benefit Arrangement investors must ensure that their investments do not constitute prohibited transactions under Section 4975 of the Code.  Such investors should consult with independent legal counsel on these issues.

**Special Limitations**

The discussion of the ERISA fiduciary aspects and the ERISA and Code prohibited transaction rules contained in this Memorandum is not intended as a substitute for careful planning.  The applicability of ERISA fiduciary rules and the ERISA or Code prohibited transaction rules to Investors may vary from one Investor to another, depending upon that Investor's situation.  Accordingly, Investors should consult with their own attorneys, accountants and other personal advisors as to the effect of ERISA and the Code on their situation of a purchase and ownership of the Membership Interests and as to potential changes in the applicable law.

## LEGAL MATTERS

The Fund has retained Geraci Law Firm of Irvine, California to advise it in connection with the preparation of this Offering, the Operating Agreement, the Subscription Agreement and any other documents related thereto.  Geraci Law Firm has not been retained to represent the interests of any Investors or Members in connection with this Offering.  Investors that are evaluating or purchasing Membership Interest should retain their own independent legal counsel to review this Offering, the Memorandum, the Operating Agreement, the Subscription Agreement and any other documents related to this Offering, and to advise them accordingly.

## ADDITIONAL INFORMATION AND UNDERTAKINGS

The Fund and Manager undertake to make available to each Investor every opportunity to obtain any additional information from them necessary to verify the accuracy of the information contained in this Memorandum, to the extent that they possess such information or can acquire it without unreasonable effort or expense.  This additional information includes all the organizational documents of the Fund, recent financial statements for the Fund and all other documents or instruments relating to the operation and business of the Fund that are material to this Offering and the transactions described in this Memorandum.

# EXHIBIT 2

# EXHIBIT 2

**Zimbra**                                                            **justin@weinstitutional.com**

## Update Regarding Pacific Private Money Group

| | |
|---|---|
| **From :** Investor Relations <invest@pacificprivatemoney.com> | Fri, Jan 23, 2026 05:16 PM |
| **Subject :** Update Regarding Pacific Private Money Group | 📎 7 attachments |
| **To :** Justin Bougher <Justin@weinstitutional.com> | |
| **Reply To :** invest@pacificprivatemoney.com | |

January 23, 2026

Dear Investor in the Pacific Freedom Fund:

I write with an update on Pacific Private Money Group ("PPM"), which is a parent company to Arrival Home Loans, and PPM's associated entities and Funds.

For background purposes for those of you invested in the Arrival Home Loans fund who did not receive my prior communication on January 9, PPM retained me as Chief Restructuring Officer in connection with financial challenges it was experiencing.  I am a restructuring and turnaround professional with 30 years of experience, including leading several real estate funds through difficult situations.  I turned my immediate focus on managing cash liquidity, evaluating assets and liabilities, and assessing paths forward, including restructuring.

At this point, it appears that Arrival Fund I is in a different financial position than other PPM Funds.  However, Arrival Home Loans is now operating at a reduced capacity and the overall situation may impact Arrival investors.

I think it is imperative to share with all investors the following points regarding PPM's current operations and the likely plan-forward:

- Cash flow, liquidity, and current assessment:
  - The company continues to operate with critically minimal cash balances, and the ability to continue to operate is at risk.
  - I have requested that all cash balances held by the fund entities be used solely for fund entity purposes.  Many investors have inquired if cash held by the investment funds is being used to fund operations and or pay professional fees (such as to my firm), and the answer is no.
  - The decision has been made to largely discontinue operations (i.e., no further originations) and to begin an orderly wind-down process at all of the Pacific Private Money funds and operating companies **<u>except for</u>** the Arrival Fund I and Arrival Home Loans entities ("AHL") (additional discussion below).
  - Ultimately, the assets of the funds will be collected (e.g., mortgage note payments and fee receivables), sold or otherwise monetized, and the net proceeds from those actions will be distributed to creditors and investors according to the requirements under California law.
  - No decision has been made re: the process to effect the wind-down; however, we are evaluating all restructuring options, including both out-of-court and in-court processes (e.g., utilizing Chapter 11 of the Bankruptcy Code to effectuate an orderly winddown of the PPM entities). In my opinion, there are extremely limited restructuring options.
  - As of January 23, 2026, PPM has retained insolvency counsel to advise the PPM entities with regard to the formal wind-down and dissolution process. Bennett Young, partner at Jeffer Mangels Butler & Mitchell ("JMBM") in San Francisco, will lead the legal efforts.

- Personnel updates:
  - The company made another reduction-in-force this week.  As a result, 5 PPM employees or contractors remain who will assist in the process to wind-down fund operations (for all entities except for AHL entities).  Twelve AHL employees remain.
  - Nam Phan, chief operating officer at PPM, resigned on January 22, 2026.

- Investor accounts:
  - Perhaps most important to many investors, I do not have an estimate that I have confidence in of the expected range of recoveries for the investors in the various funds. The main reason is that PPM does not have the cash to hire real estate valuation professionals necessary to do the required analysis to form the basis of the range of recoveries from the sale of mortgage notes, sale of real estate owned properties, and collection of loan amounts made among the various funds and to outside parties controlled by insiders. I will share with you that based on my team's high-level analysis and experience, my rough estimate is that net recoveries under an orderly liquidation process will be a fraction of total capital provided by investors.
  - The real estate valuation analysis and historical cash tracing analysis work is expected to be performed as part of the wind-down process, and PPM will cooperate and work with investors, creditors, and regulatory authorities as part of the forensic analysis that will be done.

- Arrival Home Loans:
  - As stated above, operations at AHL are continuing albeit at a reduced level while we determine if AHL has potential value, and how we might be able to preserve and monetize any such value, that may improve and enhance net recoveries for both AHL stakeholders and stakeholders in at least one other PPM entity.
  - I will keep you apprised re: AHL and the action steps that are being taken.

- Other issues:
  - Several investors alerted us this past week to a website for an entity named Oasis Private Funder which appeared to have copied the PPM website and was attempting to operate as a hard money lender. The Oasis site appears to have been shut down, and I do not know who was behind this copycat attempt.

For those of you who did not receive the January 9 communication from me, my email address is bill.brinkman@jigsawadvisors.com. I do ask for your patience in responding to individual questions and requests for documents. Please know that we will respond as quickly as we can.

Best regards,

**Bill Brinkman, Chief Restructuring Officer**
Pacific Private Money Group LLC
DRE License No. 01310091

Direct | (415) 926-4444
invest@pacificprivatemoney.com
www.PacificPrivateMoney.com

1555 Grant Ave., Novato, CA 94945

Pacific Private Money Inc. NMLS ID: 945582 DRE License No. 01897444. MLO License Endorsement 945582 Finance Lenders Law License: 6054605 Loans made or arranged pursuant to a California Finance Lenders Law license. Visit https://nmlsconsumeraccess.org

**Confidentiality Notice**: The information contained in this electronic e-mail and any accompanying attachment(s) is intended only for the use of the intended recipient and may be confidential and/or privileged. If any reader of this communication is not the intended recipient, unauthorized use, disclosure or copying is strictly prohibited, and may be unlawful. If you have received this communication in error, please immediately notify the sender by return e-mail, and delete the original message and all copies from your system. Thank you.

# EXHIBIT 3

# EXHIBIT 3

# Investor Questions for Bill Brinkman

*Compiled by PPM Investor Group*

*The information provided in this document is based on my current understanding based on information and documents that I have reviewed to date.  My work has focused on the company's current status to assess options re: various paths forward and to execute the wind-down.  I have not conducted a historical forensic or factual analysis.*

## A. Fund Structure, Assets, and Liabilities

1. What is the current status and inventory of all assets and liabilities in each PPM fund? Please include the names of all funds for which disbursements have been frozen.

   **RESPONSE:** PLEASE SEE **EXHIBIT A** FOR AN ENTY ORG CHART. IN SUMMARY THERE ARE FIVE FUNDS WHICH APPEAR TO HOLD INVESTOR CAPITAL. ACTIVITIES HAVE BEEN PAUSED IN ALL OF THE FIVE FUNDS.

2. What is the estimated value of each fund as of today, including how much is liquid?

   **RESPONSE:** PLEASE SEE **EXHIBIT B** FOR LOAN DETAILS OF EACH FUND. NOTE THAT DETAILED VALUATION/APPRAISAL ANALYSIS OF INDIVIDUAL ASSETS HAS NOT BEEN UNDERTAKEN DUE TO INSUFFICIENT CASH IN THE COMPANY'S OPERATING ACCOUNTS.

3. How many investors are in each fund, and what are the aggregate initial investment amounts per fund?

   **RESPONSE:** PLEASE SEE TABLE BELOW. NOTE THAT THE UNPAID PRINCIPAL BALANCE ("UPB") AMOUNT REPRESENTS THE BOOK VALUE (OR COST BASIS) OF THE LOAN PORTFOLIO.

### PPM: Loan Portfolio Summary

As of 1/31/26

| | Number of Investors | Total Investment | Number of Loans | UPB of Outstanding Loans | % of UPB Total |
|---|---|---|---|---|---|
| Lender: | | | | | |
| PPMF | 191 | $46,762,053 | 32 | $38,620,362 | 56.7% |
| AFI [1] | 22 | $3,812,125 | 11 | $14,440,000 | 21.2% |
| PFF | 138 | $74,221,216 | 6 | $5,317,852 | 7.8% |
| PPMI | 0 | $0 | 5 | $4,901,790 | 7.2% |
| PSWNF | 58 | $12,451,936 | 33 | $3,017,231 | 4.4% |
| POF | 12 | $2,244,689 | 1 | $1,402,558 | 2.1% |
| PMC | 0 | $0 | 1 | $369,898 | 0.5% |
| **Total** | **421** | **$139,492,019** | **89** | **$68,069,691** | **100.0%** |

[1] The  $14.4 million portfolio of Arrival loans has been either recently sold in ordinary course or is expected to be sold during the month of February. The AHL portfolio consists of notes whose origination closed recently (i.e., generally 2-4 weeks prior).

1

NOTE THAT THE TOTAL UPB IS APPROXIMATELY $68 MILLION; HOWEVER, IT APPEARS THAT THE FAIR MARKET VALUE OF THE LOAN PORTFOLIO IS SUBSTANTIALLY LESS THAN THAT AMOUNT. IN **EXHIBT B**, WE HAVE PRELIMINARILY IDENTIFIED 54 NOTES OR PROPERTIES, WITH TOTAL UPB OF APPROXIMATELY $21.6 MILLION, THAT APPEAR TO BE SALEABLE AND HAVE MARKETABLE VALUE. THE ARRIVAL HOME LOAN NOTES HAVE BEEN SOLD, OR WILL BE SHORTLY, IN ORDINARY COURSE. THERE ARE 24 NOTES, WITH A TOTAL UPB OF APPROXIMATELY $32 MILLION, THAT ARE LISTED IN **EXHIBT B** AS UNSECURED OR MATERIALLY IMPAIRED BASED UPON OUR INITIAL ANALYSIS.

4. Who are the creditors of each fund, and what are the specific amounts of their claims?

    **RESPONSE:** PLEASE SEE TABLE BELOW FOR SUMMARY OF THIRD-PARTY DEBT, ALL OF WHICH APPEARS TO BE RECORDED AT PPMI. NOTE THAT APPROXIMATELY $14 MILLION IN DEBT OWED TO SETPOINT RELATED TO FUNDING OF ARRIVAL LOANS WAS REPAID SUBSEQUENT TO JANUARY 31. ALSO, SEE **EXHIBIT C** FOR A TABLE OF INTERCOMPANY LOANS MADE AMOUNG FUNDS, OPERATING COMPANIES, HOLDING COMPANIES, AND RELATED THIRD-PARTY ENTITIES.

**PPM: DEBT OBLIGATIONS WITH THIRD PARTIES**

As of 1/31/26

| | Pacific Private Money Inc (PPMI) |
|---|---|
| Lender: | |
| Salude Grade [1] | $6,189,000 |
| Mikhael Brodsky [2] | 520,000 |
| Edward Brown [3] | 600,000 |
| Operating Lease [4] | 221,086 |
| **Total** | **$7,530,086** |

[1] Remaining amount due to Salude Grade as part of the Alpha One program.

[2] Represents an investment made by Brodsky into PPMI via unsecured note made in October 2022.

[3] The Brown note was made in August 2025 via promissory note with PPMI, and the note was secured by an asset held in the Pacific Opportunity Fund (POF) via a collateral security agreement.

[4] Represents future obligations under operating lease for office equipment.

5. Will assets from all funds be pooled to pay out claims, or will each fund be treated as a separate legal entity? The January 23 letter indicates that at least one PPM entity may see enhanced recoveries — which specific fund or funds does this refer to?

    **RESPONSE:** IT IS UNCLEAR AT THIS POINT WHAT PROCESS WILL BE UTILIZED TO EFFECT THE WIND-DOWN OF THE FUNDS (AND ALL PPM ENTITIES) AND HOW EACH ENTITY WILL BE TREATED (E.G., ON A STANDALONE BASIS OR ON A CONSOLIDATED BASIS). IF THE BANKRUPTCY PROCESS IS UTILIZED TO LIQUIDATE THE ASSETS AND SETTLE ALL CLAIMS, ONE FACTOR DETERMINING TREATMENT IS THAT THE COST TO ADMINISTER INDIVIDUAL FUNDS AS

STANDALONE CASES WILL LIKELY BE SUBSTANTIALLY HIGHER THAN ADMINISTERING ALL FUNDS IN ONE CASE. ADDING TO THE COMPLEXITY OF CASE ADMINISTRATION IS THE FACT THAT THERE ARE EXTENSIVE LOANS, OR DEBT CLAIMS, AMONG THE VARIOUS ENTITIES. THE SETTLEMENT OF SUCH DEBT CLAIMS MAY MATERIALLY IMPACT THE RECOVERIES BY EQUITY IN THE VARIOUS FUNDS.

6. What steps are being taken to appraise properties and establish the fair value of assets held by the funds?

   **RESPONSE:** A FORMAL APPRAISAL OR VALUATION PROCESS OF THE ASSETS HAS NOT BEEN UNDERTAKEN. IF CASH FUNDING IS SECURED AND A PROCESS TO SELL THE ASSETS IS AGREED UPON, WE PLAN TO RETAIN REAL EATATE PROFESSIONALS TO VALUE THE ASSETS AND TO ASSIST IN THE SALE OF NOTES AND REO PROPERTIES AS PART OF THE DISPPOSITION PROCESS. NOTE THAT IN CERTAIN SITUATIONS ASSETS—SUCH AS REO PROPERTIES— HAVE BEEN PREVIOUSLY MARKETED BY THIRD-PARTY REAL ESTATE BROKERS TO SELL THE REAL ESTATE FOR THE BENEFIT OF THE FUND THAT HOLDS THE ASSET. FROM A PRIORITY STANDPOINT, RETAINING REAL ESTATE PROFESSIONALS WILL BE EXTREMELY IMPORTANT ONCE THE PLAN FORWARD IS FINALIZED AND FUNDED.

7. Has the chief restructuring officer reviewed any lists of assets maintained for any of the PPM funds? If so, can those lists — however unverified or incomplete — be shared with fund investors?

   **RESPONSE:** WE HAVE REVIEWED THE ASSET LIST DETAIL FOR EACH OF THE FUNDS, AND THE VERSION AS OF JANUARY 31, 2026 IS INCLUDED IN **EXHIBIT B.** NOTE THAT WE HAVE NOT SHOWN THE BORROWER'S TO PROTECT PERSONAL INFORMATION.

8. Are the entities balance-sheet insolvent or is this primarily a liquidity insolvency?

   **RESPONSE:** THE PPM GROUP'S OPERATING CASH POSITION IS EXTREMELY TIGHT. THUS, THERE IS UNCERTAINTY THAT PPM WILL BE ABLE TO PAY ITS BILLS AS THEY COME DUE. EACH FUND IS IN A DIFFERENT POSITION; HOWEVER, ALL OF THE FUNDS—EXCEPT FOR THE ARRIVAL FUND—APPEAR TO HAVE A TOTAL OF INVESTOR CAPITAL BALANCE THAT IS GREATER THAN THE ESTIMATED FAIR MARKET VALUE OF THE FUND'S ASSETS. DUE TO THE NATURE OF THE ARRIVAL FUND (I.E., LOANS TYPICALLY ARE ORIGINATED AND SOLD WITHIN TWO TO FOUR WEEKS), IT DOES NOT APPEAR THAT THE LOAN PORTFOLIO IS IMPAIRED.

9. What percentage of the loan portfolio is currently performing, non-performing, or in foreclosure?

   **RESPONSE:** PLEASE SEE **EXHIBIT B** FOR A DETAILED LIST OF THE LOAN PORTFOLIOS. CERTAIN LOANS HAVE BEEN IDENTIFIED AS UNSECURED, PRIMARILY DUE TO THE UNDERLYING ASSETS BEING FORECLOSED UPON OR A SHORT SALE HAVING PREVIOUSLY OCCURRED. ADDITIONAL ANALYSIS OF THE PORTFOLIO NEEDS TO BE PERFORMED.

10. What is the most likely recovery range for investors, and what are the assumptions underlying the high and low ends of that range?

3

**RESPONSE:** THE REQUISITE VALUATION ANALYSIS OF THE ASSETS IN THE PORTFOLIO HAS NOT BEEN UNDERTAKEN; THUS, WE ARE NOT ABLE TO PROVIDE GUIDANCE AS TO EXPECTED RECOVERIES AT THIS TIME.

11. Is any fund money invested in any way in crypto assets?

**RESPONSE:** AT THIS POINT IT IS UNCLEAR IF ANY, OR WHAT AMOUNT OF, FUND CASH WAS DIRECTLY OR INDIRECTLY INVESTED INTO CRYPTO INVESTMENTS. WE ARE AWARE THAT MARK HANF HAS MADE INVESTMENTS IN CRYPTO ASSETS, AND HE HAS STATED THAT NO CASH FROM PPM WAS USED TO DIRECTLY INVEST IN CRYPTO ASSETS.

## B. Potential Fraud, Self-Dealing, and Misuse of Funds

1. Did any PPM fund make investments outside the type and risk profile that the fund's governing documents permitted?

**RESPONSE:** MY FOCUS AND PRIORITY HAS BEEN ON STABILIZING THE COMPANY AND DETERMINING AND EVALUATING GO-FORWARD OPTIONS. I HAVE NOT DEDICATED TIME TO ANALYZE INVESTMENT TYPE OR RISK PROFILE.

IN THE ORDINARY COURSE OF MY WORK, I DID NOTE CIRCUMSTANCES WHERE IT APPEARS THAT PPM FUND RESOURCES WERE INVESTED IN TRANSACTIONS THAT DID NOT INVOLVED FUNDING TRADITIONAL HARD MONEY LOANS OR CONSUMER BRIDGE LOANS. MY UNDERSTANDING OF THE DETAILS SURROUNDING THESE SITUATIONS IS INCOMPLETE, AND I WILL DOCUMENT THESE TRANSACTIONS IN FUTURE COMMUNICATIONS WITH THE AD HOC COMMITTEE.

2. Did any PPM fund make investments that were not secured by deeds of trust?

**RESPONSE:** SAME RESPONSE AS #1 ABOVE IN THAT MY UNDERSTANDING OF THE DETAILS SURROUNDING THE NUMEROUS INVESTMENTS IS INCOMPLETE; HOWEVER, IT IS ANTICIPATED THAT THE COLLATERAL SUPPORTING PPM'S LOAN PORTFOLIO WILL BE ANALYZED AS PART OF THE ORDERLY LIQUIDATION PROCESS.

3. Did PPM management utilize fund assets in ways that could constitute self-dealing — such as loans to affiliated companies, personal loans to members of management, or loans to purchase assets owned by members of management or their affiliated entities?

**RESPONSE:** I HAVE SEEN DOCUMENTATION RELATED TO LOANS MADE BY PPM FUNDS TO ENTITIES OWNED AND CONTROLLED BY MARK HANF. SPECIFCALLY, LOANS WERE MADE TO PACIFIC REALTY DEVELOPMENT ("PRD") AND TO HANF CAPITAL, BOTH OF WHICH ARE CONTROLLED BY MARK HANF. AS OF DECEMBER 31, 2025, TOTAL AMOUNTS DUE PER PPM'S BOOKS WERE APPROXIMATELY $23.3 MILLION (PRD) AND $13.8 MILLION (HANF CAPITAL). IT IS MY UNDERSTANDING THAT PRD WAS CREATED TO BE THE ENTITY TO ACQUIRE OUT OF FORECLOSURE MULTIPLE DEVELOPMENT PROJECTS AFTER A PPM DEVELOPER/BORROWER UNEXPECTEDLY PASSED-AWAY AND IT WAS DISCOVERED THAT THE DEVELOPER HAD NOT USED—SOME OR ALL—OF THE LOAN FUNDS PROVIDED BY PPM FOR THEIR INTENDED DEVELOPMENT PURPOSES.

4

4.  Were PPM funds used to purchase assets that are or were owned — personally or through affiliated entities — by Mark Hanf, Nam Phan, or Edward Brown?

    **RESPONSE:** PER QUESTION #3 ABOVE, IT APPEARS THAT PPM FUNDS WERE LOANED TO PRD AND HANF CAPITAL, AND THOSE ENTITIES PURCHASED ASSETS WITH FUNDS PROVIDED BY PPM. NOTE THAT WE HAVE NOT UNDERTAKEN A FORENSIC ANALYSIS OF PPM'S TRANSACTIONS.

5.  Did PPM commingle assets between funds? How is the Northstar Fund related to PPMF, and does Mark Hanf's role in both allow commingling of assets or inter-fund loans?

    **RESPONSE:** I HAVE NOT SEEN EXAMPLES OF COMMINGLING OF ASSETS AMONG FUNDS.

    NORTHSTAR FUND IS A VENTURE THAT WAS FORMED IN 2019 BY JOHN SIMONSE, MARK HANF, AND MATTHEW COORDES FOR THE PURPOSE OF PROVIDING CONSTRUCTION LOANS TO BUILDERS AND DEVELOPERS. IT APPEARS THAT PACIFIC PRIVATE MONEY GROUP LLC ("PPMG") HOLDS A 20% INTEREST IN NORTHSTAR FUND; HOWEVER, IT IS MY UNDERSTANDING THAT ZERO PPMG DOLLARS WERE INVESTED IN THE NORTHSTAR FUND. PER MARK HANF, PPMG WAS GRANTED THE 20% EQUITY INTEREST IN EXCHANGE FOR MARKETING AND CAPITAL RAISING ABILITIES.

6.  Is the lack of liquidity in the PPM operating companies purely a result of reduced business volume, or did cash exit the operating companies in some acute way? If so, what was the nature of the cash utilization?

    **RESPONSE:** LIQUIDITY CONSTRAINTS APPEAR TO HAVE BEEN CAUSED BY INSUFFICIENT REVENUE AND A LARGE COST STRUCTURE. I HAVE NOT SEEN OR DISCOVERED ANY OPERATING CASH EXITING THE COMPANIES FOR NON-OPERATING PURPOSES; HOWEVER, WE HAVE NOT PERFORMED FORENSIC ACCOUNTING TO TRACE THE CASH MOVEMENTS.

7.  Did the management companies themselves make investments or loans with operating cash?

    **RESPONSE:** I HAVE NOT SEEN EVIDENCE OF THE MANAGEMENT, OR OPERATING, COMPANIES MAKING DIRECT INVESTMENTS OR LOANS.

8.  Why did the funds fail if they were supposedly backed by loans with a low loan-to-value ratio?

    **RESPONSE:** WE HAVE NOT PERFORMED THE REQUISITE ANALYSIS ON PAST TRANSACTIONS TO ADEQUATELY ANSWER THIS QUESTION.

9.  Did Mark Hanf establish foreign LLCs in 2024 and 2025? If so, do those entities hold or shield money that could belong to investors? Will all affiliated entities be examined?

    **RESPONSE:** WE ARE NOT AWARE OF MARK HANF FORMING ANY TYPE OF COMPANIES IN ANY COUNTRY OUTSIDE THE U.S. IT IS OUR UNDERSTANDING AND BELIEF THAT CERTAIN CRYPTO ASSETS THAT MARK HANF REPORTEDLY HAS AN OWNERSHIP INTEREST IN ARE HELD IN AN ACCOUNT THAT WE ARE TOLD IS PHYSICALLY LOCATED—AND PERHAPS DOMICILED—IN COSTA RICA. PLEASE NOTE THAT WE HAVE NOT SEEN ANY DOCUMENTATION RELATED TO CRYPTO ASSETS.

10. Was money commingled between separate entities? Have any funds loaned or given money to any other funds?

**RESPONSE:** I HAVE NOT SEEN EXAMPLES OF MONEY FROM ONE FUND COMINGLED WITH ANOTHER FUND. PER **EXHIBIT C**, THERE APPEAR TO BE EXENSIVE INTERCOMPANY LOAN TRANSACTIONS.

## C. The 1585 Grant Avenue Property (Novato)

1. Is the multi-story office building at 1585 Grant Avenue, Novato, CA owned by a PPM fund, by Mark Hanf personally, or by one of his affiliated entities? Were PPM fund assets used in the purchase? Who is on title? Are there any encumbrances or mortgages?

**RESPONSE:** MY UNDERSTANDING BASED ON INTERNAL CONVERSATIONS IS THAT THE OFFICE BUILDING AT 1595 GRANT AVENUE WAS PURCHASED FOR APPROXIMATELY $2.2 MILLION IN NOVEMBER 2022 BY HANF CAPITAL, AN ENTITY CONTROLLED BY MARK HANF. IT APPEARS THAT THE FREEDOM FUND PROVIDED THE INITIAL DEBT FINANCING, TOTALING APPROXIMATELY $2.2 MILLION, TO PURCHASE THE BUILDING, AND SUBSEQUENTLY THE LOAN WAS REFINANCE BY A TRUST DEED INVESTOR FOR APPROXIMATELY $2 MILLION . THE CURRENT HOLDER OF THE DEBT INITIATED A FORECLOSURE ACTION IN EARLY JANUARY 2026. THE PROPERTY WAS LISTED AND MARKETED FOR SALE IN 2025; HOWEVER, IT IS UNCERTAIN IF THERE IS ANY EQUITY VALUE IN THE PROPERTY WHICH APPEARS TO HAVE A TOTAL OF APPROXIMATELY $2.5 MILLION IN MORTAGE DEBT, DEFAULT INTEREST, UNPAID PROPERTY TAXES, AND MECHANICS LIENS.

## D. Mark Hanf and Nam Phan — Current Status and Authority

1. Does Mark Hanf currently have operational authority at PPM?

**RESPONSE:** YES. MARK HANF WAS TERMINATED AS AN EMPLOYEE ON FEBRUARY 4, BUT HE HAS NOT RESIGNED OFFICER/BOARD POSITIONS.

2. Does Mark Hanf have access as a signer to bank accounts where any remaining fund cash is held?

**RESPONSE:** YES.

3. Are steps being taken to liquidate Mark Hanf's personal assets to contribute to the funds?

**RESPONSE:** THE COMPANY IS NOT INVOLVED MARK HANF'S PERSONAL ASSETS.

4. Why has Mark Hanf ceased communicating with investors?

**RESPONSE:** PLEASE UNDERSTAND THAT IT WOULD BE INAPPROPRIATE FOR ME TO RESPOND FOR MARK HANF.

Does Mark Hanf have personal legal counsel, and have they been advised not to communicate with investors?

6

**RESPONSE:** PLEASE UNDERSTAND THAT IT WOULD BE INAPPROPRIATE FOR ME TO RESPOND FOR MARK HANF.

5. When was the last time Mark Hanf drew a salary? Were bonuses paid out in December 2025?

**RESPONSE:** MARK HANF WAS TERMINATED AS AN EMPLOYEE OF PPM ON FEBRRURARY 4, AND HIS LAST PAYROLL PAYMENT WAS MADE ON THAT DAY. I AM NOT AWARE OF ANY BONUSES PAID TO ANY EMPLOYEES IN DECEMBER 2025.

NOTE THAT MARK HANF'S SALARY WAS REDUCED IN OCTOBER 2025 FROM $250,000 ANNUALLY TO APPROXIMATELY $ 50,000 ANNUALLY.

6. Does Nam Phan have personal assets and/or personal liability exposure? What steps, if any, are being taken to pursue recovery from Nam Phan personally?

**RESPONSE:** THE COMPANY IS NOT INVOLVED WITH NAM PHAN'S PERSONAL ASSETS.

## E. The Chief Restructuring Officer's Role and Independence

1. Does the chief restructuring officer serve the interests of fund investors or those of PPM's officers and management?

**RESPONSE:** I WAS RETAINED BY MY CLIENT, PPM, AND I SERVE THE CLIENT. I DO NOT REPRESENT MARK HANF, NAM PHAN, OR ANY MANAGEMENT, AND I DO NOT HAVE ANY FIDUCIARY RESPONSIBILITIES OR DUTIES TO PPM'S OFFICERS OR MANAGEMENT. WHEN A COMPANY IS IN THE ZONE OF INSOLVENCY— WHICH I BELIEVE PPM IS—THEN THE CRO'S FIDUCIARY RESPONSILITIES SHIFT FROM SHAREHOLDERS TO ALL STAKEHOLDERS (INCLUDING INVESTORS).

2. Who hired the chief restructuring officer, how is the fee determined, and what is the source of funds for payment? Have any payments been made to the CRO so far?

**RESPONSE:** I WAS RETAINED BY PPM. MY COMPENSATION ARRANGEMENT IS BASED ON AN HOURLY FEE. TO DATE I HAVE BEEN PAID $75,000, IN THREE $25,000 RETAINER INCREMENTS. MY UNDERSTANDING IS THAT MY FEES HAVE BEEN PAID FROM OPERATING CASH AT PPM AND FROM AMOUNTS THAT MARK HANF HAS PERSONALLY FUNDED.

## F. Disclosure Failures and Investigations

1. When did PPM management first become aware of the financial difficulties, and why were investors not informed at that time?

**RESPONSE:** I HAVE NOT CONDUCTED A HISTORICAL FACTUAL REVIEW, INCLUDING OF PPM MANAGEMENT'S AWARENESS AND THINKING, AND IT IS INAPPROPRIATE FOR ME TO SPECULATE AND RESPOND.

7

2. Why did PPM continue to accept new investments and represent that existing investments were being "reinvested" through at least September 2025? Did those reinvestments actually occur, and if so, where is that capital now?

   **RESPONSE:** I HAVE NOT CONDUCTED A HISTORICAL FACTUAL REVIEW OR FORENSIC ANALYSIS, AND IT IS INAPPROPRIATE FOR ME TO SPECULATE AND RESPOND. WE HAVE NOT TRACED THE FLOW OF CASH; HOWEVER, PER THE COMPANY CASH THAT WAS REINVESTED/ROLLED-OVER WAS USED TO FUND NEW LOANS.

3. Has PPM been contacted by local, state, or federal law enforcement, investigators, or regulators?

   **RESPONSE:** I AM AWARE OF TWO INQUIRIES OR INVESTIGATIONS:

   - SECURITIES AND EXCHANGE COMMISSION (SEC) INFORMED PPM OF AN INVESTIGATION ON AUGUST 14, 2025; AND,

   - CALIFORNIA DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION (DFPI) INFORMED PPMOF AN INVESTIGATION AND EXAMINAMINATION AND REQUESTED INFORMATION ON NOVEMBER 22, 2025.

4. Has PPM received notice of any civil lawsuits? If so, from which parties?

   **RESPONSE:** I AM AWARE OF ONE SUIT THAT HAS BEEN FILED:

   - SANTA CRUZ IMPORTS, INC. – FILED IN SUPERIOR COURT OF CALIFORNIA, COUNTY OF MARIN

5. Are there clawback risks if any investors received distributions or redemptions shortly before the freeze?

   **RESPONSE:** I CANNOT COMMENT ON INVESTORS' LEGAL RISKS. AN INVESTOR SHOULD DISCUSS THOSE RISKS WITH THE INVESTOR'S COUNSEL. I CAN SAY THAT IF PPM ENTITIES FILE FOR PROTECTION UNDER CHAPTER 11, CODE SECTIONS 547 AND 548 DETAIL PREFERENCES AND FRAUDULENT CONVEYANCES WHICH MANY PEOPLE ASSOCIATE WITH "CLAWBACKS".

## G. Transparency and Access to Records

1. When will the books and records of the funds be released for investor review? The operating agreement provides investors with the right to access these documents, and we are requesting access on our timeline, not management's.

   **RESPONSE:** WE ARE GATHERING AND REVIEWING INFORMATION. THERE ARE PRACTICAL ISSUES TO RESOLVE IN ORDER TO MAKE THEM AVAILABLE FOR ALL INVESTORS TO REVIEW. FIRST, DUE TO THE AMOUNT OF PERSONNEL TIME AND COST THAT IT WOULD REQUIRE TO RESPOND TO INDIVIDUAL REQUESTS FOR RECORDS, WE WILL BE CREATING A WAY FOR ALL INVESTORS TO ACCESS THE SAME INFORMATION, LIKELY VIA AN ONLINE DATA ROOM. PPM WILL COORDINATE WITH THE AD HOC INVESTOR GROUP TO IDENTIFY AND CREATE A MASTER LIST OF DOCUMENTS TO BE PROVIDED, AND THAT LIST

MAY BE AUGMENTED OVER TIME. SECOND, APPROPRIATE STEPS NEED TO BE TAKEN TO PROTECT ANY PERSONAL INFORMATION OF INVESTORS THAT MAY BE CONTAINED IN DATA REQUESTS.

2. What is the protocol for the forensic examination of PPM's investments, money trails, and financial records? Who is conducting it?

   **RESPONSE:** NO FORENSIC EXAMINATION WORK HAS BEEN UNDERTAKEN AT THIS POINT. TWO FIRMS THAT SPECIALIZE IN SUCH WORK HAVE BEEN CONTACTED; HOWEVER, NO FIRM HAS BEEN RETAINED DUE TO PPM'S LACK OF OPERATING CASH. IT IS MY EXPECTATION THAT FORENSIC ANALYSIS, INCLUDING CASH TRACING, WILL BE DONE ONCE, AND IF, OPERATING CAPITAL IS INFUSED AND A FIRM SPECIALIZING IN SUCH WORK IS RETAINED.

3. Who is the accountant for PPM — independent or in-house? Will the 2025 K-1s reflect taxable distributions that did not actually occur? When will the 2025 K-1s be issued?

   **RESPONSE:** PPM UTILIZES ACCOUNTING SEVICES FROM OUTSIDE FIRMS:

   - CATHEDRAL CPAS AND ADVISORS (FORMERLY SPIEGEL ACCOUNTANCY CORP.); AND,

   - REIL FUND SERVICES.

   TAX RETURNS, INCLUDING FORM K-1S, WILL BE PREPARED IN ACCORDANCE WITH THE TAX CODE. IT IS EXPECTED THAT AN EXTENSTION TO FILE THE 2025 RETURNS WILL BE MADE, AND THE INITIAL FEEDBACK FROM THE TAX PREPARERS IS THAT THE TAX WORK WILL OCCUR DURING MID-YEAR.

4. When will the next formal written update to investors be issued?

   **RESPONSE:** I ANTICIPATE PREPARING AN UPDATE FOR ALL INVESTORS BY THE END OF THIS WEEK (FEBRUARY 13).

5. Will investors receive full access to loan-level data?

   **RESPONSE:** I EXPECT TO PROVIDE LOAN LEVEL REPORTS WITH ANY PERSONAL INFORMATION APPROPRIATELY REDACTED.

6. Can investors receive a detailed check register for the past three years, including payroll transactions?

   **RESPONSE:** I DO NOT BELIEVE IT WOULD BE APPROPRIATE TO BROADLY DISSEMINATE CHECK REGISTER DETAIL OR PAYROLL DETAIL; HOWEVER, I WILL COORDINATE WITH THE ADHOC INVESTOR GROUP TO CREATE A PROCESS FOR INVESTORS TO ACCESS SUCH INFORMATION IN A WAY THAT DOES NOT CREATE PRIVACY ISSUES.

7. Can Mr. Brinkman provide a complete list of all investors across all funds, including contact information, so that investors can communicate with one another and coordinate in their collective interest?

   **RESPONSE:** A LIST OF ALL INVESTORS CAN BE MADE AVAILABLE SO LONG AS PPM PROTECT'S INVESTOR PERSONAL INFORMATION AND PRIVACY RIGHTS. ONE WAY TO DO THIS IS SEND ALL INVESTORS A FORM (ONLINE OR PAPER) THAT REQUESTS THEM TO AFFIRMATIVELY OPT-IN TO SHARING THEIR

PERSONAL INFORMATION WITH ALL OTHER INVESTORS. I WILL WORK WITH THE AD HOC INVESTOR GROUP TO FIND THE MOST EFFICIENT METHOD TO DOING THIS.

## H. Other Personnel

1. What were the circumstances of the COO's resignation?

   **RESPONSE:** PLEASE UNDERSTAND THAT I CANNOT COMMENT BEYOND NAM PHAN RESIGNED.

2. Is Edward Brown involved in any lawsuits filed against PPM, given his role as manager of the Southwest Fund?

   **RESPONSE:** NONE THAT I AM AWARE OF.

## I. Ongoing Operations and Cash Flow

1. Why were all remaining PPM employees terminated? How will the performing loan portfolio be serviced going forward?

   **RESPONSE:** EMPLOYEES WERE TERMINATED AND OPERATIONS HALTED OUT OF NECESSITY IN ORDER TO MINIMIZE CASH EXPENDITURES AND TO QUICKLY EFFECT THE WIND-DOWN OF THE COMPANY. A SMALL GROUP OF FORMER EMPLOYEES WITH SPECIALIZED KNOWLEDGE WERE RETAINED AS INDEPENDENT CONTRACTORS FOR SPECIFIC TASKS. EXISTING LOAN SERVICING THAT WAS DONE IN-HOUSE IS IN THE PROCESS OF BEING TRANSFERRED TO THIRD-PARTY SERVICING COMPANIES.

2. How much is currently being collected in monthly interest payments from performing loans?

   **RESPONSE:** RUN-RATE BY FUND WILL BE PROVIDED.

3. What is the monthly cost to maintain minimal loan servicing, REO property management, and accurate financial recordkeeping?

   **RESPONSE:** WE ARE UPDATING THE DETAILED OPERATING BUDGET TO REFLECT THE WIND-DOWN OF OPERATIONS SCENARIO. ALL LOAN SERVICING WILL BE OUTSOURCED TO THIRD-PARTIES WHO WILL BE COMPENSATED FROM THE SPREAD INCOME BETWEEN THE BORROWER INTEREST RATE AND THE INVESTER RETURN RATE. FORECASTED COSTS TO MANAGE REO PROPERTIES AND FINANCIAL RECORDS THROUGH THE WIND-DOWN WILL BE INCLUDED IN THE PROPOSED OPERATING BUDGET THAT WILL BE AVAILABLE NEXT WEEK.

4. What is the additional monthly cost to process defaults and foreclosures on non-performing loans?

   **RESPONSE:** FORECASTED OPERATING COSTS THROUGH THE WIND-DOWN WILL BE INCLUDED IN THE PROPOSED OPERATING BUDGET THAT WILL BE AVAILABLE NEXT WEEK.

5. How much cash is on hand and what is the current monthly burn rate?

**RESPONSE:** AS OF FEBRUARY 10, TOTAL CASH AVAILABLE FOR OPERATIONS WAS ~$212,000. THIS BALANCE INCLUDES $100,000 CONTRIBUTED BY MARK HANF ON FEBRUARY 6. SEE TABLE BELOW FOR A SNAPSHOT OF ALL CASH BALANCES.

| | Cash Balance |
|---|---|
| **FUND ACCOUNTS:** | |
| Pacific Private Money Fund (12) | $9,435 |
| Pacific Southwest Note Fund (32) | $579,124 |
| Pacific Freedom Fund (52) | $66,482 |
| Pacific Opportunity Fund (92) | $132,785 |
| Arrival Fund I (102) | $2,756,919 |
| **OPERATING ACCOUNTS:** | |
| Pacific Money Management Group (11) | $3 |
| Pacific Private Money Group (03) | $433 |
| Pacific Private Money Inc (51) | $211,995 |
| Pacific Private Money Partners (91) | $18 |
| Arrival Home Loans (101) | $7,470 |

THE COMPANY IS UPDATING ITS 13-WEEK CASH FLOW FORECAST TO REFLECT THE IMPACT OF THE TERMINATION OF EMPLOYEES AND CEASING OF OPERATIONS.

6. We understand Mr. Brinkman is seeking to raise $1–2 million in high-interest loans. What is the basis for this, and why is taking on senior debt — which would have priority over investor claims in a liquidation — in investors' interest? What specifically would these funds be used for?

   **RESPONSE:** ANY NEW CAPITAL SECURED WILL BE UTILIZED TO FUND AN ORDERLY WIND-DOWN TO FACILITATE A PROCESS THAT WOULD ULTIMATELY BE USED TO DISBURSE ANY NET PROCEEDS TO CREDITORS AND INVESTORS. PPM DOES NOT POSSESS ENOUGH OPERATING CASH TO PAY THE COSTS TO WIND-DOWN IN AN ORDERLY MANNER. WITHOUT ADDITIONAL CAPITAL, I BELIEVE THAT THE ONLY OPTIONS REMAINING FOR PPM ARE TO: 1) FILE CHAPTER 7 LIQUIDATION PETIONS FOR EACH OF THE ENTITIES; OR, 2) DISCONTINUE THE WIND-DOWN ACTIONS AND TERMINATE ALL CONTRACTORS AND PROFESSIONALS. MY GOAL IS TO SECURE NEW CAPITAL WITH THE BEST TERMS AVAILABLE.

7. What is the asset-to-liability gap today?

   RESPONSE: ON AN OVERALL BASIS, THE GAAP BASED TOTAL ASSETS EXCEED LIABILITIES. WE HAVE NOT COMPLETED THE VALUATION WORK REQUIRED TO DETERMINE THE FAIR MARKET VALUE OF THE ASSETS WHICH I BELIEVE IS THE APPROPRIATE MEASURE OF ASSETS UNDER THE CURRENT CIRCUMSTANCES.

## J. Path Forward for Investors

1. Based on his review to date, what are Mr. Brinkman's recommendations for how investors can best protect their interests and maximize the recovery of their capital?

11

**RESPONSE:** THE OPTIONS AVAILABLE TO INVESTORS APPEAR TO BE LIMITED. IN MY EXPERIENCE, THE BEST OUTCOMES IN SITUATIONS LIKE THIS ONE ARE THE RESULT OF COOPERATION AND COORDINATION AMONG THE DEBTOR, INVESTORS, CREDITORS, AND THE PROFESSIONALS RETAINED IN THE CASE. A WELL ORGANIZED INVESTOR COMMITTEE THAT IS LEAD BY EXPERIENCED, PRAGMATIC AND SOLUTIONS ORIENTED LEADERS IS AN ASSET TO ANY SITUATION LIKE THE ONE PPM FACES.

2. Are we looking at maximizing recovery or minimizing losses? What is the strategic framework?

   **RESPONSE:** THE FOCUS AND PLAN IS TO MAXIMIZE THE RECOVERIES FOR, AND ULTIMATE DISTRIBUTIONS TO, STAKEHOLDERS. THERE IS NO "ONE SOLUTION FITS ALL" APPROACH; RATHER, THE MONETIZATION PROCESS WILL BE TAILORED FOR EACH ASSET OR SIMILAR ASSETS THAT ARE IN SIMILAR CIRCUMSTANCES.

3. What additional facts will Mr. Brinkman be gathering in the next two weeks? Please itemize your anticipated fact-finding.

   **RESPONSE:** THE PRIORITY ACTION ITEMS ARE:

   - PLAN AND TAKE STEPS TO ENSURE THAT PPM DOES NOT RUN OUT OF CASH SO THAT THE COMPANY CONTINUES TO TRANSISTION ESSENTIAL SERVICES (E.G., TRANSFER IN EXCESS OF 200 LOANS FROM IN-HOUSE SERVICING TO THIRD PARTY SERVICERS).

   - SECURE, ORGANIZE AND PREPARE THE PORTFOLIO OF ASSETS TO BE SOLD, AND TO OBTAIN FINANCING TO SUPPORT AN ORDERLY WIND-DOWN PROCESS.

   - PREPARE FOR A POTENTIAL CHAPTER 11 FILING INVOLVING UP TO 15 ENTITIES BY CREATING SUPPORT FOR PETITIONS, FIRST DAY MOTIONS, STATEMENT OF FINANCIAL AFFAIRS, AND STATEMENTS OF ASSETS AN LIABILITIES.

   NOTE THAT EACH OF THE PROCESSES AND STEPS IN THE BULLETS ABOVE ENTAIL ANALYZING AND ORGANIZING FINANCIAL AND OPERATING INFORMATION WHICH WILL AID AND ASSIST THE WORK EXPECTED TO BE UNDERTAKEN BY A FORENSIC ACCOUNTING TEAM, THE WORK THAT A REGULATORY INVESTIGATIVE BODY MAY LEAD, AND THE WORK NECESSARY TO FINALIZE BOOKS AND RECORDS AND PREPARE FINAL TAX RETURNS.

# EXHIBIT A



[A] Holding company; ownership consists of 90% Mark Hanf and 10% Nam Phan.

[B] Holding company.

[C] Operating company.

[D] Operating company; not controlled by PPM and created in 2019 as a construction lending venture by John Simonse, Mark Hanf, and Matt Coordes; value of entity is unknown.

[E] Operating company; created in 2019 as a joint venture among Bill Aubrey, Tammy Blanchard, and Mark Hanf; no current activity.

[F] Operating company; most operating costs (including payroll and rent) are recorded in this entity; entity is broker for AHL; and debt facilities with Setpoint ($0 balance) and Salude Grade ($6.189 mm outstanding) used to fund loans originations reside here.

[G] Operating company; focus on consumer bridge loan transactions; three investors—Kevin Albert, Tom Kolassa, and Rick Gates—contributed $1.5mm in equity for a 10% stake.

[H] Fund company; investor cash and mortgages/deeds of trust from investment held in these entities.

[I] Fund company; not controlled by PPM and does not appear that PPM provided any capital to this entity; value of entity is unknown.

[J] Fund company; business activity consisted of providing debt capital to AHL to fund consumer bridge loans originated by AHL.

***PPM Entity Structure as of January 2026***

**EXHIBIT B**
**PACIFIC PRIVATE MONEY GROUP**
**Loan Portfolio by Lender**
As of 1/31/2026

| Account Number | Lender Name | Borrower Name | Status | Maturity Date | Note Rate | Principal Balance | Property Address | Property City | Property State | Property Type | Closing Date | Lien Position |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **LOANS: DEEMED TO BE COLLECTABLE OR HAVE SOME RECOVERABLE VALUE** | | | | | | | | | | | | |
| **PACIFIC FREEDOM FUND:** | | | | | | | | | | | | |
| 2022-0920 | PFF | Borrower 1 | Current | 11/01/25 | 8.000% | 189,677 | 26600 Ten Mile Road | Point Arena | CA | SFR | 10/27/22 | 1st |
| | | | | | | **189,677** | | | | | | |
| **PACIFIC MORTGAGE CAPITAL:** | | | | | | | | | | | | |
| 399511758 | PMC | Borrower 2 | Current | 04/01/52 | 4.875% | 369,898 | 6585 Lucerne Court | Redding | CA | Res 1-4 | 03/07/22 | 1st |
| | | | | | | **369,898** | | | | | | |
| **PACIFIC OPPORTUNITY FUND:** | | | | | | | | | | | | |
| 399511755 | POF | Borrower 3 | Current | 04/01/51 | 2.750% | 1,402,558 | 818 Newhall Road | Burlingame | CA | Res 1-4 | 03/12/21 | 1st |
| | | | | | | **1,402,558** | | | | | | |
| **PACIFIC PRIVATE MONEY FUND:** | | | | | | | | | | | | |
| 2014-1018 | PPMF | Borrower 4 | 121+ | 01/01/20 | 11.000% | 305,000 | 52 Fremont Road | San Rafael | CA | SFR | 11/05/14 | 1st |
| 2014-1020 | PPMF | Borrower 5 | 121+ | 11/01/17 | 8.500% | 340,000 | 1032 5th Street East | Sonoma | CA | SFR | 10/22/14 | 2nd |
| 2015-0410 | PPMF | Borrower 6 | 121+ | 06/01/17 | 8.500% | 335,000 | 1740 Timber Hill Road | Santa Rosa | CA | SFR | 05/04/15 | 2nd |
| 2015-0709X | PPMF | Borrower 7 | 121+ | 11/01/18 | 9.250% | 953,201 | 11015 Lochard Street | Oakland | CA | SFR | 07/11/15 | 2nd |
| 2018-0912 | PPMF | Borrower 8 | 121+ | 10/01/20 | 10.000% | 3,340,000 | 8013 Twin Oaks Avenue | Citrus Heights | CA | SFR | 09/24/18 | 1st |
| 2018-1024 | PPMF | Borrower 9 | 121+ | 11/01/19 | 10.000% | 480,000 | 281 Sequoyah View Drive | Oakland | CA | SFR | 10/29/18 | 2nd |
| 2018-1211 | PPMF | Borrower 10 | 121+ | 01/01/20 | 10.000% | 460,000 | 4431 Driftwood Court | Discovery Bay | CA | SFR | 12/19/18 | 2nd |
| 2019-0228 | PPMF | Borrower 11 | 121+ | 04/01/20 | 10.000% | 4,023,000 | 8021 Twin Oaks Avenue | Roseville | CA | Land | 03/28/19 | 1st |
| 2019-0602 | PPMF | Borrower 12 | 121+ | 08/01/21 | 10.000% | 600,000 | 913 B Street | Hayward | CA | Commercial | 07/31/19 | 1st |
| 2019-0614 | PPMF | Borrower 13 | 121+ | 07/01/21 | 10.000% | 500,000 | 8029 Twin Oaks Avenue | Citrus Heights | CA | SFR | 06/20/19 | 1st |
| 2020-0126 | PPMF | Borrower 14 | 121+ | 09/01/21 | 10.000% | 335,000 | 2839 Hoffman Boulevard | Richmond | CA | Land | 02/07/20 | 1st |
| 2013-0729 | PPMF | Borrower 15 | REO | 01/01/24 | 11.000% | 310,000 | 1485 8TH ST | OAKLAND | CA | Commercial | 08/07/13 | REO |
| 2019-0912 | PPMF | Borrower 16 | REO | 11/01/21 | 14.875% | 325,000 | 3881 Martin Luther King Jr Way | Oakland | CA | Land | 10/08/19 | REO |
| 2014-1119 | PPMF | Borrower 17 | 121+ | 03/01/20 | 9.500% | 162,534 | 28 Sandy Beach Road | Vallejo | CA | SFR | 02/18/15 | 1st |
| 20190615 | PPMF | Borrower 18 | 121+ | 12/26/25 | 8.000% | 1,210,063 | Lots 1-6 and Lot A Subdivision 8871 | Pleasant Hill | CA | Construction | 06/25/19 | 1st |
| | | | | | | **13,678,798** | | | | | | |

**EXHIBIT B**

| Account Number | Lender Name | Borrower Name | Status | Maturity Date | Note Rate | Principal Balance | Property Address | Property City | Property State | Property Type | Closing Date | Lien Position |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **PACIFIC PRIVATE MONEY INC.:** | | | | | | | | | | | | |
| 399435792 | PPMI | Borrower 19 | FC | 06/14/23 | 8.490% | 1,371,660 | 37 Covert Street | Brooklyn | NY | Construction | 06/14/21 | 2nd |
| 399435795 | PPMI | Borrower 20 | FC | 06/14/23 | 8.490% | 1,423,792 | 37 Covert St | Brooklyn | NY | Res 1-4 | 06/14/21 | 1st |
| 399641531 | PPMI | Borrower 21 | Current | 01/01/27 | 12.000% | 170,000 | 181 Washington Street | Mount Holly | NJ | Res 1-4 | 12/11/25 | 1st |
| | | | | | | **2,965,452** | | | | | | |
| **PACIFIC SOUTHWEST NOTE FUND:** | | | | | | | | | | | | |
| 9160082692 | PSWNF | Borrower 22 | 121+ | 01/01/32 | 9.200% | 142,685 | 507 Martin Luther King Place South | Conroe | TX | Res 1-4 | 12/16/16 | 1st |
| 9160075414 | PSWNF | Borrower 23 | 1-30 | 04/01/34 | 11.500% | 26,386 | 407 Rosemont St | Duck Hill | MS | Res 1-4 | 08/24/06 | 1st |
| 0002008091 | PSWNF JS | Borrower 24 | 1-30 | 01/01/48 | 4.999% | 106,914 | 1456 Red Cedar Trail | Stone Mountain | GA | Res 1-4 | 05/23/06 | |
| 9160076080 | PSWNF JS | Borrower 25 | 1-30 | 06/01/53 | 10.500% | 65,123 | 2349 North Fork Rd | North Fork | WV | Res 1-4 | 07/17/00 | 1st |
| 0002007537 | PSWNF JS | Borrower 26 | 31-60 | 07/15/43 | 9.000% | 67,478 | 505 Sedgefield Dr | Greenville | NC | Res 1-4 | 10/30/97 | |
| 9160076078 | PSWNF JS | Borrower 27 | 31-60 | 04/01/39 | 3.000% | 29,635 | 140 Richard St | Jesup | GA | Res 1-4 | 05/13/02 | 1st |
| 9160077570 | PSWNF | Borrower 28 | 31-60 | 02/20/47 | 9.642% | 108,275 | 1401 Vernon Ave | Joliet | IL | Res 1-4 | 10/29/09 | 1st |
| 9160082652 | PSWNF | Borrower 29 | 31-60 | 09/01/33 | 7.000% | 38,769 | 349 Red Bud Circle | Bullard | TX | MFG | 07/01/16 | 1st |
| 9160082674 | PSWNF | Borrower 30 | 91-120 | 12/01/29 | 7.000% | 36,773 | 135 Phelan Rd | Bastrop | TX | Res 1-4 | 12/19/19 | 1st |
| 0002007401 | PSWNF JS | Borrower 31 | BK | 11/10/40 | 6.000% | 88,864 | 712 S Fair Ave | Yakima | WA | Res 1-4 | 10/27/99 | |
| 9160075388 | PSWNF JS | Borrower 32 | BK | 06/01/35 | 6.996% | 46,594 | 275 Guest Rd | Pelham | NC | Res 1-4 | 10/19/01 | 1st |
| 9160076102 | PSWNF JS | Borrower 33 | BK | 12/01/46 | 3.000% | 76,637 | 10411 Castlerock Dr | Dallas | TX | Res 1-4 | 09/26/07 | 1st |
| 0002007404 | PSWNF JS | Borrower 34 | BK | 05/01/42 | 4.500% | 96,328 | 506 Sunview Dr | Athens | TN | Res 1-4 | 06/26/08 | |
| 9160081928 | PSWNF | Borrower 35 | BK | 02/15/38 | 6.000% | 168,760 | 319 E. Walnut | Winnie | TX | Res 1-4 | 04/13/22 | 1st |
| 0002007403 | PSWNF JS | Borrower 36 | Current | 03/01/41 | 2.000% | 95,113 | 1850 Mooresville Pk | Culleoka | TN | Res 1-4 | 09/26/07 | |
| 9160080658 | PSWNF JS | Borrower 37 | Current | 11/01/47 | 4.000% | 198,611 | 137 Woodbridge Avenue | Highland Park | NJ | Res 1-4 | 01/16/07 | 1st |
| 9160080664 | PSWNF JS | Borrower 38 | Current | 03/01/62 | 2.875% | 346,869 | 3002 Tinker Dr | Oceanside | NY | Res 1-4 | 11/23/10 | 1st |
| 9160083108 | PSWNF | Borrower 39 | Current | 09/01/29 | 10.588% | 24,836 | 910 Oakbrook Dr | Montgomery | AL | Res 1-4 | 08/18/99 | 1st |
| 2007400 | PSWNF JS | Borrower 40 | Current | 07/15/32 | 10.000% | 27,722 | 1026 E 24th St | San Angelo | TX | Res 1-4 | 04/28/07 | |
| 0002007402 | PSWNF JS | Borrower 41 | BK | 01/01/28 | 1.001% | 2,911 | 110 Towe St | Seneca | SC | Res 1-4 | 05/15/02 | |
| 0002007469 | PSWNF JS | Borrower 42 | Current | 08/01/39 | 3.625% | 82,632 | 6 Gilman St | Holyoke | MA | Res 1-4 | 08/07/08 | |
| 9160080686 | PSWNF JS | Borrower 43 | Current | 03/01/54 | 4.250% | 293,713 | 4516 Lewis St | North Myrtle Bea | SC | Res 1-4 | 09/21/07 | 1st |
| 9160082670 | PSWNF | Borrower 44 | Current | 06/15/48 | 8.000% | 100,574 | 4432 Vientos Rd | Laredo | TX | Res 1-4 | 06/14/18 | 1st |
| 9160081902 | PSWNF | Borrower 45 | Current | 05/01/35 | 10.875% | 36,065 | 133 Teresa Street | San Antonio | TX | Res 1-4 | 07/14/10 | 1st |
| 9160081930 | PSWNF | Borrower 46 | Current | 08/01/40 | 12.000% | 62,044 | 802 S 8th Ave. | Edinburg | TX | Res 1-4 | 07/04/20 | 1st |
| 9160082696 | PSWNF | Borrower 47 | Current | 10/01/39 | 8.000% | 46,559 | 520 Saddle Ridge Ct | Springtown | TX | Land | 10/01/09 | 1st |
| 9160082722 | PSWNF | Borrower 48 | Current | 05/15/28 | 5.000% | 16,869 | 106 Old Waco Road | Gatesville | TX | Res 1-4 | 05/29/18 | 1st |
| 9160091660 | PSWNF JS | Borrower 49 | FC | 08/01/33 | 11.480% | 83,368 | 980 Tunnel Hill St | Gallitzin | PA | Res 1-4 | 07/02/08 | 1st |

**EXHIBIT B**

| Account Number | Lender Name | Borrower Name | Status | Maturity Date | Note Rate | Principal Balance | Property Address | Property City | Property State | Property Type | Closing Date | Lien Position |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0002007535 | PSWNF JS | Borrower 50 | FC | 11/01/32 | 8.256% | 31,560 | 16901 Palda Dr | Cleveland | OH | Res 1-4 | 10/05/99 | |
| 9160076070 | PSWNF JS | Borrower 51 | REO | 11/01/46 | 4.000% | 262,444 | 87-288 D Saint Johns Road | Waianae | HI | Res 1-4 | 10/05/06 | REO |
| 9160082470 | PSWNF JS | Borrower 52 | REO | 09/15/49 | 6.000% | 53,222 | 1005 E Lons | Brownfield | TX | Res 1-4 | 08/09/06 | REO |
| 9160082572 | PSWNF JS | Borrower 53 | REO | 04/15/49 | 6.000% | 101,948 | 404 West Ruscomb Street | Philadelphia | PA | Res 1-4 | 07/20/07 | REO |
| 71180 | PSWNF | Borrower 54 | REO | 05/13/41 | 10.000% | 50,950 | 1502 Pheasant Dr | Venus | TX | MFG | 04/01/23 | REO |
| **Total** | | | | | | **3,017,231** | | | | | | |

**Total:Loans Deemed to be Collectable or Have Some Recoverable Value**          $  21,623,614

**LOANS: ARRIVIAL HOME LOANS (ALL OF WHICH WILL BE SOLD BY END OF FEBRUARY 2026)**

| Account Number | Lender Name | Borrower Name | Status | Maturity Date | Note Rate | Principal Balance | Property Address | Property City | Property State | Property Type | Closing Date | Lien Position |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 399635444 | AHL | Borrower 55 | Current | 12/01/26 | 10.500% | 471,000 | 19665 Casa Loma Drive | Grass Valley | CA | Res 1-4 | 12/04/25 | 1st |
| 399636590 | AHL | Borrower 56 | Current | 12/01/26 | 10.875% | 2,735,000 | 155 12th Street | Pacific Grove | CA | Res 1-4 | 12/05/25 | 1st |
| 399636593 | AHL | Borrower 57 | Current | 12/01/26 | 10.625% | 1,386,000 | 2903 E. Lions Pocket | Payson | AZ | Res 1-4 | 12/05/25 | 1st |
| 399639947 | AHL | Borrower 58 | Current | 12/01/26 | 10.250% | 1,280,000 | 7553 Stockton Ave | El Cerrito | CA | Res 1-4 | 12/23/25 | 1st |
| 399641000 | AHL | Borrower 59 | Current | 01/01/27 | 10.250% | 2,429,000 | 20638 Black Road | Los Gatos | CA | Res 1-4 | 01/02/26 | 1st |
| 399642884 | AHL | Borrower 60 | Current | 01/01/27 | 10.500% | 954,000 | 57 Danville Oak Place | Danville | CA | Res 1-4 | 01/07/26 | 1st |
| 399642446 | AHL | Borrower 61 | Current | 01/01/27 | 10.625% | 861,000 | 8356 Bella Vista Drive | Rancho Cucamor | CA | Res 1-4 | 01/08/26 | 1st |
| 399642095 | AHL | Borrower 62 | Current | 11/01/26 | 10.500% | 950,000 | 8615 E Lindgren Rd | Spokane | WA | Res 1-4 | 01/12/26 | 1st |
| 399632564 | AHL | Borrower 63 | Current | 11/01/26 | 10.500% | 594,000 | 5507 132nd St. Ne | Marysville | WA | Res 1-4 | 11/21/25 | 1st |
| 399635327 | AHL | Borrower 64 | Current | 11/01/26 | 10.500% | 2,200,000 | 4445 E Roma Ave. | Phoenix | AZ | Res 1-4 | 11/24/25 | 1st |
| 399633146 | AHL | Borrower 65 | Current | 11/01/26 | 10.500% | 580,000 | 215 Ames Court | Silverton | OR | Res 1-4 | 11/22/25 | 1st |
| **Total AHL Loans** | | | | | | **14,440,000** | | | | | | |

**LOANS: DEEMED TO BE UNSECURED OR MATERIALLY IMPAIRED**

| Account Number | Lender Name | Borrower Name | Status | Maturity Date | Note Rate | Principal Balance | Property Address | Property City | Property State | Property Type | Closing Date | Lien Position |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2022-0108 | PFF | Borrower 66 | 121+ | 11/01/22 | 9.000% | 423,925 | 1551 Laguna Road | Santa Rosa | CA | Unsecured | 11/01/21 | 1st |
| 2022-0109 | PFF | Borrower 67 | 121+ | 11/01/22 | 9.000% | 45,085 | 9579 Ross Station Rd | Sebastopol | CA | Unsecured | 11/01/21 | 1st |
| 2023-0801 | PFF | Borrower 68 | 121+ | 09/01/24 | 12.000% | 2,200,000 | 321-323 Aspen Avenue | South San Franci | CA | Unsecured | 08/07/23 | 1st |
| 2022-0107 | PFF | Borrower 69 | 121+ | 12/01/22 | 9.000% | 1,377,165 | 45460 Indian Shoals Rd | Mendocino | CA | SFR | 12/01/21 | 1st |
| 2022-0307X | PFF | Borrower 70 | 121+ | 04/01/23 | 9.000% | 1,082,000 | 45460 Indian Shoals Rd | Mendocino | CA | SFR | 03/04/22 | 3rd |
| 2015-0919X | PPMF | Borrower 71 | 121+ | 03/01/18 | 8.500% | 225,000 | 1032 East 5th Street | Sonoma | CA | Unsecured | 09/25/15 | 1st |
| 2017-0920X | PPMF | Borrower 72 | 121+ | 10/01/18 | 10.000% | 480,000 | 1027 Parkview Avenue | Redding | CA | Unsecured | 09/22/17 | 1st |
| 2018-1111 | PPMF | Borrower 73 | 121+ | 12/01/19 | 10.000% | 622,000 | 4030 Elston Avenue | Oakland | CA | Unsecured | 11/16/18 | 2nd |
| 2018-1221 | PPMF | Borrower 74 | 121+ | 06/01/32 | 8.500% | 7,688,126 | 65 Lasker Lane | Cotati | CA | Unsecured | 01/29/19 | 1st |
| 2019-0405 | PPMF | Borrower 75 | 121+ | 05/01/20 | 10.000% | 302,122 | 415 Sunnyslope Avenue | Oakland | CA | Unsecured | 04/12/19 | 2nd |
| 2019-1108 | PPMF | Borrower 76 | 121+ | 11/01/21 | 10.500% | 158,117 | 1567 E. Valley RD | Santa Barbara | CA | Unsecured | 11/13/19 | 1st |

**EXHIBIT B**

| Account Number | Lender Name | Borrower Name | Status | Maturity Date | Note Rate | Principal Balance | Property Address | Property City | Property State | Property Type | Closing Date | Lien Position |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2020-0330 | PPMF | Borrower 77 | 121+ | 11/01/20 | 12.000% | 125,000 | 1551 Laguna Road | Santa Rosa | CA | Unsecured | 04/09/20 | 3rd |
| 2019-0621% | PPMF | Borrower 78 | 121+ | 09/01/22 | 10.750% | 300,000 | 7449 Fairplay Road | Somerset | CA | Unsecured | 08/29/19 | 1st |
| 2019-1020% | PPMF | Borrower 79 | 121+ | 01/01/22 | 15.750% | 50,000 | 5050 Granite Springs Winery Road | Somerset | CA | Unsecured | 12/05/19 | 1st |
| 2019-0109 | PPMF | Borrower 80 | 121+ | 07/01/29 | 9.000% | 8,137,528 | Lots 55, 56, 57, 58, 59 and 48 | San Rafael | CA | Unsecured | 02/13/19 | 1st |
| 20200728C | PPMF | Borrower 81 | 121+ | 09/01/21 | 10.000% | 572,987 | 2006 San Miguel | Walnut Creek | CA | Unsecured | 08/21/20 | 1st |
| 2020-1113 | PPMF | Borrower 82 | 121+ | 12/01/21 | 8.500% | 3,000,000 | 7621 Healdsburg Ave | Sebastopol | CA | Land | 11/24/20 | 1st |
| 2015-0807X | PPMF | Borrower 83 | 121+ | 11/01/18 | 9.250% | 1,166,789 | 1327 Ward Street | Berkeley | CA | SFR | 08/21/15 | 2nd |
| 2017-0727X | PPMF | Borrower 84 | 121+ | 09/01/18 | 9.900% | 900,000 | 305 Old McCloud Rd | Mount Shasta | CA | Commercial | 08/04/17 | 1st |
| 2020-0415 | PPMF | Borrower 85 | 121+ | 04/01/21 | 12.000% | 350,000 | 45460 Indian Shoals Road | Mendocino | CA | SFR | 04/22/20 | 2nd |
| 2020-0715 | PPMF | Borrower 86 | 121+ | 08/01/21 | 10.000% | 615,000 | 985 Mohr Lane | Concord | CA | Land | 07/31/20 | 1st |
| 2019-0705 | PPMF | Borrower 87 | 121+ | 09/01/20 | 11.000% | 248,894 | 985 Mohr Lane | Concord | CA | Commercial | 08/08/19 | 1st |
| 20220223 | PPMI | Borrower 88 | 121+ | 12/01/24 | 9.000% | 1,486,338 | 981 Mohr Lane | Concord | CA | Unsecured | 03/15/22 | 1st |
| 2021-0613 | PPMI | Borrower 89 | 121+ | 07/01/22 | 9.500% | 450,000 | 98B Windhover Way | Martinez | CA | Land | 07/01/21 | 1st |
| **Total Unsecured Loans** | | | | | | **32,006,077** | | | | | | |
| **Total All Loans** | | | | | | **$ 68,069,691** | | | | | | |

**EXHIBIT C**

**PPM**
Intercompany: S-T Due To/Due From
As of December 31, 2025

PFF
(52)

| | | | | | Borrower Entities: | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PPMG (03) | PMMG (11) | PPMF (12) | PSWMG (31) | PSWNF (32) | PMC (41) | PPMI (51) | ~~POF (93)~~ | PPMP (91) | AHL (101) | | PRD | Hanf Cap | Total |
| **Lender Entity: Funds** | | | | | | | | | | | | | | |
| PPMF (12) | $0 | $23,106 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $7,352,234 | $3,655,470 | $11,030,810 |
| PSWNF (32) | 0 | | 1,794,126 | 764,118 | 0 | 0 | 770,000 | 0 | 0 | 0 | | 134,569 | 182,556 | 3,645,368 |
| PFF (52) | 0 | 0 | 13,747,638 | 0 | 0 | 727,577 | 38,861,179 | 0 | 0 | 0 | | 4,107,125 | 18,420,724 | 75,864,244 |
| POF (92) | 0 | 0 | 110,576 | 0 | 0 | 0 | 0 | 1,182,090 | 58,744 | 0 | | | | 1,351,410 |
| AF I (102) | 0 | 0 | 0 | 0 | 0 | 0 | 1,612,419 | 0 | 0 | 0 | | | | 1,612,419 |
| **Total** | **$0** | **$23,106** | **$15,652,340** | **$764,118** | **$0** | **$727,577** | **$41,243,598** | **$1,182,090** | **$58,744** | **$0** | | **$11,593,928** | **$22,258,749** | **$93,504,251** |
| | | | | | | | | | | | | | | |
| **Lender Entity: Op Cos/Hold Cos** | | | | | | | | | | | | | | |
| PPMG (03) | $0 | $0 | $251,182 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $22,714 | $0 | $273,896 |
| PNFMG (31) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 5,387 | 5,387 |
| PMC (41) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 4,849 | 0 | 4,849 |
| PPMI (51) | 1,740,552 | 323 | 18,753,766 | 344,126 | 3,264 | 2,595,878 | 0 | 0 | 729 | 7,503,303 | | 2,373,474 | 522,581 | 33,837,997 |
| AF I (101) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 |
| **Total** | **$1,740,552** | **$323** | **$19,004,948** | **$344,126** | **$3,264** | **$2,595,878** | **$0** | **$0** | **$729** | **$7,503,303** | | **$2,401,036** | **$527,968** | **$34,122,128** |
| | | | | | | | | | | | | | | |
| **Total Funds & Op Cos/Hold Cos** | 1,740,552 | 23,429 | 34,657,288 | 1,108,244 | 3,264 | 3,323,456 | 41,243,598 | 1,182,090 | 59,473 | $7,503,303 | | 13,994,965 | 22,786,717 | 127,626,379 |

DRAFT - FOR DISCUSSION PURPSOES ONLY